IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALEXANDRO KRIMAN, Plaintiff.

Case No. 3:25-cv-02266-E-BN

OFFICE DEPOT INC., Defendant.

**PLAINTIFF'S AMEND TO ORIGINAL PETITION AND JURY DEMAND TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES ALEXANDRO KRIMAN (hereinafter "Plaintiff"), filing this *First Amended Original Petition and Jury Demand,* complaining of OFFICE DEPOT, LLC and VEYER LOGISTICS (hereinafter "Defendants"), and would respectfully show the Court as follows:

**I. DISCOVERY CONTROL PLAN**

Plaintiff intends that discovery be conducted under Discover Level 2.

**II. PARTIES**

1. Plaintiff ALEXANDRO KRIMAN is an individual who resides in Denton County, Texas. At all times material to this lawsuit, Plaintiff was an employee of OFFICE DEPOT, LLC.

2. Defendant OFFICE DEPOT, LLC is a Delaware business corporation doing business in the State of Texas. Defendant OFFICE DEPOT, LLC may be served with process through their registered agent C T CORPORATION, located at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

3. Defendant VEYER, LLC is a Delaware business corporation doing business in the State of Texas. Defendant VEYER, LLC may be served with process through their registered agent C T CORPORATION, located at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

**III. JURISDICTION AND VENUE**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

_____

**ALEXANDRO KRIMAN,  Plaintiff, §**

**VS.**

**§**

**OFFICE DEPOT, LLC, AND § VEYER LOGISTICS,  Defendants.**

_____

4. This Court has jurisdiction over this lawsuit because the amount in controversy exceeds this

Court's minimum jurisdictional requirements.

5. The Court has jurisdiction over Defendants OFFICE DEPOT, LLC and VEYER, LLC a non-

resident, because OFFICE DEPOT, LLC and VEYER, LLC purposefully availed itself of the privileges and benefits of conducting business in Texas pursuant to §17.042, TEX. CIV. PRAC. & REM. CODE.

6. Venue is mandatory in Dallas County, Texas, pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE Section 15.002(a)(1), because all or substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.

**IV. NATURE OF THE CASE**

**Additionally, see 38 complains exhibit A for additional details and PowerPoint – exhibit B**

**Brief Overview:**
Plaintiff was originally hired as consultant by a 3rd party staffing agency to work inside Office Depot's offices and report to Director Chavarria, but then SVP Miller swiftly made Plaintiff to report to him (SVP Miller). Then, after several months working as a consultant, SVP Miller offered Plaintiff a full-time Sr. Financial Analyst role with Office Depot, because of the vision plaintiff had presented to SVP Miller to transform OD analytics. These are critical points that confirm SVP Miller being pleased with Plaintiff's performance. While serving SVP Miller plaintiff also received an excellent performance review covering 21 months, together with on-going verbal compliments. But, after plaintiff mentioned his applications to other internal OD roles, out of the blue without previous verbal and/or written warnings, SVP Miller swiftly demoted Plaintiff to report to someone less qualified than him, someone Plaintiff had recruited and have been supervising while assisting him with the backend databases related to the analytics reporting project he had envisioned for SVP Miller. Plaintiff arrived to Office Depot holding a Doctorate PhD in Business, Master's in Engineering, and 10+ years of experience that uniquely combine technical skills & cross-functional business experience, including previous managerial and consultancy experience.

The 38 complaints (Exhibit A) are all **interconnected** (a chain of tactics) and **interrelated** (all aimed at forcing Mr. Kriman to resign), forming a deliberate scheme by Office Depot to force Mr. Kriman's resignation. Therefore, they must not be treated as isolated incidents, as Office Depot claims. To facilitate readability, we address their 10 dismissal arguments, each backed by evidence (Exhibit C) and law, proving their arguments (no facts, isolated incidents, no EEOC knowledge, performance-based firing) are wrong.

Extensive research has been conducted using electronic means such as AI, internet search, together with human input.

| Defendant's Arguments | Key Complaint(s) but not limited to | Evidence, exhibit C | Why defendant argument Fails | Legal Basis |
|---|---|---|---|---|
| No knowledge of EEOC charge | Item 1, 29: Fired and e.g. attacked, harassed, retaliated, during EEOC probe; Defendant denied knowledge of EEOC. | See PowerPoint exhibit C | Emails show defendant knew; lie proves malice. | Texas Labor Code §21.055; *San Antonio Water Sys. v. Nicholas* (461 S.W.3d 131): Knowledge supports retaliation. |
| Performance-based termination, no discrimination/retaliation | Item 7,22,28. E.g. Plaintiff was hired as external consultant to report to Director Chavarria, but then swiftly to report to SVP Miller. Plaintiff went from external consultant to OD full time employee offered directly by SVP Miller. Also highly contradictory reviews between SVP Miller & Bouzek; fabricated issues. | See PowerPoint exhibit C | Plaintiff hiring history Records and contradictive reviews; timing post-EEOC/FMLA shows pretext and malice. | *Alamo Heights v. Clark* (544 S.W.3d 755): Pretextual discipline proves retaliation. |
| Unsubstantiated HR investigations | Item 31: Withholding HR results; ignored complaints. | See PowerPoint exhibit C | Refusal hides misconduct; pattern shows bad faith. | *San Antonio Water Sys. v. Nicholas* (461 S.W.3d 131): Inaction on complaints supports failure to stop retaliation. |
| No adverse action due to protected class | Items 5, 20, 21, 36: Blocked 11 internal jobs applications (not even interviews), accent comments, and "English skills" requirement with replacement job positing post-termination. | See PowerPoint exhibit C | Comments, job posting, rejections show bias; comparators promoted younger employees. All show malice. | Texas Labor Code §21.051; *AutoZone v. Reyes* (272 S.W.3d 588): Bias in promotions proves discrimination. |
| Constructive discharge not independent claim | Items 3, 6, 8, 14, 19, 34: Given a total of 209 courses (in 3 consecutive phases), micromanagement, isolation, overwork. | See PowerPoint exhibit C | Malice, pattern of intolerable acts to force resignation; not isolated. | *Baylor Univ. v. Coley* (221 S.W.3d 599): Unreasonable tactics support constructive discharge. |

| PTO not actionable without contract | Item 26: Unpaid 92 hours PTO and Bonus, timed termination post EEOC/FMLA to avoid payment. | See PowerPoint exhibit C | Adverse action during protected activity shows retaliation. | *Alamo Heights v. Clark* (544 S.W.3d 755): Post-protected activity harm is actionable. |
|---|---|---|---|---|
| IIED not viable in employment | Item 24: Intentional infliction of emotional distress; extreme abuse (micromanagement, overload, premeditated malice). | See PowerPoint exhibit C | Pattern of abuse after EEOC/FMLA shows retaliation, not just IIED; proves malice. | *Alamo Heights v. Clark* (544 S.W.3d 755): Adverse actions support retaliation. |
| Defamation lacks detail, privileged | Items 11, 27: False tenure reported to prospective employers after termination (17 vs. 39 months), despite notifying defendant about so-called error. | See PowerPoint exhibit C | Malicious lie post-termination and notice shows no privilege. | *Randall's v. Johnson* (891 S.W.2d 640): Malice overcomes privilege. |
| Breach of contract no enforceable terms | Item 23: SVP hyped Plaintiff with executive-like responsibilities by empowering plaintiff to lead projects, set vision/policy/guidelines, direct senior manager; then demoted to report to that manager by claiming "organizational changes" despite plaintiff being the only one affected among 9 direct reports to SVP Miller. | See PowerPoint exhibit C | Demotion pre-EEOC/FMLA, targeting only plaintiff, shows e.g. disrcrimination, retaliation as part of the scheme that escalated post-EEOC/FMLA; pattern proves pretext, malice. | *Alamo Heights v. Clark* (544 S.W.3d 755): Pretext actions supports retaliation. |
| Fraud no facts, lacks specificity | Item 25: provided false job title/duties during FMLA. | See PowerPoint exhibit C | Misrepresentation to sabotage FMLA shows malice. | *AutoZone v. Reyes* (272 S.W.3d 588): Adverse actions support retaliation. |

**Note:** See Exhibit A for all 38 complaints, backed by Exhibit C (slides 1-86), proving Office Depot's coordinated scheme to force Mr. Kriman's resignation.

**When looking at exhibit B, just to mention a few, we would like highlight some cases that have been filed against Office Depot, Veyer:**

| 9. Williams v. Office Depot Inc. (2000) | **Sealed** settlement in a **race discrimination and wrongful termination** case. | **Sealed Settlement** |
|---|---|---|
| 10. Siegel v. Office Depot Inc. (2001) | **Sealed** settlement in an **age** discrimination case. | **Sealed Settlement** |
| 1. Martinez v. Office Depot, Inc. | Plaintiff alleged **age** and national origin discrimination under the ADEA. Court granted summary judgment in part. | Discrimination |
| 2. Flores v. Office Depot, Inc. | $10 Million jury verdict for plaintiff who was terminated in **retaliation** for taking medical leave. Case revealed **contrived PIP and bad-faith HR investigation.** Plaintiff claimed fabricated termination for **refusing to fire an older employee who was about to become eligible for a retirement benefit.** | Retaliation, Bad-Faith HR |
| 5. Mayes v. Office Depot, Inc. (2003) | Plaintiff alleged discrimination based on race, sex, and **age** by being **denied promotion** to assistant manager. | Discrimination |
| 11. Luebano v. Office Depot, L.L.C. (2023) | 5th Circuit revived **FMLA interference** claims; employee on leave saw her job posted and was ultimately terminated. | Retaliation (FMLA) |
| 17. Carroll v. Office Depot, Inc. | African American and legally blind former employee alleged discrimination based on race and disability after being **passed over for a promotion.** Also asserted **FMLA violations.** | Discrimination, Retaliation |
| 14. Amy Mott v. Office Depot, Inc. | Part-time cashier claimed wrongful discharge, **interference with FMLA** rights, and retaliation. | Retaliation (FMLA) |
| 15. Khalfani Jama v. Office Depot Inc. et al | Plaintiff filed a complaint for **wrongful termination.** | Wrongful Termination |
| 27. Dolese v. Office Depot, Inc. | Affirmed summary judgment for Office Depot on race and **age** discrimination claims. | Discrimination |
| 30. Barnes v. Office Depot, Inc. | Alleged pregnancy discrimination and retaliation; company **made her life miserable before firing her to simulate fairness.** | Discrimination, Retaliation |
| 31. Baird v. Office Depot | Alleged **failure to promote** on at least three occasions. | Discrimination |
| 47. Melillo v. Office Depot, **Veyer** LLC | 9:2025cv81015, 8/15/2025. | FMLA discrimination |

| Allen Roberts Vs Office Depot **Veyer** | 1:2025cv01219, 7/7/2025 | Employment case. |
| Pai Vs The ODP corporation **Veyer** | 3:2023cv03279, 6/30/2023. | Employment case. |
| Brown Vs ODP corporation **Veyer** | 2:2024cv02510, 11/11/2024 | Employment case |

7. This is a civil action for but not limited to e.g. discrimination, retaliation, failure to stop retaliation, failure to accommodate, FMLA interference and retaliation, failure to promote/transfer, constructive termination/discharge, wrongful termination, retaliation & termination during EEOC investigation, and post-termination defamation (Libel) in violation of the Texas Labor Code, Title 21, and other relevant statutes, and FMLA/accommodation based on the Defendant's actions toward Plaintiff during and after Plaintiff's employment. (see exhibit table with 38 complaints).

**V. FACTUAL ALLEGATIONS – Additionally, see 38 complains exhibit A for additional details and PowerPoint – exhibit C**

8. Plaintiff began working for Defendant OFFICE DEPOT, LLC on July 27, 2020, as an external Consultant (but working internally at Office Depot) and thereafter hired as full-time employee by Office Depot, LLC. Plaintiff was terminated on October 23, 2023.

9. Plaintiff was initially hired as an external consultant (but working internally at Office Depot) and, due to his excellent work, was quickly offered a full-time role by SVP Miller, which reinforces Plaintiff good performance. Plaintiff served under Miller for two years with outstanding performance reviews and verbal congratulations as well. Altogether, Plaintiff worked for almost 3.5 years for OFFICE DEPOT, LLC.

10. During the course of Plaintiff's employment, Plaintiff was subjected to all sort of systemic tactics to force him to resign (see exhibit table with 38 complaints). Specifically, many younger employees were given opportunities while older employees were not, but instead hired as

as "consultants" of something. Furthermore, Plaintiff applied for a dozen internal jobs with OFFICE DEPOT, LLC, but was never even interviewed.

11. After Plaintiff applied to other internal roles and expressing to SVP Miller his interest in moving up the ladder, he was swiftly and unexpectantly reassigned to report to a less-qualified Sr. Manager, someone Plaintiff had recruited, provided direction to, and had previously verbally and in writing warned regarding his performance and behavior.

12. This orchestrated demotion publicly humiliated Plaintiff and was seemingly intended to push him toward resignation. Despite Plaintiff's numerous complaints to HR about

mistreatment, applications to many internal jobs, and pleas for reassignment, the situation worsened, particularly after he requested FMLA, accommodation, and filed with the EEOC.

13. The ongoing micromanagement, harassment, isolation, intimidations, threats, and retaliation created an intolerable work environment designed to force Plaintiff's departure. OFFICE DEPOT, LLC's actions not only caused immediate physical harm and emotional distress but also jeopardized Plaintiff's long-term career prospects.

14. Plaintiff's years of dedication and contributions to the company were swiftly dismissed through discriminatory retaliation and many other tactics. This detrimental experience eroded Plaintiff's confidence, trust in colleagues, and ability to pursue high-level roles aligned with his Ph.D. and expertise, leading to substantial lost income and career damage. He could have had a promising career with Office Depot.

15. The long-term abuse by OFFICE DEPOT, LLC, has profoundly impacted both the Plaintiff's professional trajectory and personal well-being.

16. Subsequently, Plaintiff began to experience increased retaliation for making the complaint. After Plaintiff conveyed to the SVP that he was applying to other internal roles, Plaintiff was asked to report to a Sr. Manager that took direction from Plaintiff. Plaintiff had previously given verbal warnings and a written warning to Sr. Manager due to performance and behavior issues.

17. Plaintiff also suffered further harm as Defendant failed to stop or address the ongoing

retaliation. Plaintiff informed HR innumerable times about the retaliation from the SVP and from the Sr. Manager and even asked to be transferred or to report to someone else.

18. Plaintiff's working conditions became intolerable as a result of the Defendant's actions, leading to constructive termination. Specifically, but not limited to (see 38 complaints from exhibit):

a. Between June and August 2023, Plaintiff was given a total of 209 online courses to complete along with his daily responsibilities after notifying filing with the EEOC and requesting FMLA and accommodation.

b. Plaintiff was removed from all his previous executive-level responsibilities and projects to entry-level responsibilities by the Sr. Manager.

c. Daily meetings with the Sr. Manager that last 1-1.5 hours were scheduled, including each end-of-day having to email the Sr. Manager.

d. Abusive excessive micromanagement with tactics designed to oppress and trigger a resignation

e. Changes to the work were constantly requested by the Sr. Manager, no matter how good the work was.

f. Sr. Manager constantly belittling and lecturing Plaintiff, intimidation and threats.

g. Cloud-based access to the analytics infrastructure that Plaintiff created with his hands, was removed by the Sr. Manager.

h. Additionally, he received two performance PCD/PIP without previous warnings that also overlapped in time to force him to leave.

i. Sr. Manager applied new rules to Plaintiff's job by asking to work a minimum of 10 hours/day plus weekends when needed.

j. Isolated from the rest of the team, Plaintiff was never introduced to a new analyst in the team, which is not the way teams operate at OD.

k. Changes were made to job his title to portrait Plaintiff as a backend database developer/coder (not his line of expertise) which was later corrected after Plaintiff complained.

l. Attempt to change responsibilities by forcing database backend development.

m.      Work outside Plaintiff's area of expertise was requested.

n. Applied to a dozen internal OD jobs but were never interviewed, despite Plaintiff uniquely high qualifications

19. Plaintiff requested accommodations and Family Medical Leave. OFFICE DEPOT, LLC

violated FMLA by doing the following:

a. PIP given to Plaintiff after requesting FMLA and Accommodation.

b. Meetings were changed to conflict with Plaintiff's request for FMLA time.

c. Office Depot made changes to standard ADA form when requesting a second accommodation by including customized questions to intrude in Plaintiff's health condition (doctor-patient confidentiality)

d. Provided false documentation during FMLA request to the doctor to change Plaintiff's job title and description as a way to try to increase the need for Plaintiff's presence at the office and to obtain what is considered patient-Doctor confidentiality.

e. Harassed and terminated while requesting second FMLA and Accommodation.

20. After Plaintiff filed a complaint with the Equal Employment Opportunity Commission

(EEOC), he was terminated. OFFICE DEPOT, LLC advised EEOC that they were unaware of the Plaintiff's complaint with the EEOC although Plaintiff notified OFFICE DEPOT, LLC's human resource department including many HR individuals and the human resource department's vice president.

21. OFFICE DEPOT, LLC provided false information to potential employers indicating that Plaintiff's tenure was 17 months although in reality he worked for OFFICE DEPOT, LLC for almost three and a half (3.5) years. Plaintiff notify Office Depot, LLC about this, but no changes were made to the employment reports made by Office Depot, LLC.

22. OFFICE DEPOT, LLC purposely terminated Plaintiff before receiving his $10,000 bonus for his 2022 performance. Contradictory performance reviews (SVP Vs Richard) and the time-range they covered (SVP review=21 months, Richard review=8 months); because of Richard's poor performance review and termination time, Plaintiff lost his bonus.

23. Plaintiff filed a charge of discrimination with the EEOC on July 6, 2023.

24. The EEOC issued a Right to Sue Letter on November 20, 2024.

25. As a result of Defendant's actions, Plaintiff has suffered substantial harm, including a promising career with OD, emotional distress, lost wages, and other damages.

26. Furthermore, Plaintiff has suffered difficulty sleeping, weakness, anxiety, heart palpitations, nervousness, sweating, high blood pressure, nausea, gas, heartburn, digestive and urination complication with often desire to release and loss of earnings.

## VI. CAUSES OF ACTION

*A. Discrimination (Title VII, ADA, Chapter 21, Texas Labor Code §21.051)*

27. Plaintiff realleges and incorporates by reference the preceding paragraphs.

28. Defendants' conduct constitutes unlawful discrimination in violation of the Texas Labor Code §21.051. Defendants discriminated against Plaintiff on the basis of age and accent, causing Plaintiff harm as set forth above.

29. Plaintiff was at time of employment fifty-seven (57) year old Hispanic with accent and Jewish.

30. Defendant made accent comments toward Plaintiff.

31. Defendant posted an ad for Plaintiff's previous position stating "English Skills" needed and upgraded role to "manager".

32. Defendant provided HR with fake reviews of Plaintiff claiming he was underperforming.

33. Defendant's actions constitute unlawful employment practices in violation of Title VII, the ADA, and the Texas Labor Code.

*B. Retaliation (Texas Labor Code §21.055)*

34. Plaintiff realleges and incorporates by reference the preceding paragraphs.

35. Defendants retaliated against Plaintiff for engaging in protected activity under the Texas Labor Code §21.055, specifically Plaintiff's complaint of discriminatory treatment, causing Plaintiff harm as set forth above.

36. Defendants fired Plaintiff on October 23, 2023, during the EEOC investigation that was filed on July 6, 2023.

37. Defendants fired Plaintiff while processing second accommodation and FMLA which were initially filed on August 31, 2023.

38. Defendants blocked eleven (11) internal jobs applications despite Plaintiff's unusually high qualifications and accomplishments.

39. Plaintiff was replaced with a manager role post-termination.

40. Defendants reported to potential employers that Plaintiff worked with them for only seventeen (17) months instead of thirty-nine (39) months.

41. Defendants caused Plaintiff to lose executive career.

42. Defendants did not pay Plaintiff's 2023 pro-rated bonus from August to December.

43. Defendants underpaid Plaintiff for executive work.

44. Defendants interfered with future employment opportunities by disclosing wrong tenure at OD.

45. Defendants fabricated performance issues of Plaintiff after discussing promotion wishes.

46. Defendants denied having knowledge of the July 6, 2023, EEOC filing despite emails sent to HR.

47. Defendants manipulated PIPs post FMLA.

48. Defendants withheld HR investigation results to provide in writing. Defendants refused transparency to hide their unsubstantiated claims and to dodge accountability.

49. Plaintiff was targeted by Defendants after SVP praised him for analytics work. *C. Failure to Stop Retaliation (Texas Labor Code §21.055)*

50. Plaintiff realleges and incorporates by reference the preceding paragraphs.

51. Defendants had knowledge of the retaliatory conduct and failed to take prompt and effective remedial action to stop the retaliation, in violation of Texas Labor Code §21.055.

52. Defendant ignored innumerable HR complaints Plaintiff made.

53. Defendant failed to take reasonable steps to prevent ongoing retaliation after Plaintiff reported it.

*D. Constructive Termination (Texas Common Law)*

54. Plaintiff realleges and incorporates by reference the preceding paragraphs.

55. Defendants gave Plaintiff 209 training courses to complete.

56. Defendants demoted Plaintiff from reporting to SVP to Richard after two (2) years of stellar work.

57. Defendants micromanaged Plaintiff with daily meetings and emails.

58. Defendants performed contradictory reviews causing Plaintiff to lose 40% of bonus.

59. Defendants forced ten (10) hour workdays including weekend against SVP's 40-hour deal.

60. Defendants changed the FMLA ADA form to get more information out of Plaintiff.

61. Defendants isolated Plaintiff from the analytics team.

62. Defendants changed Plaintiff's job titles and duties for FMLA.

63. Defendants exploited Plaintiff's ideas without proper credit to Plaintiff.

64. Defendants overloaded Plaintiff with work while Plaintiff was overseas due to bereavement.

65. Defendant made working conditions so intolerable that Plaintiff was forced to resign. In the alternative, Plaintiff was wrongfully terminated in violation of public policy and statutory protections.

*E. Termination DuringEEOC Investigation*

66. Plaintiff realleges and incorporates by reference the preceding paragraphs.

67. Plaintiff was terminated in retaliation for engaging in the EEOC process, in violation of federal and state law.

*F. Defamation–Libel(Post-Termination)*

68. Plaintiff realleges and incorporates by reference the preceding paragraphs.

69. Defendant made false, defamatory written statements about Plaintiff post-employment with actual malice, causing reputational and economic harm.

*G. Breach of Contract*

70. Plaintiff realleges and incorporates by reference the preceding paragraphs.

71. Defendant breach of implied contract. Defendant hyped Plaintiff up as executive material, then terminated him.

*H. Intentional Infliction of Emotional Distress with Retaliation.*

72. Plaintiff realleges and incorporates by reference the preceding paragraphs.

73. Plaintiff experienced extreme abuse including but no limited to micromanagement, training overload, and separation from the team.

off.

*I. Fraudulent Misrepresentation*

74. Plaintiff realleges and incorporates by reference the preceding paragraphs.

75. Plaintiff was hired as an analyst and pushed to the backend coding. *J. Failure to Paid Time Off*

76. Plaintiff realleges and incorporates by reference the preceding paragraphs.

77. Defendants violated Texas Labor Code by not paying Plaintiff ninety-two hours of paid time

## VII. DAMAGES

78. As a direct result of Defendants' actions, Plaintiff has suffered economic damages, including lost wages and benefits and a promising career with OD, as well as non-economic damages, including emotional distress and pain and suffering. Plaintiff is seeking $7,055,000. *Please see attached Specific Dollar Value Chart attached hereto as Exhibit A.*

79. Plaintiff seeks all available damages under Title VII of the Civil Rights Act of 1964, including but not limited to compensatory damages, punitive damages, back pay, front pay, and future earnings due to losing a promising career with OD.

## VIII. CONDITIONS PRECEDENT

80. Plaintiff has exhausted all administrative prerequisites, including timely filing a charge with the EEOC and/or Texas Workforce Commission. Plaintiff files this action with the applicable statutory timeframes.

## IX. REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court:

1. Award Plaintiff damages for economic and non-economic harm, including backpay, front pay, and punitive, compensatory damages and a promising career with OD;

2. Award punitive damages for Defendant's willful, malicious, and/or grossly negligent conduct;

3. Award attorney's fees and costs of court;

4. Award pre- and post-judgment interest as allowed by law;

5. Award any other relief the Court deems just and proper.

**X. PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court grant the following relief:

1. Judgment in favor of Plaintiff for all damages, costs, and other relief sought herein;

2. A trial by jury on all issues so triable;

3. Any other relief that the Court deems just and proper.

Date: September 17, 2025

Respectfully submitted,

Alexandro Kriman

By: **ALEXANDRO KRIMAN**

_____

830 Senna Drive  Argyle, Texas 75226 – tel. (949) 394-5895, Email: alexkriman@hotmail.com - *Pro Se*

EXHIBIT A

(38 complaints)

| Item # | Specific complaint Items | Dollar Value | Why | Legal Basis, Defendant Argument, Plaintiff Proof | Supporting Case Law | Slide # for complaint explanation and proof, not limited to | Related complaint slides |
|---|---|---|---|---|---|---|---|
| 1 | Firing during EEOC investigation (7/6/23 filed, 10/23/23 fired) | 150,000 | Retaliation mid-probe—hit income/trust. Premeditated malice | **Legal Basis**: Retaliation and FMLA interference (Texas Labor Code §21.055; 29 U.S.C. §2615), Federal FMLA retaliation (29 U.S.C. §2615). Back pay $103K + benefits 10/23/23 to trial and lost of deserved promotions. **Defendant Argument**: Timing alone insufficient for causation. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Close timing plus adverse actions infer retaliation. | Slides 3,5, 55 | These 38 complaints, are supported by an 86-page PowerPoint presenting a chronology of events, a detailed account of Office Depot's actions, and supporting evidence, which collectively demonstrate they are all interconnected (a chain of tactics) and interrelated (all aimed at forcing Mr. Kriman to resign), which conveys pattern of systematic tactics deployed over time to create negative documentation, coerce resignation, and undermine |
| 2 | Terminating while processing 2nd accommodation/FMLA, altered ADA form (8/31/23) | 125,000 | Sabotaged health rights—added stress. Premeditated malice | **Legal Basis**: FMLA interference/retaliation (29 U.S.C. §2615; Texas Labor Code §21.055). Lost wages during accommodation period. **Defendant Argument**: No specific acts alleged. | *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. 2012): FMLA retaliation via adverse actions post-request. | Slides 75 | |
| 3 | Giving 209 online training courses | 75,000 | Oppressive busywork to force resignation. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No specific retaliation facts. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Adverse actions post-protected activity support retaliation. | Slide 79, 83 | |
| 4 | Demoting from Executive-level duties to entry-level duties (Bouzek) | 200,000 | Humiliation, career stall—although SVP praised, reporting to someone took direction from Kriman. Premeditated malice. | **Legal Basis**: Adverse action (Texas Labor Code §21.051, §21.055). Monthly salary difference executive vs entry-level duties. **Defendant Argument**: No adverse action occurred. | *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d #47 (5th Cir. 2000): Demotion to subordinate is adverse action. | Slides 84,83, 4,5, 7, 15, 17,19,20, 21,35 | |
| 5 | Blocking 11 internal job apps | 300,000 | Killed promo path—bias against age/Hispanic/accent/Jewish. Premeditated malice | **Legal Basis**: retaliation (§21.055) and Discrimination (Texas Labor Code §21.051). Lost promotional salary increases per blocked position. **Defendant Argument**: No comparators alleged. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Comparator evidence supports discrimination. | Slides 4, 7, 14, 55, 59, 60 | |
| 6 | Micromanaging with daily meetings/emails | 50,000 | Entry-level work after exec-level—retaliatory. Daily emails and meetings 1-1.5 hours. Premeditated malice | **Legal Basis**: Retaliation via hostile environment (Texas Labor Code §21.055) and constructive termination (Texas Common Law). **Defendant Argument**: No specific harassment facts. | *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126 (Tex. App. 1999): Micromanagement supports hostile environment. | Slide 4, 5, 7, 37, 38, 53, 55, 56, | |
| 7 | Contradictory reviews losing 40% bonus | 40,000 | SVP's praise vs. Bouzek's lies—lost bonus. | **Legal Basis**: Retaliation (Texas Labor Code §21.055). bonus amount owed with Interest and penalties. **Defendant Argument**: No contract for bonus, not adverse. | *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. 2012): Bonus denial post-protected activity supports retaliation. | Slides 5, 11, 15, 17, 24, 28,45,56 | |
| 8 | Forcing 10-hour days/weekends | 100,000 | Broke SVP's 40-hour deal—retaliatory. Demands 10+ hrs/day plus weekends. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). Disparate treatment - forced longer hours than similarly situated employees. **Defendant Argument**: Work hours not actionable. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Adverse actions post-protected activity support retaliation. | Slide 5, 45, 46, 47, 51, 55, 56, 83 | |
| 9 | Ignoring long-term complaints to HR | 75,000 | HR enabled retaliation, no action. Premeditated malice. | **Legal Basis**: Failure to stop retaliation (Texas Labor Code §21.055). **Defendant Argument**: No facts of inaction. | *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131 (Tex. 2015): Inaction on complaints supports retaliation. | Slide 4, 5, 38, 45, 53, 54, 56, 57, 58 | |
| 10 | Replacing with manager role post-firing | 100,000 | Proves promotion capability—bias. | **Legal Basis**: Discrimination (Texas Labor Code §21.051). Salary differential between plaintiff role and manager replacement role. **Defendant Argument**: No comparators or bias. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Replacement evidence supports discrimination. | Slide 80, 81 | |
| 11 | After termination - Reporting 17 months tenure instead of 39-libel | 100,000 | Defamation—ODP was warned Dec 2023, no fix. Premeditated malice | **Legal Basis**: Defamation (libel). Lost Office Depot career progression and tenure benefits. **Defendant Argument**: Statements privileged.. | *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640 (Tex. 1995): False statements with malice actionable. | Slide 82 | |
| 12 | Changing FMLA/ADA form to intrude | 60,000 | Intruded doctor-patient confidentiality. Premeditated malice | **Legal Basis**: retaliation (§21.055) and FMLA interference (29 U.S.C. §2615). **Defendant Argument**: No interference alleged. | *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. 2012): Improper FMLA process supports interference. | Slide 75 | and undermine |

| # | Claim | Amount | Description | Legal Basis / Defendant Argument | Case Citation | Slides |
|---|---|---|---|---|---|---|
| 13 | Lost executive career path (PhD, analytics) | 1,500,000 | Decades of 6 figures roles and promotions gone—although SVP praised plaintiff and hire him from external consultant to full-time employee. SVP Miller's review confirms exec potential, tied to bias/retaliation. | **Legal Basis**: Damages from discrimination/retaliation (Texas Labor Code §21.051, §21.055). **Defendant Argument**: Conclusory damages claim. | *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012): Career loss compensable in discrimination. | Slide 5, 7, 9, 12, 17, 22, 24, 28, 31, 38, 45, 53, 55, 83 |
| 14 | Isolation from analytics team, no contact. | 40,000 | Sabotage, loneliness—retaliatory. Premeditated malice. | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No adverse action. | *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126 (Tex. App. 1999): Isolation supports hostile environment. | Slide 7, 44, 45, 55, 56, 83 |
| 15 | Provided new job title/duties for FMLA | 50,000 | Lied to doctor with fake job title and duties document—added stress. False title "Sr. Financial Systems" on FMLA form. Premeditated malice | **Legal Basis**: retaliation (§21.055) and FMLA interference (29 U.S.C. §2615). **Defendant Argument**: No misrepresentation shown. | *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. 2012): False job info in FMLA process is interference. | Slide 62, 63 |
| 16 | Not paying 2023 pro-rated bonus-convenient timing | 20,000 | Owed $15K + damages—retaliatory. | **Legal Basis**: Retaliation (Texas Labor Code §21.055). bonus with Interest and penalties. **Defendant Argument**: No contract for bonus.. | *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. 2012): Bonus denial post-protected activity supports retaliation. | Slides 38, 53, |
| 17 | Underpaying for exec work while hired as Sr. analyst | 250,000 | $85K/yr gap x 3.5 yrs—bias. Premeditated malice to abuse employee. | **Legal Basis**: Damages from discrimination (Texas Labor Code §21.051). Monthly underpayment plus interest and penalties. **Defendant Argument**: Conclusory claim. | *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012): Underpayment tied to bias compensable. | Slide 5, 7, 9, 12, 17, 22, 23, 24, 28, 31, 38, 45, 53, 55, 83 |
| 18 | Exploiting ideas w/o credit | 100,000 | Stole analytics vision (360 Logistics)-retaliatory. Premeditated malice to abuse employee. | **Legal Basis**: constructive termination (Texas Common Law), Discrimination/retaliation (Texas Labor Code §21.051, §21.055). Failure to provide professional recognition. Lost promotional opportunities due to lack of credit for contributions. **Defendant Argument**: No intent shown. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Exploitation then adverse action supports discrimination. | Slide 7, 23, 53, 56, 83 |
| 19 | Bereavement overload, no workload cut | 25,000 | Piled work while grieving—retaliatory.  Premeditated malice. | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No adverse action. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Adverse actions post-protected activity support retaliation. | Slide 85 |
| 20 | Accent comments, not understanding by SVP Miller | 50,000 | National origin bias, humiliation. Premeditated malice | **Legal Basis**: constructive termination (Texas Common Law), Discrimination (Texas Labor Code §21.051). **Defendant Argument**: No intent shown. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Discriminatory comments support national origin claim. | Slide 5, 7, 38, 45, 55, 81, 84 |
| 21 | Post-firing job posting needing "English skills" | 75,000 | Proof of bias, not performance. Premeditated malice | **Legal Basis**: retaliation (§21.055), Discrimination (Texas Labor Code §21.051). **Defendant Argument**: No bias shown. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Job ads implying bias support discrimination. | Slide 80, 81 |
| 22 | Defamation from Bouzek's false claims | 100,000 | Fake overlapping contradictory reviews, trashed reputation. Premeditated malice | **Legal Basis**: Defamation (libel). **Defendant Argument**: Statements privileged. | *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640 (Tex. 1995): False performance claims with malice actionable. | Slides 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 23 | Breach of implied contract (SVP's "exec-level" remarks) | 150,000 | SVP hyped Plaintiff with executive-like responsibilities by empowering plaintiff to lead projects, set vision/policy/guidelines, direct senior manager; then demoted to report to that manager pre-EEOC/FMLA by claiming "organizational changes" despite plaintiff being the only one affected among 9 direct reports to SVP Miller. Premeditated malice. | **Legal Basis**: Retaliation (Texas Labor Code §21.051), Discrimination (§21.051), Constructive Termination (common law). Specific contract terms breached, lost promotional opportunity value. **Defendant Argument**: No specific contract terms. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Adverse actions post-protected activity support retaliation. | Slide 84, 83, 4,5, 7, 11, 15, 17,19,20, 21,35 |

employee well-being, rather than being isolated incidents.

Hence, this cumulative conduct establishes the evidence for the 38 complaints presented. Therefore, reviewing the entire PowerPoint, beyond the specified slides, is critical for a clear and accurate understanding of the full situation.

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 | Intentional infliction of emotional distress | 600,000 | Extreme abuse—micromanagement, overload. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055; IIED preempted). Physical symptoms: insomnia, gastrointestinal distress, anxiety, hypertension caused by workplace stress. **Defendant Argument**: IIED not viable in employment. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Pattern of adverse actions supports retaliation. | Slides 53, 56, 84 |
| 25 | Fraudulent misrepresentation attempt with new job title/description(analyst to backend duties) | 75,000 | Lied about job scope—set for failure during FMLA/accommodation. Job duties changed to backend, adverse treatment coinciding with protected activity. Premeditated malice | **Legal Basis**: Discrimination/retaliation (Texas Labor Code §21.051, §21.055; fraud). **Defendant Argument**: Lacks Rule 9(b)-like specifics. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Adverse actions support discrimination/retaliation. | Slide 9, 63 |
| 26 | Violation of Texas Labor Code (unpaid PTO, 92 hrs) | 10,000 | Denied $5K + penalty, terminated during EEOC, FMLA/accommodation. Premeditated malice. | **Legal Basis**: Retaliation (Texas Labor Code §21.055; no PTO mandate but adverse action post EEOC). **Defendant Argument**: No contract/policy alleged. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Adverse actions post-protected activity support retaliation. | Slide 38 |
| 27 | Interference with future employment (tenure lie) | 125,000 | Sabotaged job hunt—defamation, libel, Premeditated malice | **Legal Basis**: Defamation (libel). Lost job opportunities due to false information. **Defendant Argument**: Statements privileged. | *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640 (Tex. 1995): False statements with malice actionable. | Slide 82 |
| 28 | Fabricating performance issues post-promo role for Bouzek | 150,000 | SVP praised, Bouzek tanked—pretext. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation shown. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Pretextual discipline supports retaliation. | Slides 9, 10, 11, 12, 13, 14, 15, 17, 43 |
| 29 | Denying knowledge of 7/6/23 EEOC charge | 125,000 | Lied to EEOC—obstructs justice. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). Obstruction of EEOC process. **Defendant Argument**: No facts of knowledge. | *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131 (Tex. 2015): Employer knowledge supports retaliation. | Slide 3, 5, 38 |
| 30 | Manipulating PIPs to hide retaliation | 100,000 | Overlapping PIPs post-FMLA/EEOC. PIPs 5/3/23, 6/28/23 show rigged timing post-EEOC/FMLA. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation shown. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Unwarranted PIPs post-protected activity support retaliation. | Slides 43 |
| 31 | Withholding HR investigation results and failure to stop retaliation | 100,000 | Hid claims, dodged accountability, despite documented requests. Premeditated malice | **Legal Basis**: Retaliation/failure to stop (Texas Labor Code §21.055). Denial of due process. Refusal to provide investigation findings despite documented requests. **Defendant Argument**: No facts of inaction. | *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131 (Tex. 2015): Failure to address complaints supports retaliation. | Slide 79 |
| 32 | Targeting post-SVP praise for analytics | 200,000 | Exploited, then sabotaged—360 Logistics. Premeditated malice | **Legal Basis**: Discrimination/retaliation (Texas Labor Code §21.051, §21.055). **Defendant Argument**: No intent shown. | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Exploitation then adverse action supports discrimination. | Slide 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 33 | Wrongful termination | 160,000 | Based on discrimination/retaliation, and post EEOC, FMLA, accommodation. Pattern. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation shown. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Termination tied to retaliation actionable. | Slide 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 34 | Constructive termination/discharge | 150,000 | Gradual pressure to resign. Micromanagement, isolation, support retaliation pattern. Premeditated malice | **Legal Basis**: discrimination (§21.051), Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation shown. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Pattern of adverse actions supports retaliation | Slides 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 35 | Systematic retaliation | 200,000 | Ongoing pre & post-EEOC/FMLA, PIPs, micromanagement, isolation show pattern. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation shown. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Pattern of adverse actions supports retaliation. | Slides 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 36 | Discrimination (age, Hispanic, accent, Jewish) | 250,000 | Bias in promotions, job posted ad, comments. "English skills". Accent comments, job rejections, and post termination. Premeditated malice | **Legal Basis**: Discrimination (Texas Labor Code §21.051). **Defendant Argument**: No comparators/intent.). | *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008): Comments, comparators support discrimination. | Slides 3, 9, 10, 11,12,13,14,15, 17, 73,83 |

| | | | | | |
|---|---|---|---|---|---|
| 37 | Retaliation post-EEOC/FMLA | 175,000 | Punitive damages—malice. PIPs, FMLA conflicts post-EEOC/FMLA. Premeditated malice | **Legal Basis**: Retaliation (Texas Labor Code §21.055). **Defendant Argument**: No causation or malice. | *Alamo Heights ISD v. Clark*, 544 S.W.3d 755 (Tex. 2018): Malicious retaliation supports punitive damages. | Slides 3, 9, 10, 11,12,13,14,15, 17, 73,83 |
| 38 | Punitive damages—malice, willful misconduct | 900,000 | Pure premeditated malice, revenge, Exploitation, lies, sabotage pattern show willful intent. | **Legal Basis**: Punitive damages (Texas Labor Code §21.2585). Corporate liability for willful misconduct. **Defendant Argument**: No willful intent. | *Apache Corp. v. Davis*, 573 S.W.3d 475 (Tex. App. 2019): Malice in discrimination/retaliation justifies punitives. | Slides 3-85 |
| **TOTAL** | | **7,055,000** | | | | |

# EXHIBIT B

Exhibit B lists 250 lawsuits filed against Office Depot, demonstrating a consistent, company-wide pattern of employment-related issues such as discriminatory, retaliatory, and unlawful practices similar to the 38 interconnected complaints in Exhibit A. These cases, spanning multiple jurisdictions, include e.g. wrongful termination, retaliation for protected activities, discrimination, consumer fraud, securities fraud, wage violations, and even sealed employment disputes. Therefore, the plaintiff's case is not an isolated incident as the defendant tries to portray it; instead it is one manifestation within a systemic pattern of misconduct. Defendant's own large history of unlawful practices requires presenting the magnitude of the problem to refute their arguments of isolated incidents or lack of merit.

| Case Name | Details & Summary | Category |
|---|---|---|
| 1. Martinez v. Office Depot, Inc. | Plaintiff alleged age and national origin discrimination under the ADEA. Court granted summary judgment in part. | Discrimination |
| 2. Flores v. Office Depot, Inc. | $10M jury verdict for plaintiff who was terminated in retaliation for taking medical leave. Case revealed contrived PIP and bad-faith HR investigation. Plaintiff claimed termination for refusing to fire an older employee who was about to become eligible for a retirement benefit | Retaliation, Bad-Faith HR |
| 3. Anderson v. Office Depot, Inc. | Involved allegations of racial discrimination. | Discrimination |
| 4. Unnamed 2023 Knee Surgery Case | An assistant store manager had bias claims revived after being fired for taking protected leave for knee surgery. | Retaliation, Discrimination |
| 5. Mayes v. Office Depot, Inc. (2003) | Plaintiff alleged discrimination based on race, sex, and age by being denied promotion to assistant manager. | Discrimination |
| 6. Janie Davis v. Office Depot, Inc. (2016) | Plaintiff alleged racial discrimination, asserting violations of the Civil Rights Act and Texas Labor Code. | Discrimination |
| 7. Sheri Vigoda v. Office Depot (2009) | Sued alleging unlawful interference, discrimination, and retaliation related to her rights under the FMLA. | Retaliation (FMLA) |
| 8. Wehrle v. Office Depot, Inc. (1996) | Plaintiff brought forward claims of sexual harassment, alleging a hostile work environment. | Discrimination |
| 9. Williams v. Office Depot Inc. (2000) | Sealed settlement in a race discrimination and wrongful termination case. | Sealed Settlement |
| 10. Siegel v. Office Depot Inc. (2001) | Sealed settlement in an age discrimination case. | Sealed Settlement |
| 11. Luebano v. Office Depot, L.L.C. (2023) | 5th Circuit revived FMLA interference claims; employee on leave saw her job posted and was ultimately terminated. | Retaliation (FMLA) |
| 13. Ronnie v. Office Depot, LLC (2023) | Eleventh Circuit clarified the reasonable-belief standard for whistleblowers alleging unlawful retaliation under the Sarbanes-Oxley Act. | Retaliation (Whistleblower) |
| 14. Amy Mott v. Office Depot, Inc. | Part-time cashier claimed wrongful discharge, interference with FMLA rights, and retaliation. | Retaliation (FMLA) |
| 15. Khalfani Jama v. Office Depot Inc. et al | Plaintiff filed a complaint for wrongful termination. | Wrongful Termination |
| 16. Sutula-Johnson v. Office Depot (2018) | Employee resigned and sued for breach of contract and violations of Illinois Wage Payment and Collection Act. | Wage & Hour |
| 17. Carroll v. Office Depot, Inc. | African American and legally blind former employee alleged discrimination based on race and disability after being passed over for a promotion. Also asserted FMLA violations. | Discrimination, Retaliation |
| 18. CA Labor Fed v. Office Depot (2000) | Alleged unlawful discrimination against unions by establishing a policy of not delivering products to union offices. | Unlawful Practice |
| 19. FTC Malware Scan Case | $35M settlement for falsely claiming scans detected malware to trick customers into buying repair services. | Consumer Fraud |
| 20. Marketing Spam Class Action | Newly filed class action alleging Office Depot ignored repeated opt-out requests, sending marketing texts despite demands to stop. | Consumer Fraud |
| 21. Spyware Marketing Class Action | Facing class action over alleged spyware in marketing emails. | Consumer Fraud |
| 22. Bogus Sale Prices Class Action | Sued over alleged false advertising of sale prices. | Consumer Fraud |
| 23. Overtime Pay Class Action | Certified class action for failing to include incentive bonus pay in overtime wage calculations. | Wage & Hour |
| 24. Defective Chairs Penalty | Paid $3.4M penalty for knowingly failing to report defects in two models of office chairs. | Unlawful Practice |
| 25. CA Govt Contracts Mediation | Entered voluntary mediation over a 5-year-old lawsuit concerning government contracts with the State of California. | Unlawful Practice |
| 26. CA False Claims Act Settlement | Paid $80 million to settle a historic False Claims Act case concerning government contracts. | Unlawful Practice |
| 27. Dolese v. Office Depot, Inc. | Affirmed summary judgment for Office Depot on race and age discrimination claims. | Discrimination |

| | | |
|---|---|---|
| 28. Myers v. Office Depot, Inc. | Case dismissed at summary judgment for lack of evidence that harassment was based on sex. | Discrimination |
| 29. Agolli v. Office Depot, Inc. | Summary judgment for Office Depot on a disability discrimination claim. | Discrimination |
| 30. Barnes v. Office Depot, Inc. | Alleged pregnancy discrimination and retaliation; company made her life miserable before firing her to simulate fairness. | Discrimination, Retaliation |
| 31. Baird v. Office Depot | Alleged failure to promote on at least three occasions. | Discrimination |
| 32. EEOC v. Office Depot (2011) | The EEOC sued for disability discrimination after firing an employee with cancer for needing a temporary leave for treatment. | Discrimination |
| 33. People of CA v. Office Depot (2016) | Paid $1.35M to settle for systematically denying employees overtime pay and rest breaks. | Wage & Hour |
| 34. Duran v. Office Depot | Class-action alleging illegal misclassification of Assistant Store Managers to deny overtime pay. | Wage & Hour |
| 35. FTC v. Office Depot (2019) | $35M settlement for a tech support scam that tricked customers into buying unnecessary computer repairs. | Consumer Fraud |
| 36. U.S. ex rel. Taylor v. Office Depot | Paid $68.5M to resolve a False Claims Act lawsuit for systematically overcharging government agencies. | Unlawful Practice |
| 37. Office Depot FCPA Investigation | Disclosed an internal investigation into potential bribery of foreign officials in Kenya for government contracts. | Unlawful Practice |
| 38. Illinois Wage Law Lawsuit (2017) | Class-action alleging failure to pay commissioned sales employees minimum wage and overtime. | Wage & Hour |
| 39. Shareholder Lawsuit (2010) | Shareholder derivative lawsuit alleged executives made false statements about the company's financial health. | Securities Fraud |
| 40. Data Breach (2019) | Office Depot paid $1.4 million to settle FTC charges that it falsely claimed to have performed malware scans on customers' computers as part of a tech support scam. This is an alternate source for the previous class action. | Consumer Fraud |
| 41. SEC Filing - Bribery Allegations | Office Depot disclosed in an SEC filing that it had launched an internal investigation into potential violations of the Foreign Corrupt Practices Act (FCPA) related to operations in Kenya. | Unlawful Practice |
| 42. Overcharging Government Agencies | Office Depot paid $68.5 million to settle a False Claims Act lawsuit alleging it overcharged U.S. government agencies for office supplies. | Unlawful Practice |
| 43. Wage & Hour Lawsuit (Illinois, 2017) | A lawsuit alleged Office Depot failed to pay commissioned sales employees minimum wage and overtime, violating the Illinois Minimum Wage Law and IMWL. | Wage & Hour |
| 44. Shareholder Derivative Lawsuit (2010) | A shareholder lawsuit alleged that Office Depot executives made false and misleading statements about the company's financial condition, inflating its stock price artificially. | Securities Fraud |
| 45. Ruiz v. Home Depot (PR 3:00-cv-02082, 08/24/2000) | Employment action by a service representative who was terminated by the defendant when she requested an accommodation of fixed hours. | employment |
| 46. Rendon v. Office Depot (2025) | 370 Torts - Personal Property - Other Fraud | Fraud |
| 47. Melillo v. Office Depot, Veyer LLC | 9:2025cv81015, 8/15/2025. FMLA discrimination | FMLA discrimination |
| Allen Roberts Vs Office Depot Veyer | 1:2025cv01219, 7/7/2025. Employment case. | employment |
| Pai Vs The ODP corporation Veyer | 3:2023cv03279, 6/30/2023. Employment case. | employment |
| Brown Vs ODP corporation Veyer | 2:2024cv02510, 11/11/2024. Employment case | employment |
| Bonelli v. Office Depot | | employment |
| Bennet Vs Office Depot | | |
| Veale v. ODP Business Solutions, LLC | | employment |
| Benge v. Office Depot, LLC, et al | | employment |
| Mitchell v. Office Depot Inc. | | employment |

| | |
|---|---|
| Joe Phem v. Office Depot, Inc. et al | employment |
| Degross v. Office Depot Office Max | employment |
| Middlebrooks v. Office Depot, LLC | employment |
| Lopez v. Office Depot Inc. et al | employment |
| Andrew Kallsen v. Office Depot, LLC et al | employment |
| Luebano v. Office Depot, LLC | employment |
| Collinsworth v. Office Depot Inc | employment |
| SCEBBI v. OFFICE DEPOT INC | employment |
| Roberts v. Office Depot, LLC | employment |
| Rosa v. Action Logistics et al | employment |
| Shawn Martin v. Office Depot, Inc., et al | employment |
| Nick v. Office Depot, Inc. | employment |
| Minner v. Office Depot, Inc. | employment |
| Avnet v. Office Depot, Inc. | employment |
| Gooden v. Office Depot, Inc. | employment |
| John Moore v. Office Depot, Inc. et al | employment |
| Kolosova v. Office Depot et al | employment |
| Furtick v. Office Depot Inc. | employment |
| Miriam Tello v. Office Depot, Inc. et al | employment |
| Fernando Zotea v. Office Depot,Inc., et al | employment |
| Kolosova v. Office Depot, Inc. et al | employment |
| Darlak v. Office Depot, Inc. | employment |
| Burgos v. Office Depot, Inc. | employment |
| Weber v. Office Depot, Inc. et al | employment |
| Guy v. Office Depot, Inc. | employment |
| Thomas v. Office Depot, Inc. et al | employment |
| Barnett v. Office Depot Inc | employment |
| Alvin Alvarez v. Office Depot, Inc et al | employment |

| | | |
|---|---|---|
| Jama v. Office Depot, Inc. | | employment |
| Vang v. Office Depot, Inc. | | employment |
| Meadows v. Office Depot, Inc. | | employment |
| Boice v. Office Depot, Inc. | | employment |
| Stanford v. Office Depot Inc | | employment |
| Kaur v. Office Depot, Inc. | | employment |
| Koszuta v. Office Depot, Inc. | | employment |
| Singer v. Officemax, Incorporated et al | | employment |
| Kozak v. Office Depot, Inc. | | employment |
| CASTELLUCCIO v. OFFICE DEPOT, INC. | | employment |
| Sherfey v. Office Depot, Inc. | | employment |
| GALLOGLY v. OFFICE DEPOT et al | | employment |
| Kemper v. Office Depot Inc | | employment |
| Eddy Vinicio Gonzalez v. Office Depot, Inc. | | employment |
| PLUMMER v. OFFICE DEPOT, INC. | | employment |
| Berryman et al v. Office Depot, Inc. | | employment |
| BYRNE v. OFFICE DEPOT, INC. | | employment |
| Salcido v. Office Depot, Inc. | | employment |
| Pressley v. Office Depot, Inc. | | employment |
| Buice v. Office Depot, Inc. | | employment |
| Bauer v. Office Depot, Inc. | | employment |
| Nantambu v. Office Depot | | employment |
| Emrit vs Office Depot | | employment |
| Pierce v. Office Depot Inc | | employment |
| Danny King v. Office Depot, Inc. et al | | employment |
| Duncan v. Office Depot Inc | | employment |
| Thenbouapha v. Office Depot, Inc. | | employment |
| Beach v. Office Depot Inc | | employment |

| | | |
|---|---|---|
| Brito v. Office Depot, Inc. | | employment |
| Baird v. Office Depot | | employment |
| Woodcock v. Office Depot, Inc. | | employment |
| Johanna Isom v. Office Depot, Inc. et al | | employment |
| Tsang et al v. Office Depot, Inc. | | employment |
| Rhodes v. Office Depot, Inc. | | employment |
| Obiacoro v. Office Depot Inc. | | employment |
| Villalpando v. Exel Direct Inc. et al | | employment |
| Salazar v. Office Depot, Inc. | | employment |
| Sims v. Office Depot, Inc. | | employment |
| McDowell v. Office Depot, Inc. | | employment |
| Martinez v. Office Depot, Inc. | | employment |
| Talkington v. Office Depot, Inc. et al | | employment |
| Holliger v. Office Depot, Inc. | | employment |
| Gregory A Myers v. Office Depot Inc et al | | employment |
| Angela Whittaker v. Office Depot, Inc. et al | | employment |
| Kerns v. Office Depot Inc. | | employment |
| Tatum v. Office Depot, Inc. et al | | employment |
| Provine v. Office Depot, Inc. | | employment |
| Redmond v. Office Depot, Inc. | | employment |
| Woods v. Office Depot, Inc. | | employment |
| Agolli v. Office Depot, Inc. | | employment |
| Towns v. Office Depot et al | | employment |
| Maurice Simpson v. Office Depot Inc et al | | employment |
| David Soldan v. Office Depot Inc et al | | employment |
| Maurice McCullough v. Office Depot Inc et al | | employment |
| Reyes v. Office Depot, Inc. | | employment |
| ESUKA v. OFFICE DEPOT et al | | employment |

| | | |
|---|---|---|
| Ante v. Office Depot Business Services et al | | employment |
| Felder v. Office Depot Inc | | employment |
| Louis Coleman v. Office Depot, Inc. et al | | employment |
| Joseph Still v. Office Depot, Inc. et al | | employment |
| Impey v. Office Depot, Inc. | | employment |
| Ololade v. Office Depot, Inc. | | employment |
| ZECKMAN v. OFFICE DEPOT, INC. et al | | employment |
| Martinez v. Office Depot, Inc. et al | | employment |
| Harvey v. Office Depot, Inc | | employment |
| Butler v. Office Depot, Inc. | | employment |
| Murrell v. Office Depot, Inc. | | employment |
| BARNES v. OFFICE DEPOT, INC. | | employment |
| Derton v. Office Depot, Inc. | | employment |
| Woodward v. Office Depot of Texas, L.P. | | employment |
| Birch v. Office Depot Inc, et al | | employment |
| Dameron v. Office Depot, Inc. | | employment |
| Snell v. Office Depot, Incorporated et al | | employment |
| Myers v. Office Depot, Incorporated et al | | employment |
| Kleewein v. Office Depot | | employment |
| Carol Schermerhorn v. Office Depot Inc et al | | employment |
| Karen Davidian v. Office Depot Inc et al | | employment |
| Adams v. Office Depot Inc | | employment |
| Beekman et al v. Office Depot Inc | | employment |
| Higgins v. Office Depot Inc | | employment |
| Narayan v. Office Depot Inc | | employment |
| Pritchett v. Office Depot, Inc. | | employment |
| Dixon v. Office Depot, Inc. | | employment |
| Bloom v. Office Depot, Inc. | | employment |

| | |
|---|---|
| Ramirez v. Office Depot, Inc. | employment |
| Perry v. Office Depot | employment |
| Brenda Naun v. Office Depot Inc et al | employment |
| Hill v. Office Depot Inc | employment |
| Graham v. Office Depot Inc | employment |
| Armijo v. Office Depot, Inc | employment |
| Vielman v. Ofc Depot Inc, et al | employment |
| Donald Brown, et al v. Albertsons Inc, et al | employment |
| Bruce v. Office Depot Inc | employment |
| Riggins v. Office Depot Inc | employment |
| Bradshaw v. Office Depot Inc | employment |
| Milligan v. Office Depot Inc, et al | employment |
| Reynolds, et al v. Office Depot, Inc. | employment |
| Smith v. Office Depot, Inc. | employment |
| Mitchell v. Office Depot | employment |
| Cross, et al v. Office Depot | employment |
| LEWIS, et al v. OFFICE DEPOT INC | employment |
| Insco v. Office Depot Inc | employment |
| Dejene v. Office Depot, Inc | employment |
| Eubanks v. Office Depot, Inc. | employment |
| Sarti v. Ofc Depot Inc | employment |
| POLLOCK v. OFFICE DEPOT, INC. | employment |
| Baker v. Office Depot, Inc. | employment |
| Booth, et al v. Office Depot | employment |
| Gloria Gilmore v. Office Depot, et al | employment |
| Ronald C Carter v. Office Depot Inc, et al | employment |
| John Dante v. Office Depot Inc, et al | employment |
| Amador v. Office Depot Inc. | employment |

| | | |
|---|---|---|
| Gallegos v. Office Depot, Inc. | | employment |
| Galloway v. Office Depot, Inc. | | employment |
| Green v. Office Depot, Inc., et al | | employment |
| Stephanie White v. Office Depot, et al | | employment |
| SMALL v. OFFICE DEPOT, et al | | employment |
| DIMARCELLO v. OFFICE DEPOT, et al | | employment |
| Melissa Johnson v. Office Depot Inc, et al | | employment |
| Pino v. Office Depot Inc | | employment |
| Crandall, et al v. Office Depot Inc | | employment |
| Nedd v. Office Depot, Inc. | | employment |
| Rucker v. Office Depot, Inc., et al | | employment |
| Brown v. Office Depot | | employment |
| Riggs v. Boeing Company | | employment |
| Hassell, et al v. Office Depot, et al | | employment |
| Lebar v. Office Depot, Inc. | | employment |
| Braggs v. Office Depot, Inc. | | employment |
| Hassell v. Office Depot, et al | | employment |
| Sanders v. Office Depot Inc | | employment |
| Barnett v. Office Depot Inc, et al | | employment |
| Richardson v. Office Depot, Inc. | | employment |
| Nuh, et al v. Office Depot, Inc. | | employment |
| Byrne, et al v. Office Depot, Inc. | | employment |
| Rundblad v. Office Depot, Inc., et al | | employment |
| McDowell v. Office Depot | | employment |
| Morales, et al v. Office Depot | | employment |
| Gordon v. Office Depot #8 | | employment |
| Claxton v. Office Depot Inc | | employment |
| Franks, et al v. Office Depot Inc | | employment |

| | | |
|---|---|---|
| Crawford v. Office Depot Inc | | employment |
| Lockhart v. Office Depot Inc. | | employment |
| Osborne v. Office Depot, Inc. | | employment |
| Jones v. Office Depot, Inc. | | employment |
| Mott et al v. Office Depot, Inc. | | employment |
| Heck v. DAS Enterprises, Inc, et al | | employment |
| Cohen v. Office Depot, Inc., et al | | employment |
| Callozzo v. Ofc Depot Inc | | employment |
| Keasling v. Office Depot, et al | | employment |
| Cage v. Office Depot | | employment |
| Terrell, et al v. Office Depot Inc, et al | | employment |
| Salvato, et al v. Office Depot Inc, et al | | employment |
| Krulek v. Office Depot, Inc., et al | | employment |
| Garcia v. Eastman Inc, et al | | employment |
| Salvato, et al v. Office Depot Inc DE, et al | | employment |
| Terrell, et al v. Office Depot Inc DE, et al | | employment |
| Fertig v. Office Depot, Inc. | | employment |
| Carlisle v. Office Depot, et al | | employment |
| Willey v. Office Depot | | employment |
| TUTT, CYNTHIA v. OFFICE DEPOT, INC. | | employment |
| Wehrle v. Office Depot Inc, et al | | employment |
| Ahmed Dawlatly v. Office Depot Inc, et al | | employment |
| Susan C Carlson v. Office Depot Inc, et al | | employment |
| McLish v. Office Depot Inc, et al | | employment |
| Turner v. Office Depot Inc, et al | | employment |
| Richardson v. Office Depot, Inc., et al | | employment |
| Espinosa v. Office Depot Inc | | employment |
| DESMORE v. OFFICE DEPOT, et al | | employment |

| Class actions | | |
|---|---|---|
| Glasel v. Office Depot (2024) | Class action for violating the Telephone Consumer Protection Act (TCPA) by sending unsolicited texts after opt-out requests. https://topclassactions.com/lawsuit-settlements/tcpa/office-depot-class-action-claims-retailer-sends-unsolicited-text-messages-after-opt-out/ | |
| Encinas v. Office Depot (2024) | Class action alleging Office Depot embedded "spy pixels" in marketing emails to track recipients without consent. https://www.classaction.org/news/office-depot-facing-class-action-lawsuit-over-alleged-spyware-in-marketing-emails | |
| Phantom Discounts Lawsuit (2024) | Class action alleging deceptive "phantom" sale pricing violating California consumer laws. https://www.adexchanger.com/daily-news-roundup/wednesday-18122024/ | |
| False Discount Pricing (2025) | Whistleblower settlement over Office Depot overcharging government agencies, resulting in $77.5 million settlement. https://www.lieffcabraser.com/false-claims-act/office-depot/ | |
| False malware claims | Office Depot and tech support Support.com to pay $35 million for falsely claiming scan detected signs of malware. https://www.ftc.gov/business-guidance/blog/2019/03/office-depot-and-supportcom-pay-35-million-falsely-claiming-scan-detected-signs-malware-consumers | |
| Ignoring Op-Out | Newly filed class action lawsuit, Office Depot allegedly ignored repeated opt-out requests, sending marketing texts despite consumers' explicit demands to stop. https://natlawreview.com/article/paper-jammed-office-depot-stuck-after-ignoring-stop | |
| Marketing Spyware | Office Depot Facing Class Action Lawsuit Over Alleged Spyware in Marketing Emails. https://www.classaction.org/news/office-depot-facing-class-action-lawsuit-over-alleged-spyware-in-marketing-emails | |
| Bogus sales prices | Office Depot Sued Over Bogus Sale Prices https://www.adexchanger.com/daily-news-roundup/wednesday-18122024/ | |
| Overtime & Bonuses | Office Depot overtime lawsuit has been certified as a class action, opening the company to potentially thousands of claims. The lawsuit alleges that Office Depot failed to include incentive bonus pay when calculating employees' overtime wages https://www.lawyersandsettlements.com/lawsuit/office-depot-overtime-class-action-wage.html | |
| Duran v. Office Depot | A class-action lawsuit alleging Office Depot misclassified its Assistant Store Managers as exempt from overtime pay, thereby denying them wages. https://oag.ca.gov/system/files/attachments/press_releases/Office%20Depot%20Settlement%20Agreement_0.pdf | |

# EXHIBIT C
## (PowerPoint with evidence)

please refer to actual PowerPoint PPT extension file (attached) to see corresponding **slides numbers from exhibit A**

ALEXANDRO KRIMAN'S EVIDENCE – OFFICE DEPOT CASE

# OFFICE DEPOT (ODP) RESPONSE TO EEOC MENTIONED 5 BASIC POINTS:

1. INDICATES THAT ODP HAS POLICIES IN PLACE TO COMPLY WITH THE LAW, **ALTHOUGH WE ALL KNOW THAT MANY COMPANIES ACTUALLY BREAK THE LAW**

2. INDICATES THAT ODP WAS UNAWARE OF MR. KRIMAN FILLING A COMPLAINT WITH THE EEOC, **ALTHOUGH WE HAVE EVIDENCE THAT ODP KNEW THAT MR. KRIMAN FILED WITH THE EEOC**

3. PROVIDES COPIES OF THE PERFORMANCE MEASURES AGAINST MR. KRIMAN ("PCD" AND "PIP"), **ALTHOUGH WE WILL PROVE THAT THESE STEPS HAD NOTHING TO DO WITH PERFORMANCE, BUT WERE DESIGNED TO OPPRESS MR. KRIMAN TO FORCE HIM TO RESIGN**

4. PROVIDES COPIES OF MR. KRIMAN SUPERVISOR'S NOTES TO CONVEY UNDERPERFORMING, **ALTHOUGH YOU WILL SEE EVIDENCE OF SERIOUS CONTRADICTIONS AND "CONSTRUCTIVE TERMINATION"**

5. MENTIONS THAT MR. KRIMAN HAS NO PROOF OF DISCRIMINATION OR RETALIATION AGAINST HIM, **ALTHOUGH YOU WILL SEE EVIDENCE THAT PROVES OTHERWISE**

# FOREWORD

WE WILL PRESENT HERE THE WHOLE STORY VIA A COMPELLING ARRAY OF TANGIBLE VISUAL EVIDENCE TO DEMONSTRATE ODP'S DISCRIMINATION AND RETALIATION CULPABILITY, DEMONSTRATE THE UTILIZATONS OF GRADUAL & SYSTEMATIC TACTICS TO FORCE MR. KRIMAN TO RESIGN, TOGETHER WITH DEMONSTRATING THAT ODP HAS SKILLFULLY MANIPULATED WHAT TO SAY AND NOT TO SAY TO ATTEMPT TO AVOID PUNISHMENT.

*Mr. Kriman was hired 1st as an external consultant (but working inside OD) and due to his excellent work he was swiftly offered by SVP Miller a full-time role with ODP. Hence, he served SVP Miller for 2 years and received an excellent performance review. However, the unwarranted and abrupt sudden shift after informing SVP Miller of his application to other internal roles and desire to attain higher job titles, was responded by "singling out" Mr. Kriman with a deliberate orchestration of Mr. Kriman's transition from reporting to a high-ranking SVP to reporting to a Sr. Manager with lower qualifications than Mr. Kriman (AKA an "unfortunate restructure" according to ODP) – to report to a Sr. manager who was recruited by Mr. Kriman to assist him with his project and took direction from him (as requested by the SVP), which inflicted not only personal harm on Mr. Kriman, but also produced a profound sense of embarrassment that was purposefully orchestrated and displayed on front of the entire Office Depot organization to trigger Mr. Kriman's resignation.*

*Likewise, the persistent disregard for many complaints to HR, for a dozen of internal job applications, pleas to HR seeking for a fresh start away from his new supervisor, and the factual ongoing excessive micromanagement, systematic harassment and increment of the harassment following requests for (FMLA, Accommodation, and filing with the EEOC), intensified justified feelings of injustice due to e.g. discrimination, retaliation, harassment, isolation, profound injustice, and excessive micromanagement aimed at forcing him to resign.*

*Furthermore, Office Depot's persistent mistreatment has not only taken a toll on Mr. Kriman's immediate present and future health, producing pain & suffering, but also has far-reaching consequences for his future career trajectory. Over three years of dedication to Office Depot and Mr. Kriman's entire work that transformed analytics and allowed significant efficiencies for the company- with aspirations of a successful future - are now completely wasted due to an unwarranted termination due to discrimination.*

*Beyond this, the experience has eroded his confidence in both himself and in the ethical standards of coworkers and companies in general. This erosion impacts Mr. Kriman's confidence, his trust in future colleagues, and the ability to easily collaborate with future coworkers due to mistrust. It also undermines his confidence in aiming for top-tier positions that are well-aligned with his Doctorate PhD and top-notch work experience qualifications, resulting in a significant loss of potential income until his retirement. Therefore, we can undeniably state that the long-term abuse and damage caused by Office Depot's actions has adversely and profoundly impacted Mr. Kriman's professional career future trajectory.*

# BEFORE WE BEGIN, WE WOULD LIKE TO NOTICE THAT OFFICE DEPOT WAS MISLEADING AND UNTRUTHFUL IN THEIR RESPONSE TO EEOC

To whom it may concern:

Alexandro Kriman
To:Zoe Maloney
Cc:Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton
Thu 7/6/2023 9:40 PM



This is a formal complaint for retaliation, harassment, and discrimination based on being over 40, Hispanic, and having an accent.
I request that you investigate this matter and take appropriate action against Richard Bouzek.

The following are the events that I believe constitute retaliation, harassment, and discrimination:

I was hired as a Sr. Financial Analyst on August 2020; my job was to prepare reports for SPV Miller. Yet, due to my management consultant experience, SVP Miller approved my vision and plan to transform analytics for the company, so I was verbally put in charge of the project I created. After two years of developing 360 Logistics (nowadays called Veyer Intelligence) and other projects, collaborating with executives and managers across the organization, and receiving a successful review from SVP Miller, I approached him in May 2022 to discuss my career goals. I spoke to him about my interest in moving to other company areas for higher-level roles that better align with my qualifications. SVP Miller indicated that I had his full support and mentioned that my capabilities and contributions to the company's transforming analytics were already at the executive level.

After that conversation, several months passed, and I started reporting to Richard Bouzek. However, SVP Miller said it was because of his new responsibilities involving the company's transformation but emphasized that it had nothing to do with my performance. He also indicated that little should change and that my work should continue as usual with the difference that I report to Richard.

By the end of July 2022, once Richard Bouzek became my manager, I had an initial conversation with him. I asked for his help to attain another role anywhere across ODP Corp that could allow me to step away from the umbrella under SVP Miller. Richard indicated that I had his support and that, as SVP Miller suggested, things should not change regarding my work. Furthermore, remember that I disclosed my desire for other job opportunities to Zoe Malone and other HR executives.

However, despite my application to many internal roles, I have yet to be able to interview for any of the many positions I applied for or even be called by someone to develop a plan to transfer me to a new role. So, opportunities have not been presented despite my consistent good performance and contributions to the company as indicated in SVP Miller's review, my tenure with ODP, having a doctorate in business, a masters in engineering, and outstanding work experience. I was passed over for promotions, although plenty of Office Depot employees are younger and with less academic and work experience qualifications who are promoted to managerial and executive roles.

The above facts indicate that I am not wanted as an Office Depot employee and show clear discrimination against me because of my age, being Hispanic, and having an accent.

Furthermore, because of the above, I have been discriminated against and harassed, and retaliated against by Richard Bouzek. While I was leading business intelligence analytics under SVP Miller, on February 2022, I gave a formal written warning to Richard for underperforming in his work.

The above-written warning explains Richard's additional retaliation as well. Let's remember that my 1st performance review from SVP Miller (a seasoned high-level executive) involved 2020 & 2021 for a total of 21 months being evaluated when he provided my review, which indicated that I had done a "great job, innovating, collaborating, and driving the business."

In contradiction, Richard's 2022 review delivered on April 2023 evaluated only eight months (since Richard became my supervisor) and described me as an underperforming employee. However, he is a much less experienced corporate employee without previous work experience in business intelligence analytics (only systems administration and warehouse management experience). Still, regardless, it was a review that destroyed my reputation with the company.

Then, a month after delivering the 2022 yearly review, on 5/2/23, Richard proceeded with a PCD to further complain about my work. Then, less than two months later, on 6/28/23, Richard continued with another PIP to complain further about my work and verbally threatened to terminate my employment within the indicated 60 days or less if he didn't see improvement.

Moreover, Richard crafted for me an isolation culture. On December 2022, he hired another analyst for the team (Sudheer). However, Richard never introduced us; I have not spoken to Sudheer since he was hired, even though we are on the same team. Richard doesn't inform me about what is happening with veyer's intelligence, meets separately with Sudheer, and only Richard knows what each person is doing or the direction path where veyer intelligence is going. In essence, Richard implemented a top-secret management style, he keeps everything to himself.

In addition to the above, since I started to report to Richard, he also changed my job responsibilities and started to aggressively micromanage me with daily 1-1.5 hours meetings and demanding daily email status reports. First, by removing me from my leadership responsibilities while I reported to SVP Miller and then started to push my work much more on the back-end databases direction because he knows that it is not my strong area. Aren't competent managers supposed to empower employees (like SVP Miller did), capitalize on their strengths, and support them to help them thrive instead of oppressing them?

Lastly, on 6/28, I reminded Richard that I am an average working 12 hours/day and sometimes even 16 hours. Yet, Richard's response was not with empathy or to acknowledge my responsibility due to his flaws. Instead, he textually said that as a salaried employee, it is expected that the norm is to work 10 hours/day and do whatever is needed to finish the work. I wonder if Richard's mentality is also shared by the ODP organization?

You, as a reader, should see a pattern of retaliation, harassment, and discrimination based on (age, being Hispanic, having an accent, also no opportunities to attain another role across the company, as well as, a bad and contradictory yearly reviews followed by a quick PCD and then a PIP, the isolation culture and secrecy, changing duties, micromanaging, and expecting to work overtime each day) and all this despite of having qualifications that place me on the top 1-3% of the ODP workforce, and despite of my tangible contributions to the ODP organization with 360 Logistics (veyer intelligence) and other projects.

Regarding all the above, I also filed with the EEOC, so you should expect to hear from them in about 10 days.

Kindly,
Dr. Alexandro Kriman (Doctorate PhD in Business, Masters in Engineering, Certificate in Industrial Management)

---

## 5 (FIVE) HR PEOPLE WERE NOTIFIED ABOUT THE EEOC FILING.

### ODP's RESPONSE TEXTUALLY SAID:

*In this charge, Kriman makes several references to filing a charge in July 2023. **Respondent has no knowledge of such charge, never received any notice of such charge**, nor has been provided with a copy of such charge"*



**ZOE MALONEY WAS NOTIFIED, SHE IS THE HEAD OF HR.**

**HOW IS IT POSSIBLE THAT 5 (FIVE) HR PEOPLE DO NOT READ THEIR EMAILS ???**

*(watermark:) DOCUMENT/NOTICE FILED WITH THE EEOC*



# SECTION A

THIS SECTION IS AIMED AT PROVING THAT MR. KRIMAN WAS NOT "A SIMPLE ANALYST THAT WAS UNDERPERFORMING", AS ODP WANTS TO PORTRAY MR. KRIMAN TO TRY TO REMOVE CONCERNS RELATED TO E.G. DISCRIMINATION, CONSTRUCTIVE TERMINATION, AND RETALIATION DUE TO HIS AGE AND BEING HISPANIC WITH AN ACCENT.

**THE STEP BY STEP REALITY OF WHAT HAPPENED IS:**

1. MR. KRIMAN WAS HIRED AS AN INTERNAL CONSULTANT
2. THEN QUICKLY OFFERED A FULL-TIME ROLE BECAUSE THEY LIKED HIS WORK
3. MR. KRIMAN WAS THE MASTERMIND, THE ORCHESTRATOR THAT CREATED THE VISION TO TRANSFORM ANALYTICS AND INTRODUCED POWER BI TO OFFICE DEPOT
4. SVP MILLER VERBALLY PUT MR. KRIMAN IN-CHARGE OF THE PROJECT MR. KRIMAN CREATED, **WHICH (INDIRECTLY) GAVE HIM EXECUTIVE-LEVEL RESPONSIBILITIES**
5. MR. KRIMAN USED HIS OWN PERSONAL CREDIT CARD TO DEVELOP THE PROJECT AND RECRUITED AND MANAGED R. BOUZEK AS PER SVP MILLER'S INTRUCTIONS
6. MR. KRIMAN FORMALLY REPRIMENDED BOUZEK DUE TO PERFORMANCE AND QUESTIONABLE PRACTICES
7. AFTER MR. KRIMAN REPORTED FOR ABOUT 2 YEARS TO SVP MILLER, MR. KRIMAN DISCUSSED AGAIN WITH SVP MILLER HIS DESIRE FOR BETTER OPPORTUNITIES AND APPLICATIONS TO OTHER INTERNAL ROLES
8. AFTERWARDS, MR. KRIMAN IS TOLD BY SVP MILLER TO REPORT TO R. BOUZEK, WHO PREVIOUSLY REPORTED TO MR. KRIMAN
9. BOUZEK MICROMANGED AND REMOVED MR. KRIMAN FROM ALL HIS PREVIOUS EXECUTIVE-LEVEL RESPONSIBILITIES, LITERALLY ASKED HIM TO DO AS TOLD, AND ISOLATED MR. KRIMAN FROM THE TEAM
10. MR. KRIMAN FACED CONSTRUCTIVE TERMINATION AND RETALIATION ACTIONS TO FORCE HIM TO RESIGN, BUT WAS EVENTUALLY FIRED.    **WHY IS THIS SECTION SO IMPORTANT ?**

**BECAUSE BY VERIFYING THAT MR. KRIMAN WAS THE VISIONARY THAT CREATED 360 LOGISTICS AND OTHER IDEAS, AS WELL AS RECRUITED BOUZEK, YOU WILL UNDERSTAND THAT MR. KRIMAN WAS ESSENCIALLY EXPLOITED TO GET AS MUCH KNOW-HOW AND IDEAS FROM HIM, AND THEN (DUE TO HIS AGE & ACCENT) WAS PUSHED TO THE SIDE LIKE A DISPOSABLE ITEM, TO FORCE HIM TO RESIGN VIA CONSTRUCTIVE TERMINATION AND RETALIATION TACTICS.**

# MR. KRIMAN IS INITIALLY HIRED AS A CONSULTANT AND LATER OFFERED A FULL-TIME ROLE WITH OFFICE DEPOT

# HOW OFFICE DEPOT (ODP) HIRED MR. KRIMAN

MR. KRIMAN WAS INITIALLY HIRED BY THE **ARC GROUP** TO WORK INTERNALLY FOR ODP AND REPORT TO DIRECTOR CHAVARRIA BUT THEN SVP MILLER ASKED TO REPORT TO HIM, WAS HIRED AS A "SUPPLY CHAIN BUSINESS ANALYST – CONSULTANT".

HENCE, MR. KRIMAN OFFICIAL START DATE WITH OFFICE DEPOT WAS **JULY 27TH 2020**



# HOWEVER, MR. KRIMAN IS QUICKLY HIRED AS FULL TIME ODP EMPLOYEE

**ON SEPTEMBER 2020** (FEW MONTHS LATER) MR. KRIMAN'S BOSS (SVP MILLER) OFFERED HIM A FULL TIME ROLE AS A "SR. FINANCIAL ANALYST" AT ODP. HOWEVER, THE HR PAPERWORK WAS NOT FINALIZED UNTIL **DECEMBER 2020.**

SVP MILLER WAS IMPRESSED WITH MR. KRIMAN'S VISION FOR A PROJECT TO TRANSFORM ANALYTICS AT ODP, BRINGING ON BOARD THE POWER BI ANALYTICS TOOL, AND LIKED THE WORK MR. KRIMAN HAD CREATED.

HENCE, SVP MILLER PLACED MR. KRIMAN ON CHARGE OF THE PROJECT HE ENVISIONED AND CREATED, TOGETHER WITH GIVING MR. KRIMAN THE AUTHORITY TO **RECRUIT RICHARD BOUZEK** TO ASSIST HIM WITH BACKEND DATA DEVELOPMENT.

WHILE MR. KRIMAN REPORTED TO SVP MILLER, HE DID NOTHING BUT TO CONGRATULATE MR. KRIMAN FOR HIS VISION TO TRANSFORM ANALYTICS, THE DASHBOARDS HE CREATED, AND FOR IMPLEMENTING THE AUTOMATED CLOUD INFRASTRUCTURE THAT HOUSED THE ANALYTICS DASHBOARDS.

THERE WAS NEVER EVEN ONE VERBAL OR IN-WRITING COMPLAINT ABOUT MR. KRIMAN'S WORK

# 2020-2021-2022 REVIEW FROM SVP MILLER…VS…2022 REVIEW FROM BOUZEK

## SUSPICIOUS - VERY CONTRADICTORY REVIEWS ?

NOTE: REVIEWS FOR THE PREVIOUS YEAR
ARE ALWAYS GIVEN AROUND
FEBRUARY/APRIL OF THE FOLOWING YEAR.

# MR. KRIMAN'S 1ST PERFORMANCE REVIEW FROM SVP MILLER



THIS REVIEW INCLUDED A FACE-TO-FACE CONVERSATION WHERE MR. KRIMAN **REITERATED** TO SVP MILLER HIS DESIRE TO CLIMB THE LADDER AND APPLY TO OTHER INTERNAL ROLES.

SVP MILLER SAID TO MR. KRIMAN THAT HE CAN PERFORM AT THE EXECUTIVE LEVEL AND TO WAIT TO SEE WHAT CAN BE DONE. BUT NO OPPORTUNITIES EVER CAME. MR KRIMAN WAS NOT EVEN APPROACHED TO DISCUSS FUTURE POSSIBILITIES FOR HIS FUTURE WITH ODP.

THIS IS THE REVIEW GIVEN BY SVP MILLER TO MR. KRIMAN

**THIS REVIEW EVALUATED 21 MONTHS (2020,2021, AND PART OF 2022)** SERVING SVP MILLER

LETS BREAKDOWN WHAT SVP MILLER SAID:

1.  Alex has done a great job at creating active reporting.
2.  Alex continues to drive the business forward.
3.  Alex is tasked with building and improving reporting for the entire field Supply Chain organization, to include HR, LP, Safety, Training.
4.  He has not only created the first pass data views but has continued to develop them as well.
5.  The collaboration with multiple teams has been essential to the success of our OD360 platform . (which Mr. Kriman envisioned & created)
6.  Alex has developed a great tool, which is a value add to our teams.
7.  Leading API Request through OMNITRACS.
8.  Alex has done a great job in pushing forward, Looking for New Opportunity.
9.  Alex continues to look for new opportunity not only in the data dashboard and visibility but "in other areas as well" including opportunity to reduce cost in our IT spend with regards to circuit expense.

AS YOU CAN SEE MR. KRIMAN WAS NOT A "SIMPLE ENTRY-LEVEL ANALYST" AS THE ODP RESPONSE IS TRYING TO PORTRAY HIM. MR. KRIMAN WAS IN-CHARGE OF ANALYTICS, SO IT WAS TEXTUALLY SAID ON POINT #2, <u>ALEX CONTINUES TO DRIVE THE BUSINESS FORWARD</u>.
THIS MEANS THAT MR. KRIMAN'S WAS VIEWED AS A PROACTIVE LEADER BY SVP MILLER, NOT A SIMPLE ANALYST THAT FOLLOWS INSTRUCTIONS.

# MR. KRIMAN'S IN-WRITING RESPONSE TO SVP MILLER'S REVIEW

Hello Bob,  The below table is a summary of my accomplishments and their impact, from the time I joined ODP -Veyer during mid-2020. On the surface, the Power Bi dashboards are the obvious visible accomplishments, but they are the tip of the iceberg.  With that said, I would like to point out accomplishments that are less obvious, but more online with the truly important elements I bring to the table. Meaning, delivering vision, innovation, strategic thinking, planning, and an atypical combination of business & technical skills to make things happen and keep Veyer's best interest at heart.

| Accomplishments | Organizational Impact |
|---|---|
| Envisioned, planned, developed, and manages 360 Logistics | Introduced a new framework for analytics based on 3 key principles (centralization, sustainability, consistency), so we can keep Veyer's best interest at heart. Meaning developing things in a way that benefit Veyer, not private interest, always keeping in mind sustainability and a good ROI from a business perspective. 1. Centralization: All data in 1-stop place  2. Sustainable: Able to last in time, even with a high employee turnover  3. Consistency: Uniformity in the way things are done • Developed 360 Logistics vision and guidelines to steer Veyer's analytics over a well-founded, sharply-defined well-structured course. • Successful in managing & planning 360 Logistics, a very large project that has made a strong impact on ODP • Delivered a new cultural-approach for "analytics" to allow cultural change, from a constantly popping up reports/dashboards type of mentality to actually focusing on analyzing data & making recommendations |
| Gave birth to Power Bi at ODP | • Stood strong against persistent executive discouragement from other departments and their lack of support to use Power Bi. Hence, used own credit card to get Power Bi and even used an office "fan" to demonstrate its benefits • Many people that create Power Bi dashboards nowadays, didn't even know what Power Bi was until they saw the work I started with Power Bi. |
| Cross-functional work with executives and GMs from (Finance, HR, IT, Canada, Returns, Training, Transportation, Procurement, and external vendors) | • Managed to get their support to provide the needed data, which allowed to centralize data within 360 Logistics. Furthermore, managed to get data from Canada, which was known to be reluctant to provide data to ODP |
| Analyzed ODP Business Intelligence Analytics and Reporting to deliver a critical assessment report | • Proved the labyrinth of databases, different reports, and formats within ODP, which didn't serve Veyer's best interest. It didn't allow to create an efficient & sustainable Business Intelligence Analytics and Reporting infrastructure. • Unveiled the serious problems with previous dashboards/reports and their so-called "spider web of complexity", which didn't keep Veyer's best interest at heart to allow an efficient, long-term sustainable analytics |
| Developed new additional metrics for Omnitracs PF data, together with the Zip code categorization, and the "desktop" field check mark in the driver's device | These new data, the Zip code category, and the desktop check mark, will help to better understand the fleet, as well as the routes, and drivers' performance. |
| Developed the beginning-to-end KPIs | These KPIs will allow get a higher-level macro view of SC and detect the impact of certain areas on SC |
| Built from scratch Geographic location database | Now, SC can see their DCs and XDs in a map, filter by region, and even refer to google maps |
| Presented report regarding transferring data using the IT dept. services | Proved IT' development, which allowed Veyer to get better pricing from the IT department |
| Presented the WI improvement project, including estimates from WI providers | It will help to improve DC/XD performance due to better WI, which translates into considerable savings. This also proved that we are currently paying more for a lower quality WI service |
| Presented a project idea to activate the Power Bi native connector for Snowflake | Requested from Iyad & Laing a Power Bi connector for Snowflake, although at the time, they didn't even know what Power Bi was. Currently, their group is capitalizing on that request by using Power Bi and the connector, but the connector was never made available to 360 Logistics. This process improves dashboard refreshing and data download times |
| Presented a project idea to connect Power Bi directly to Azure SQL via its Azure native connector | This project unveiled the "IT" politics, where the "IT" department doesn't want to allow a direct connection to Azure, so they can justify having Snowflake. This process improves dashboard refreshing and data download times |
| Presented a project to use a virtual machine for refreshing, as well as for all Veyer employees to reduce PC-related cost | This project will improve the reliability and performance of the dashboard refreshing process, as well as potentially reduce PC-related cost for Veyer |
| Have several other projects in the pipeline that are critical for SC | These projects will help to increase access to critical SC data to get a much broader view |

*Identified the problem with the existing Bi Analytics & reporting infrastructure to propose the 360 Logistics solution and its vision:*

1. *Proposed 360 Logistics and its vision, strategic thinking to keep steering things on the right direction*

2. *Managing 360 Logistics with a new framework to transform analytics based on 3 key principles (centralization, sustainability, consistency)*

3. *Cross-functional work to get access to the data needed for 360 Logistics, including from G&T Canada*

4. *Guidelines to steer Veyer's BI analytics reporting over a well-founded, sharply-defined well-structured course*

5. *Proposed new cultural-approach for "analytics" to go from a constantly popping up reports to analyzing data & making recommendations*

6. *360 Logistics ignited the fire that triggered the use of Power Bi across ODP*

7. *Stayed on course despite of persistent discouragement to continue to use ineffective tools like cognos and tableau*

8. *New metrics & databases (internally and using external suppliers) to improve SC analytics, as well as projects related to cost savings*

*The above represent the unseen specific accomplishments. The Power Bi dashboards represent the visible accomplishments, which are a fraction of all the work being done behind the curtains.*

MR. KRIMAN SENT THIS REPLY IN RESPONSE TO HIS PERFORMANCE REVIEW FROM SVP MILLER BECAUSE HE FELT THAT ALTHOUGH IT WAS A GOOD REVIEW, SVP MILLER WAS OMMITTING IMPORTANT DETAILS ABOUT MR. KRIMAN's CONTRIBUTIONS TO THE COMPANY, SO THESE MANY POINTS NEEDED CLARIFICATION, BUT SVP MILLER NEVER ADDRESSED THIS RESPONSE EITHER VERBALLY OR IN WRITING.

# 2022 REVIEW FROM R. BOUZEK WHO PREVIOUSLY REPORTED TO MR. KRIMAN.

## KEEP IN MIND THAT THIS REVIEW IS FOR ONLY 8 MONTHS REPORTING TO BOUZEK

**2022 REVIEW FROM BOUZEK:**

Alex overall had a good year, as he played a strategic role in the development of Veyer Intelligence. Alex's primary focus was on the front-end development using MS Power BI. Alex does a nice job analyzing information and trends and consistently brings ideas and continuously challenges the norm, this is instrumental as we evaluate how we look at the business going forward. As we move forward with Veyer Intelligence, it will be critical that Alex shows more initiative in seeking solutions to problems and is able to break down a problem into smaller, manageable parts using methodologies to solve. In addition, partnering with departments and building relationships will be key to ensuring he consistently meets or exceeds organizational goals and completes tasks in a timely manner. I appreciate your contributions to the team, the BU, and the organization in 2022. Thank you for these efforts and I look forward to your contributions and commitment to excellence in 2023

**MR. KRIMAN RESPONSE TO R. BOUZEK's REVIEW:**

I have been working for ODP for 2.5 years (since Aug. 2020).I came to ODP with over a decade of experience leading, orchestrating the transformation of BI analytics, developing strategic vision and projects to increase revenue/efficiency, as well as with an atypical combination of technical & business experience, which includes a Doctorate PhD in business, Masters in engineering, a certificate in industrial management, executive experience, management consultant experience, vast cross-functional experience (including in marketing and business development), and vast US and international/foreign languages experience.

The above allowed me to take the initiative to identify the inefficiencies and pitfalls of the former back & frontend BI analytics/reporting infrastructure, reason why I single-handed developed a proposal for SVP Miller to implement in phases a new vision for BI analytics, to change the perspective on how we manage BI analytics, and develop pioneer BI analytics by transforming things from top to bottom with the creation of 360 Logistics (nowadays called Veyer Intelligence) and other important peripheral projects. Because of this, SVP Miller approved my proposal and had me for 2 years on charge of everything related to BI analytics, allowed me to recruit Richard Bouzek to assist me with the backend, and gave me the authority to unofficially manage the team.

For 2 years, I received from SVP Miller many compliments and slaps on my shoulder regarding the above mentioned accomplishments, not only praising my vision, but also my ability to launch and implement a project and peripherals that seemed almost impossible. I was also praised for the tremendous positive impact these developments made across Veyer improving efficiency and revenue, but also within ODP and Varis when they became aware of the BI analytics work I was doing for SVP Miller. Nevertheless, these accomplishments and events have never been rightfully explained and acknowledged in my performance reviews. While I appreciate the opportunities my current role has provided to contribute to the overall ODP organization with these outstanding accomplishments, I am interested in taking ODP's word about "inclusion, retention, and identifying top talent". Therefore, I am interested in finding a role that better aligns with my high qualifications and goals, which I explained to SVP Miller when he hired me, as regard to seeking a Director-level role. This would allow me to further contribute to the company's success by being able to better tap on the broad repertoire of qualifications/skills/accomplishments I bring to the table. With that said and objectively speaking, even though the above mentioned qualifications, accomplishments, and events deserve a promotion to at least a Sr. Manager role, unfortunately all my job applications to Director and even to Sr. Manager roles have been rejected, even when applying to a simple Sr. Manager of insights role. In the meantime until ODP decides to recognize my qualifications, skills, accomplishments, and many contributions to the organization, I am staying focused in helping 360 Logistics/Veyer Intelligence, because being the father of this project and all related work, I want to see it grow and succeed.

## AGAIN, BOUZEK NEVER RESPONDED EITHER VERBALLY OR IN WRITING TO MR. KRIMAN REVIEW'S RESPONSE.

# COMPARING 2020-2021-2022 REVIEW FROM SVP MILLER VS 2022 REVIEW FROM BOUZEK

**WHAT R. BOUZEK'S REVIEW CRITICIZED ABOUT MR. KRIMAN** (INCONSISTENTLY MEETS EXPECTATIONS)

- CRITICAL THAT ALEX SHOWS MORE INITIATIVE IN SEEKING SOLUTIONS TO PROBLEMS.

- PARTNERING WITH DEPARTMENTS AND BUILDING RELATIONSHIPS WILL BE KEY TO ENSURING HE CONSISTENTLY MEETS OR EXCEEDS ORGANIZATIONAL GOALS.

- COMPLETING TASKS IN A TIMELY MANNER IS EMPHASIZED.

BOUZEK's 8 MONTHS REVIEW

## CONTRADICTION ?... DOES MANAGER BOUZEK KNOW BETTER THAN SEASONED SENIOR VICE PRESIDENT MILLER

**WHAT SVP MILLER REVIEW SAID ABOUT MR. KRIMAN** (ABOVE SPECTATIONS)

SVP MILLER 21 MONTHS REVIEW

1. ALEX HAS DONE A GREAT JOB AT CREATING ACTIVE REPORTING.
2. ALEX CONTINUES TO DRIVE THE BUSINESS FORWARD.
3. ALEX IS TASKED WITH BUILDING AND IMPROVING REPORTING FOR THE ENTIRE FIELD SUPPLY CHAIN ORGANIZATION, TO INCLUDE HR, LP, SAFETY, TRAINING.
4. HE HAS NOT ONLY CREATED THE FIRST PASS DATA VIEWS BUT HAS CONTINUED TO DEVELOP THEM AS WELL.
5. THE COLLABORATION WITH MULTIPLE TEAMS HAS BEEN ESSENTIAL TO THE SUCCESS OF OUR OD360 PLATFORM . (WHICH MR. KRIMAN ENVISIONED & CREATED)
6. **ALEX HAS DEVELOPED A GREAT TOOL**, WHICH IS A VALUE ADD TO OUR TEAMS (REFERRING TO THE POWER BI INFRASTRUCTURE MR. CREATED NOT BOUZEK)
7. LEADING API REQUEST THROUGH OMNITRACS.
8. ALEX HAS DONE A GREAT JOB IN PUSHING FORWARD, LOOKING FOR NEW OPPORTUNITY. ALEX CONTINUES TO LOOK FOR NEW OPPORTUNITY NOT ONLY IN THE DATA DASHBOARD AND
9. VISIBILITY BUT "IN OTHER AREAS AS WELL" INCLUDING OPPORTUNITY TO REDUCE COST IN OUR IT SPEND WITH REGARDS TO CIRCUIT EXPENSE.



SO, SVP MILLER'S REVIEW EVALUATED **21 MONTHS**, WITHOUT ANY NEGATIVE COMMENTS AGAINST MR. KRIMAN AND INSTEAD SAID "DONE A GREAT JOB", HE "DRIVES THE BUSINESS FORWARD".

THEN MR. KRIMAN STARTS REPORTING TO R. BOUZEK AND AFTER ONLY **8 MONTHS**, BOUZEK SUSPICIOUSLY EVALUATES MR. KRIMAN AS AN UNDERPERFORMING EMPLOYEE ?

NOT TO MENTION THAT EVERYTHING THAT BOUZEK KNEW ABOUT ANALYTICS AND PROJECT MANAGEMENT IN THAT AREA, BOUZEK LEARNED IT FROM MR. KRIMAN

BY TOOL HE MEANS NOT ONLY THE DASHBOARDS, BUT THE WHOLE CLOUD INFRASTRUCTURE, AND THE MANY CHANGES TO THE DATA TO BE ABLE TO PRODUCE THE END RESULT.

OFFICE DEPOT SAID THAT MR.KRIMAN STARTED TO REPORT TO BOUZEK BECAUSE THEY LIKED BOUZEK'S DASHBOARD AND SAID THAT MR. KRIMAN HAD PROBLEMS DELIVERING

SO, LETS REVIEW THE ACTUAL FACTS

# OFFICE DEPOT'S CONTRADICTORY EXPLANATION ABOUT WHY MR. KRIMAN STARTED TO REPORT TO BOUZEK



THIS IS THE REVIEW GIVEN BY SVP MILLER TO MR. KRIMAN

WHY OFFICE DEPOT IS DECEIVING WITH THEIR RESPONSE ?
THERE IS AN OBVIOUS CONTRADICTION BETWEEN SVP MILLER'S REVIEW AND THE LEGAL COUNSEL RESPONSE.

THIS POWERPOINT DOCUMENT HAS ALREADY PROVEN THAT ODP'S REPONSE IS UNTRUTHFUL REGARDING SEVERAL ISSUES, FOR EXAMPLE:

1-THAT ODP DID NOT KNOW ABOUT THE EEOC FILING

2-THAT MR. KRIMAN DID NOT MANAGE 360 LOGISTICS AND BOUZEK

3-THAT BOUZEK TOOK OVER BECAUSE MR. KRIMAN UNDERPERFORMED

4-THAT THEY NEEDED A POINT OF CONTACT, ALTHOUGH MR. KRIMAN WAS ALWAYS (SINCE AUGUST 2020) THE ANALYTICS POINT OF CONTACT WITH EXECUTIVES AND OTHER EMPLOYEES

THERE ARE COUNTLESS EMAILS LIKE THIS IN ODP's EMAIL DATABASE, WHERE MR. KRIMAN COMMUNICATES NOT ONLY WITH SVP MILLER BUT ALSO WITH OTHER VPs AND SR. DIRECTORS WITHIN THE TEAM, AS WELL AS WITH OUTSIDE TEAMS ACROSS OFFICE DEPOT.

ODP LEGAL COUNSEL REPONSE IS INCONGRUENT WITH THE ABOVE

INTERESTING COMMENTS FROM ODP LEGAL COUNSEL, BECAUSE SVP MILLER ALWAYS OPENED UP WITH MR. KRIMAN SAYING NEGATIVE THINGS ABOUT BOUZEK, WHICH WERE CONGRUENT WITH WHAT MR. KRIMAN THOUGHT ABOUT BOUZEK. SVP MILLER EVEN "TEXTUALLY" SAID THAT HE DIDN'T LIKE BOUZEK'S LABOR DASHBOARD AND THAT MR. KRIMAN PERFORMANCE WAS 2ND TO NONE.

PROOF THAT BOUZEK REPORTED TO MR. KRIMAN AND WANTED TO RETALIATE BECAUSE MR. KRIMAN OFTEN COMPLAINED ABOUT BOUZEK'S WORK (THERE IS PROOF OF MOTIVE)

SUDDENLY MR. KRIMAN HAS TO REPORT TO BOUZEK (WHO PREVIOUSLY REPORTED TO MR. KRIMAN), AND ACCORDING TO SVP MILLER DUE TO SO-CALLED "UNFORTUNATE ORGANIZATIONAL CHANGES" ?

# PROOF THAT BOUZEK REPORTED TO MR. KRIMAN

WHEN SVP APPROVED MR. KRIMAN'S VISION TO REINVENT ODP ANALYTICS, SVP MILLER ALLOWED MR. KRIMAN TO RECRUIT BOUZEK TO ASSIST HIM WITH THE BACKEND, AS WELL AS VERBALLY TOLD MR. KRIMAN THAT HE (MR. KRIMAN) WAS ON CHARGE OF THE PROJECT HE ENVISIONED.

THIS LETTER WAS SENT BY MR. KRIMAN TO BOUZEK ON 2/21/22 AFTER VERBALLY BEING INSTRUCTED BY SVP MILLER TO HANDLE THE PROBLEMS WITH BOUZEK'S BEHAVIOR AND PERFORMANCE AS MR. KRIMAN DEEMED APPROPRIATE.

THE UNDERLINED SENTENSES IN RED CLEARLY SHOW THAT BOUZEK REPORTED TO MR. KRIMAN

BOUZEK'S MOTIVE TO RETALIATE

**DOCUMENT - MR. KRIMAN'S FORMAL WARNING TO R. BOUZEK DUE TO HIS BAD PERFORMANCE**

To: Richard Bouzek
From: Alex Kriman
Re: 360 Logistics
Date: 2/21/2022

When I started working for OD, I conducted an assessment of OD analytics, which concluded that there was a systemic problem with their analytics. This prompted me to create 360 Logistics with a new vision for analytics and Bob approved the project. Paramount importance was placed on doing things differently from the past by focusing on 3 critical aspects (centralization, long-term sustainability, and consistency).

As you must recall, I eventually called you and I decided to invite you to assist me with the backend development, which (by the way) was your 1st introduction to Power Bi. During that conversation, you politely thanked me for the opportunity and acknowledged to understand the clear boundaries I had set in place, where your involvement was limited to the backend only. My stewardship of this project has always been focused on the above 3 aspects, without any private agendas, simply looking to protect Bob and his new Veyer division, so we don't fallback in the old bad way of doing things.

Setting up the project with some clear boundaries, as it should be done in any project, proved to be very effective for almost an entire year, where we enjoyed a good positive collaboration and exchange of views, which prompted me to recommend you to Bob.

Unfortunately, at around July 2021, during the time you were hired into a new role, things took a negative turn. I began to observe that something was wrong, you started to act differently, you were losing focus on the backend, despite of me not even knowing at the time that you were working on the Labor dashboard. It seems that this is the time when you decided to disregard the agreed boundaries.

This disregard for the agreed boundaries, started to produce all sort of problems:

1. Started to lose focus on backend development, by not producing proper backend solutions
2. The Labor dashboard is visually and technically fully incongruent with 360 Logistics guidelines
3. Despite of previous instructions, refused to review with Alex the Labor dashboard for approval to be released
4. Lied about receiving instructions regarding the Labor dashboard not having to be part of 360 Logistics
5. Confessed to be working on other dashboards, but refused to show them to Alex for approval
6. Was asked numerable times to put the Labor dashboard in 360 Logistics, but instead chose to deceive using a link
7. Announcing at meetings future 360 Logistics developments without consulting in advance with Alex for approval, as well as jeopardizes 360 Logistics with ideas that are incongruent with its vision.

As you can see, you clearly stepped outside your agreed responsibilities in this project, and by doing so, caused much detriment to 360 Logistics as a project, to its vision, and to Veyer's future analytics.

You are a technically skillful professional, and I can understand your desire to be noticed, but there is a right way and a wrong way to do things. I enjoy seeing people flourish and supporting people, perhaps someday you come up with your own project idea, but do so without trying to capitalize on somebody else's project and work.

With that said, as the professional you are, I expect that you swiftly start operating in a manner that is consistent with what you agreed when I invited you to assist me with 360 Logistics' backend.

I have informally discussed these things several times with you, so I am now formally informing you of the above.

Cordially.



THE ABOVE IS THE ACTUAL EMAIL MR. KRIMAN SENT TO BOUZEK WITH THE ATTACHED DOCUMENT.

DOES THAT SOUND LIKE A "SIMPLE ANALYST" TALKING TO BOUZEK, WHO WAS A SR. MANAGER BY JOB TITLE ?

THE REALITY (AS SHOWN HERE) IS THAT BOUZEK TOOK DIRECTION FROM MR. KRIMAN AS PER SVP MILLER's INSTRUCTIONS.

ON 2/5/22 MR. KRIMAN SENT THIS EMAIL TO SVP MILLER – THEREAFTER MR. KRIMAN TALKED TO SVP MILLER ABOUT REMOVING BOUZEK FROM HIS ROLE SUPPORTING 360 LOGISTICS DUE PERFORMANCE AND OTHER ISSUES

Case 3:25-cv-02266-E-BN    Document 15    Filed 09/18/25    Page 49 of 116    PageID 207

**From:** Alexandro Kriman
**Sent:** Saturday, February 5, 2022 7:21 PM
**To:** Robert Miller <Robert.Miller@officedepot.com>
**Subject:** Veyer

Hello Bob,

Since we are approaching the deadline to tangibly become Veyer, I prepared the below recommendations:

THIS (BACKEND DATA ENGINEER/ARCHITECT) WAS PLANNED BY MR. KRIMAN TO REPLACE BOUZEK DUE TO PERFORMANCE AND OTHER ISSUES, WHICH WAS ALSO VERBALLY DISCUSSED WITH SVP MILLER AND WITH BOUZEK

THIS EMAIL ALSO SHOWS THAT MR. KRIMAN WAS THE MASTERMIND, THE ORCHESTRATOR, THE VISIONARY THAT WAS LEADING THE ANALYTICS-RELATED DEVELOPMENTS, INCLUDING THE CREATION OF A FORMAL ANALYTICS DEPARTMENT THAT REPORTED DIRECTLY TO SVP MILLER.

BOUZEK'S MOTIVE TO RETALIATE



# PROOF THAT BOUZEK REPORTED TO MR. KRIMAN

## THESE EMAILS SHOW THAT MR. KRIMAN GAVE DIRECTION TO BOUZEK **AS PER VERBAL INSTRUCTIONS FROM SVP MILLER TO BE RESPONSIBLE FOR EVERYTHING RELATED TO POWER BI AND THE 360 LOGISTICS PROJECT**

Alexandro Kriman

To:

Richard Bouzek
Sat 4/3/2022 11:49 AM

Hi Richard,

I was thinking last night about the conversation we had about gameon, you mentioned that a solution is to bring several measures within one large DAX script.

A measure compiling several other measures requires a much larger DAX script, much like writing a large SQL script but in DAX. So, the frontend problem is not being solved, but rather transformed into another problem.

This made me realize that we continue to misunderstand 360 Logistics vision, which is placing 360 Logistics in danger to be derailed.
We are thinking in dashboard terms rather than in database terms, basically continuing to place (or prioritize) the carriage instead of the horse.
Although the dashboards are what end-users see and touch, 360 Logistics vision's foundation are the long-term sustainable databases, not the dashboards, the dashboards are the tip of the iceberg.

**Why is the above happening ?**

Besides the above said (prioritizing the carriage instead of the horse), there is also a big disconnection with what you seem to see as "simple, easy, or simplifying things", which could be related to not being able to place yourself in a "worse-case scenario" situation such as e.g.:

1-In the future, what if you & I are no longer being with Veyer, so other employees will need to take over 360 Logistics.
2-In the future, what if you & I move upwards or sideways into other responsibilities, so other employees will need to take over 360 Logistics.
3-What if the above 2 previous situations are worsened by a high employee turnover within the employees that took over 360 Logistics.
4-Just for argument's sake, what if those new 360 Logistics employees do not have the skills/competency level that we have.

Because of the above examples, well-thought-out backend development to minimize frontend complexity and acrobatics, is critical to 360 Logistics vision and critical to Veyer's Business intelligence long-term sustainability.

**How we will solve the above disconnection to keep 360 Logistics on track with its vision - New steps to approach any development for 360 Logistics :**

1-We will first create a rough list of (numbers, KPIs that will be likely displayed, and understand what visuals/filters are likely to be used in the dashboard), in essence we will produce a blueprint draft.
So, with that information in hand, a backend solution will be carefully thought-out to fulfil the specific needs of the dashboard being created.
In simple terms, we will start focusing on the horse to later create the carriage (not the other way around)

2-Because of the above #1, we will strongly prioritize & review backend development before we even start building a dashboard.

Regards.

---

Alexandro Kriman

To:

Richard Bouzek
Fri 10/8/2021 10:39 AM

**Discuss Labor dash**

Mon 10/11/2021 11:00 AM – 11:30 AMFri 10/8/2021 11:00 AM – 11:30 AM

No conflicts

**RSVP to this event**
Email organizer
Add a message to Alexandro Kriman (optional)
__Yes__ __Maybe__ __No__ __Propose__ new time

Hello,

As per Bob's direction to oversee 360 Logistics and SC Power Bi dashboards, wanted to discuss the below:

1-Discuss Labor Power Bi developments to see if there is any TMI or overlap with existing dashboards in 360 Logistics.

2-Ensure that the Labor planning dashboard has no SQL syntax or frontend complexity. Also, that backend views/tables are properly labelled, and located in the same place as other 360 Logistics data.

3-As per Bob's directive, he wants all SC Power Bi developments in 360 Logistics and physically saved as pbix files in the 360 Logistics workspace, regardless of being under development. That's not the case with the current setup for the labor planning dashboard.

The ultimate goal is that 360 Logistics centralizes all needed critical data to operate SC. Once that is achieved, 360 Logistics should be almost self-sufficient, so data-related tasks like ours should be focused on analyzing data and not in producing more dashboards. This is a critical step for SC, so we no longer drown in a spider web of (complexity, TMI, overlaps, excessive reports, reports/dashboards coming from different sources, different formats, and backend data tables/views that sometimes can't be found and/or understood).

Regards.



GIVING HERE DIRECTION TO BOUZEK ABOUT IMPORTANT ITEMS FOR THE UPCOMING YEAR 2022

---

Alexandro Kriman

To:

Richard Bouzek
Mon 8/30/2021 9:48 AM

Hello Richard,

In order to keep 360 Logistics on track and true to its vision from beginning to fruition, there are certain items I need to discuss with you.

With that said, I have been given by Bob certain responsibilities, which means that everything related to Power Bi and to 360 Logistics needs to go through me for approval.

With that said, these are the items that need to addressed:

1-For example, views like DPMO are on a sharepoint location that is not part of the two (2) 360 Logistics databases (which are 360 Logistics in sharepoint & Snowflake).
This creates problems because it is a detour from 360 Logistics vision to centralize the backend.

2-Recently delivered views have many fields that now need to be created in Power Bi (frontend) instead of doing so in the backend, as we have always done.
As you know, part of 360 Logistics vision is to develop a backend that centralizes data and provides simplicity, together with including all needed numbers/KPIs, so anybody can understand things for long term replication.
This issue has triggered a lot back and forth time waste, having to ask many questions to develop things in Power Bi instead of the backend.

3-Your new duties related to Labor Force, require the production of a dashboard, but things are not being run through me and discussed in detail prior to you setting up meetings with top management to show the work.
I am very happy for you regarding your new role, but it is my responsibility to ensure that dashboards comply with 360 Logistics vision, that there is no TMI, and that no data and/or KPIs are repeated in dashboards that are already in 360 L. This is an area that needs further improvement, since we already know that some dashboards will need to be merged into one to better organize things.

4-Bob wants all Power Bi dashboards to be centralized in 360 L, stored in the 360 L workspace, and displayed either in the 360 L Executive or Management APPs, for which you have access.
With that said, the Labor dashboard you created needs to be placed in the 360 Logistics workspace, so from there is uploaded into the 360 L executive APP. Currently, that's not the case.

It is understandable that now that you have a new role, your focus has shifted towards your new responsibilities. However, there is a tangible overlap between the work you do and 360 Logistics, so let's get back on track with the above items to successfully finish the implementation of 360 Logistics.
Afterwards, once 360 Logistics is fully implemented and automated, there will be no more need for new Power Bi dashboards, so we can stay focused on analyzing data for revenue creation and/or process optimization.

We can have a meeting to further discuss the above if you need.

Regards.

PROOF THAT SVP MILLER PUT MR. KRIMAN ON CHARGE OF ANALYTICS BECAUSE IT WAS MR. KRIMAN'S VISION, HIS PROJECT IDEA

YOU CAN SEE THAT MR. KRIMAN WAS THE MASTERMIND, THE ORCHESTRATOR OF THESE NEW ANALYTICS DEVELOPMENTS, WHICH REQUIRED EXECUTIVE-LEVEL WORK (AUTHORIZED BY SVP MILLER), DESPITE HAVING A SR. ANALYST JOB TITLE

# CREDIT CARD PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

MR. KRIMAN PURCHASED A MICROSOFT POWER BI LICENSE USING HIS **OWN PERSONAL CREDIT CARD**, BUT AUTHORIZED BY SVP MILLER.

EVENTUALLY, OFFICE DEPOT REIMBURSED MR. KRIMAN AND PURCHASED A POWER BI LICENSE USING THE OFFICE DEPOT's ACCOUNT THEY HAD WITH MICROSOFT.

From: Alexandro Kriman <Alexandro.Kriman@OfficeDepot.com>
Sent: Thursday, April 8, 2021 1:12 AM
To: Jhon Keneth Cruz (CONCENTRIX CORPORATION) <v-jhocruz@microsoft.com>
Subject: [EXTERNAL] Re: [Case #:25076957] - User purchased license with his credit card for Powerbi and now h...

Hello Kenneth,

Now that the situation was cleared with Office Depot admin, I would like to discuss with you about my personal credit card.



Related to the below, I am an Office Depot employee, I initially opened a Power Bi PRO account using my personal credit card (but using the Office Depot domain @na.odcorp.net). Because of the domain, the account has always been under the Office Depot administration, although the monthly charges were applied to Office Depot and also to my personal credit card (double monthly charges).

Therefore, if MS was collecting charges from Office Depot and from my personal card, I should be reimbursed for the charges to my personal card ?

Please let me know.

Regards.

From: Michael Nussbaum <michael.nussbaum@officedepot.com>
Sent: Wednesday, April 7, 2021 11:58 AM
To: Alexandro Kriman <Alexandro.Kriman@OfficeDepot.com>
Subject: Fw: [Case #:25076957] - User purchased license with his credit card for Powerbi and now h...

Hello Alexandro,

Please see below, microsoft removed the license and your card will no longer be charged.

Thank you,

**Michael Nussbaum** Lead Systems Engineer | Office Depot, Inc.
6600 North Military Trail | Boca Raton, FL 33496-2434
Tel: 561.438.0246 | michael.nussbaum@officedepot.com

MR. KRIMAN USED HIS OWN PERSONAL CREDIT CARD TO LAUNCH THE PROJECT HE ENVISIONED AND THEN APPROVED BY SVP MILLER (360 LOGISTICS) BEFORE MR. KRIMAN RECRUITED BOUZEK

HOWEVER, ODP SAYS THAT MR. KRIMAN WAS JUST AN ANALYST THAT NEVER ENVISIONED OR MANAGED ANYTHING ?

# POLICY PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN



Alexandro Kriman

To: Robert Miller

Sun 11/21/2021 10:25 AM

MR. KRIMAN SENT THIS EMAIL TO SVP MILLER, SO HE CAN FORWARD TO THE ENTIRE ORGANIZATION A POLICIY MEMO THAT MR. KRIMAN HAD CREATED TO COMMUNICATE A NEW ANALYTICS POLICY TO THE ORGANIZATION.

AS YOU CAN SEE, SVP MILLER WAS LETTING MR. KRIMAN TAKE THE LEAD WHEN IT CAME TO ANALYTICS. WE ALL KNOW THAT PROVIDING VISION, POLICY, GUIDELINES ARE ALL EXECUTIVE-LEVEL RESPONSIBILITIES, WHICH CONTRADICT ODP's RESPONSE.

Analytics Policy.docx
20 KB

360 Logistics-Frontend and Backend Guidelines.docx
292 KB

2 attachments (312 KB)  Save all to OneDrive - Office Depot  Download all

MR. KRIMAN PROVIDED POLICY & GUIDELINES RELATED TO ANALYTICS TO SVP MILLER, THEN SVP MILLER FORWADED THOSE TO THE ORGANIZATION TO MAKE IT OFFICIAL

Hello Bob,

First of all, happy birthday.

As we discussed during the meeting, SC is experiencing various internal & external challenges that affect 360 Logistics' vision.

As time goes by, these challenges will continue to increase in number, unless they are addressed.

My recommendation is to submit an official new policy memo (such as the attached one) to all SC and other external related departments, so we can tackle t

With a new policy memo like this, we could accomplish the following:

1. Push to increase 360 Logistics utilization rate
2. Reiterate that 360 Logistics is the only place you should go for data
3. Stop external departments from pushing unauthorized developments into SC
4. Stop internal new developments without going through an approval process
5. Emphasize that frontend dashboards & backend databases must conform to 360 Logistics' guidelines
6. Stop the utilization of locally-made reports/dashboards across all DCs and XDs (e.g. excel reports that continue to reside in people's PCs)

Regards

---

Peris Jones

Mon 1/3/2022 9:14 AM

To: Farhan Mirza; Mike Wagner; Anjanette Neely; Michael Beckman; John Manns; Jonathan Kailan; Kelvin Crockett; Oscar Salks; Steve Minnucazi; Mike Santillo; Eric Thomas +54 others
Cc: Robert Miller; Brian Booto; Brian Savage; John Chavarria; Ryan Patters; Annie Frye; Paula Ruiz; Dave Kubicek; Jennifer Harrold; Roberta Diebold; Walt Hall; Alexandro Kriman +1 other

SC Analytics Policy.docx
403 KB

A screenshot of a cell phone Description automatically generated

**Supply Chain Analytics & Reporting New Policy**

As you are aware, ODP Corp is splitting into two independent publicly traded companies, so we can concentrate efforts on our unique strengths.

This transformation into two separate companies, means that we are committed to implement changes and innovations that will allow us to become more focused, strategic, proactive, and effective in providing the best possible service and high-quality experience for our customers.

For that purpose, from a Business Intelligence & Reporting perspective, the newly created 360 Logistics is the new vision for Supply Chain Analytics. This new vision is part of the transformational changes & innovation that will permit the following

1. Create automated, interactive, online dashboards
2. Centralize all SC analytics (dashboards & databases), so 360 Logistics is the 1 and only "stop place" for all SC analytics
3. Eliminate the labyrinth of tools, reports, dashboards, and different formats we previously used

THIS EMAIL PROVES THAT SVP MILLER'S SECRETARY (PERIS JONES) ON 1/3/22 FORWARDED MR. KRIMAN'S NEW POLICY TO THE ENTIRE ORGANIZATION (AS ORDERED BY SVP MILLER)

# POLICY PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

From: Robert Miller <Robert.Miller@officedepot.com>
Sent: Monday, January 3, 2022 8:30 AM
To: Peris Jones <Peris.Jones@OfficeDepot.com>
Cc: Alexandro Kriman <Alexandro.Kriman@OfficeDepot.com>
Subject: FW: Memo

Peris
Good morning
Please proof and put on letter head and send out to field supply chain team this am

Robert Miller
Senior Vice President, Supply Chain – Field Operations

E-Mail:Robert.Miller@officedepot.com
Office Depot Inc., 2200 N. Highway, Grand Prairie, TX 75050
Cell: 425.466.1948 Office: 972.602.4813

**SVP MILLER's EMAIL TO HIS SECRETARY**

From: Alexandro Kriman <Alexandro.Kriman@OfficeDepot.com>
Sent: Monday, December 13, 2021 3:41 PM
To: Robert Miller <Robert.Miller@officedepot.com>
Subject: Memo

Hello Bob,

During 2021, we encountered many internal & external setbacks, as far as having to deal with analytical work that is not aligned with the analytics vision/guidelines we are aiming to pursue with 360 Logistics.

Therefore, to start 2022 with a strong foothold on analytics and avoid any further setbacks, as well as in anticipation to becoming "Veyer" in March 2022, it would be advisable to start paving the way with a more formal and proactive approach.

With that said, I believe that a memo, such as the attached sample, could serve that purpose.

Regards,

To: All Supply Chain, etc
From: SVP Robert Miller
Re: Supply Chain Analytics & Reporting New Policy
Date: December 2021

**MR. KRIMAN's EMAIL TO SVP MILLER**

As you are aware, ODP Corp is splitting into two independent publicly traded companies, so we can concentrate efforts on our unique strengths.

This transformation into two separate companies, means that we are committed to implement changes and innovations that will allow us to become more focused, strategic, proactive, and effective in providing the best possible service and high-quality experience to our customers.

For that purpose, from a Business Intelligence & Reporting perspective, the newly created 360 Logistics is the new vision for Supply Chain Analytics. This new vision is part of the transformational changes &innovation that will permit the following:

1. Create automated, interactive, online dashboards
2. Centralize all SC analytics (dashboards & databases), so 360 Logistics is the 1 and only "stop place" for all SC analytics
3. Eliminate the labyrinth of tools, reports, dashboards, and different formats we previously used
4. Eliminate ad-hoc and/or locally made reports/dashboards that are stored outside 360 Logistics
5. Make the data more easily accessible via (computers, tablets, phones)
6. Avoid TMI and data overlap
7. Create a more consistent and simple way of presenting data
8. From a technical standpoint, minimize front-end complexity by building well-thought-out backend databases
9. Get analytics-related roles to actually analyze data, instead of constantly developing more reports and dashboards
10. Safeguard the efficiency and long-term sustainability of SC analytics

Therefore, in order to stay on track with the above vision, we must put in effect a new policy for SC analytics:

A. Requests for (reports, dashboards, or even data) that are not part of 360 Logistics, must be approved by SVP Robert Miller
B. The later implementation of any request, must also be approved by SVP Robert Miller
C. Approved implementations must only exist in 360 Logistics. Having them stored in other places or PCs will not be allowed
D. If the above relates to ad-hoc work, it must have an expiration/deactivation date of no more than 10 consecutive days.

In addition to the above policy, 360 Logistics has internally implemented detailed guidelines for dashboard/report building and for the backend databases that feed the dashboards/reports, so we can formally ensure consistency in the way we do things, as well as safeguard the efficiency and long-term sustainability of SC analytics.

I would like to thank you all for your dedication and efforts to continue to excel and drive strong results.

Kindly yours,

SVP Robert Miller

**HERE YOU CLEARLY SEE MR. KRIMAN's EMAIL TO SVP MILLER, AND SVP MILLER INSTRUCTING HIS SECRETARY TO FORWARD IT TO THE REST OF THE ORGANIZATION**

**HOWEVER, OFFICE DEPOT WANTS TO PORTRAY MR. KRIMAN AS A SIMPLE ANALYST INVOLVED IN A SIMPLE TERMINATION CASE, DUE TO UNDERPERFORMING.**

# WIFI PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

**From:** Alexandro Kriman
**Sent:** Tuesday, May 17, 2022 2:16 PM
**To:** Robert Miller <Robert.Miller@officedepot.com>
**Subject:** Internet Wifi

Hello Bob,

Regarding our conversation, as the WIFI technology keeps improving, we should ensure that the update of Veyer's WIFI will leave Veyer well prepared for future upgrades.

Hence, I prepared this table to summarize the current WIFI technology developments:

| Wifi name | Launched Year | Wifi Standard | Frequency | Max Put | Advantage 1 | Advantage 2 | Advantage 3 | Advantage 4 | Advantage 5 |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 2014 | 802.11ac | 2.4 & 5 ghz | 1.3 Gbps | Router communicates with 1 device at a time | radial signal | different signals will interfere | WPA2 | Promotes battery consumption |
| 6 | 2019 | 802.11ax | 2.4 & 5 ghz, 5 ghz is 129 channels. | 9.6 Gbps | Router works with multiple devices simultaneously (OFDMA and MUMIMO) - Reduces latency | Signal direction control, not radial signal as older routers | Routers minimize interference from other signals | Higher security, routers use WPA3 | Reduces device battery consumption |
| 6E | 2020 | 802.11axe | 2.4, 5, 6 ghz. 6 ghz provides 160 channels to avoid traffic congestion and work between 80-160 MHZ. | 9.6 Gbps | Router works with multiple devices simultaneously (OFDMA and MUMIMO) - Reduces latency | Signal direction control, not radial signal as older routers | Routers minimize interference from other signals | Higher security, routers use WPA3 | Reduces device battery consumption |

**Recommendation:**

1-Get an internet wifi 6 service provider wherever is possible (10 gbps). Otherwise, get less than 10 gbps if cost is too high.
2-Get wifi 6 modems (docsis 3.1) to be prepared for future upgrades to WIFI 6E
3-Get routers wifi 6E routers.
Although 6E is the most advanced WIFI, implementing 6E will require all devices to be 6ghz capable, which is unrealistic to accomplish.
However, a WIFI 6E routers can function as a WIFI 6 or WIFI 5 router, so next time you need to upgrade the WIFI, you are already prepared for the upgrade to 6E.

4-Make sure that routers are IPV6 capable, since IPV4 is gradually going away.
5-Place routers on each side of the central work area and at a lower distance from the floor, current routers are fixed to the roof.

MR. KRIMAN ALSO IDENTIFIED PROBLEMS WITH THE WIFI IN WAREHOUSES

SVP MILLER USED MR. KRIMAN'S DISCOVERY AND IDEAS TO LAUNCH A PROJECT TO IMPROVE THE WIFI INFRASTRUCTURE ACROSS ALL WAREHOUSES IN THE USA.

DOES THIS SOUND LIKE A SIMPLE ANALYST THAT DID NOT ENVISIONED AND MANAGED ANYTHING AS OD CLAIMS?



POSITIONING OF ROUTERS FOR BETTER PERFORMANCE

CENTRAL WORK AREA AND RACKS

ROUTERS COULD BE LOWERED TO BE CLOSER TO THE END USER INSTEAD OF BEING FIXED TO THE ROOF

# VARIOUS PROJECTS PROOF – 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

### THESE ARE COPIES OF MANY THINGS MR. KRIMAN SHARED WITH SVP MILLER, CERTAINLY NOT THE TYPE OF WORK DONE BY A SIMPLE ANALYST AS ODP TRIES TO PORTRAY MR. KRIMAN.







HERE YOU SEE MR. KRIMAN'S VISION TO CENTRALIZE DATA, DIAGRAMS MR. KRIMAN CREATED TO EVALUATE THE CURRENT DATA INFRASTRUCTURE, RECOMMENDATIONS TO SVP MILLER TO HANDLE ANALYTICS ACROSS THE COMPANY, AND RECOMMENDATIONS FOR NEW METRICS

# BUDGET PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

IN 2020 MR KRIMAN SENT THIS EMAIL TO SVP MILLER THAT PROVES THAT MR. KRIMAN WAS THE ONE MANAGING THE DEVELOPMENT OF HIS OWN VISION TO TRANSFORM ANALYTICS.

WITH HIS EXPERIENCE, MR. KRIMAN DISCOVERED SOME GIGANTIC CHARGES TO SVP MILLER'S BUDGET DUE TO OVERCHARGES FROM THE "IT" DEPARTMENT (THIS WAS ACKNOWLEDGED BY SVP MILLER IN HIS REVIEW)

WE ALL KNOW THAT PROVIDING VISION, BUDGET CONTROL, POLICY, GUIDELINES ARE ALL EXECUTIVE-LEVEL RESPONSIBILITIES, WHICH CONTRADICT ODP's RESPONSE ABOUT MR. KRIMAN

To: Bob Miller
Re: PARS meeting with Sean Howell
Date: 10/22/2020

Bod,
The below information can be used as a benchmark to better understand the charges from IT/SC Support Optimization:

**External contractor:**
- $7,800
- 1 week to complete work
- Migrate 34 tables from SQL to SF

MR. KRIMAN'S EXPERTISE AND EFFORTS PROVED THAT ODP's IT DEPARTMENT WAS OVERCHARGING 21 TIMES MORE THAN AN EXTERNAL CONTRACTOR TO MOVE DATA FROM 1 SYSTEM TO ANOTHER, WHICH WAS PART OF MR. KRIMAN's VISION

**Office Depot IT/SC Support Optimization:**
- $166,000 (initial charge), $140,000 (latest charge)
- 50 weeks (worst case scenario), 14 weeks (best case scenario) to complete work
- Migrate 26 tables

# MORE PROJECTS PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

**To:** Robert Miller

Hello Bob,

I have been doing a bit of research regarding the below.
What do you think ?

Wed 1/5/2022 11:59 AM

MR KRIMAN SENT THIS EMAIL TO SVP MILLER THAT PROVES THAT MR. KRIMAN WAS THE VISIONARY, THE ONE MANAGING THE DEVELOPMENT OF HIS OWN VISION TO TRANSFORM ANALYTICS

AS EXPLAINED BEFORE, BOUZEK WAS INSTRUCTED BY SVP MILLER TO TAKE DIRECTION FROM MR. KRIMAN

**INTEGRATION OF INTERNAL & EXTERNAL SUPPLY CHAIN DATA WITHIN 360 LOGISTICS**

**INTEGRATION OF INTERNAL & EXTERNAL SUPPLY CHAIN DATA WITHIN 360 LOGISTICS**



INTERNAL SC DATA

CURRENTLY, 360 LOGISTICS DISPLAYS DATA RELATED TO INTERNAL SUPPLY CHAIN (MEANING AFTER RECEIVING THE GOODS WE PURCHASED)



EXTERNAL SC DATA

WE WANT TO INCLUDE IN 360 LOGISTICS DATA RELATED TO EXTERNAL SUPPLY CHAIN (MEANING VISUALIZING ORDERS AND SHIPMENTS BEFORE THEY ARE RECEIVED BY OD



EXTERNAL DATA - CURRENT STATUS QUO

1. EXTERNAL DATA IS PROVIDED BY THE "INFOR NEXUS" SYSTEM.

2. DONNA SERVAIS' TEAM PROVIDES THE DATA VIA EMAILS, AS SEEN BELOW.

ACCORDING TO DONNA SERVAIS, NEXUS WILL LIKELY BE REPLACED BY A NEW SYSTEM CALLED 'PROJECT44'.



**RECOMMENDATION**

ALSO EVALUATE A COMPANY THAT HAS BEEN GIVEN LOTS OF POSITIVE REVIEWS, DUE TO THEIR UNIQUE PLATFORM THAT PROVIDES REAL-TIME LOCATION, TOGETHER WITH CENTRALIZING AND SIMPLIFYING ALL THE IMPORT WORK. THE COMPANY IS CALLED 'FLEXPORT'



### 360 Logistics - thinking forward

Alexandro Kriman

To: Robert Miller

Cc: John Chavarria;    Brian Savage;    Ryan Patten;    Brian Boots

Thu 5/20/2021 5:40 PM

Hello Bob,

Since giving birth to 360 Logistics, it was understood that user feedback & ensuring utilization were important user-related elements of 360 Logistics.

With that said, now that 360 Logistics reached critical size, it is important to think forward about the below items.

1-Slide # 1,2 show how to move forward

2-Slide # 3 shows details involving a "Feedback Review Team" to handle 360 Logistics' feedback.
For this purpose, a "feedback form" dashboard is being developed.
However, let's keep in mind that 360 Logistics should only present analytics that are deemed strictly necessary to effectively operate our SC locations, this is very critical for the long-term sustainability of 360 Logistics as an effective tool,
The aim is to refrain from turning 360 Logistics into a bottom-less bucket of requests, therefore peripheral but helpful data should be added to another workspace called (360 Logistics-Appendix).

3-Slide # 4 shows details involving 360 Logistics' utilization.
Ensuring traffic & the proper utilization of 360 Logistics data is crucial to effectively capitalize on 360 Logistics.
For this purpose, we are developing a "traffic & utilization" dashboard.

THIS EMAIL PROVES MR. KRIMAN ENVISIONED AND MANAGED THE 360 LOGISTICS PROJECT (ITS SAYS "GAVE BIRTH")

HERE MR. KRIMAN EMAILED SVP MILLER AND HIS DIRECTORS TO TELL THEM HOW TO MOVE FORWARD WITH 360 LOGISTICS BECAUSE HE ENVISIONED 360 LOGISTICS.

# CRITICAL ISSUES PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN

Alexandro Kriman

To:

Robert Miller
Tue 5/3/2022 2:55 PM

Hello Bob,

I approached Richard to discussed something that is very concerning for Veyer.

Therefore, in conclusion, the situation between Veyer & OD's ( IT, analytics/reporting unit) is a situation that whether is classified as conflict of interest or politics, Veyer needs to proactively tackle. It has an unnecessary negative financial impact on Veyer, together with negatively impacting the analytics-related vision, goals, objectives we are pursuing.

**Allow me to unfold:**

1- The (IT, analytics/reporting unit) have been trying anything they can to acquire know-how from Veyer to replicate our efforts, to the point that it has become too obvious, disrespectful, and shameful. If you recall, at first their executives proactively encouraged me to drop all the work I was doing with Power BI and 360 Logistics. Nowadays, they are proactively wondering how to emulate the work done with Power Bi & 360 Logistics.

2- As regards to BI/Analytics/Reporting, Veyer doesn't need anything from OD, besides, (lowering access restrictions, and a native connector). In fact, the ( IT, analytics/reporting unit) are an obstacle to our analytics-related progress rather than a benefit.

3- The (IT, analytics/reporting unit) were designed to provide services, which means that 360 Logistics became a threat to their function. Therefore, the ( IT, analytics/reporting unit) keep pressing to push more reports and solutions into Veyer, which means that Veyer has to pay for work that could be done internally by 360 Logistics.

4- Regarding point #3, they are not only making Veyer incur in unnecessary expenses, but they are also pushing into Veyer work that doesn't comply with 360 Logistics vision and guidelines. In essence, they are disrupting everything that Veyer is working for as regards to BI/Analytics/Reporting, vision, goals, objectives.

**Proposed solutions to the above issues:**

1- Immediately stop further Veyer analytics-related requests to ( IT, analytics/reporting unit). Hence, instruct all Veyer employees that no further requests to ( IT, analytics/reporting unit) will be submitted without first going through Veyer's internal approval committee (SVP Bob Miller, the regionals, and 360 Logistics unit). This is something I previously laid on the table, but now is becoming even more critical to proactively tackle this problem.

2- Assess any already made requests to ( IT, analytics/reporting unit) to see if those can be brought back to Veyer, to be developed internally by 360 Logistics

3- Discuss with ( IT, analytics/reporting unit) that they can't discuss developing any work/projects with any Veyer employee, unless that the work/project has been internally approved by Veyer's internal approval committee. In essence, we will let them know if we need something from them.

Regards.

# LEADERSHIP PROOF - 360 LOGISTICS WAS ENVISIONED & MANAGED BY MR. KRIMAN



THIS EMAIL IS FROM A VP TO MR. KRIMAN AND OTHERS.

AS YOU CAN SEE MR. KRIMAN WAS VIEWED BY THE VPs AND SR. DIRECTORS THAT REPORTED TO SVP MILLER AS PART OF THE LEADERSHIP, BECAUSE HE WAS RESPONSIBLE FOR 360 LOGISTICS ANALYTICS.

WHILE BOUZEK PROVIDED SUPPORT TO MR. KRIMAN's 360 LOGISTICS PROJECT, HE WAS EVENTUALLY PLACED ON-CHARGE OF (LABOR PLANNING ONLY) WHILE STILL FULFILLING HIS DUTIES TO SUPPORT MR. KRIMAN.

HOWEVER DURING THIS MEETING, SVP MILLER ANNOUNCED THAT MR. KRIMAN WAS FROM THAT POINT FORWARD REPORTING TO BOUZEK.

STRANGELY, ODP RESPONSE MENTIONES THAT MR. KRIMAN WAS JUST AN ANALYST THAT DIDN'T ENVISION OR MANAGE ANYTHING ???

**AT THE END OF 2021, THEN SR. DIRECTOR RYAN PATTEN WAS ATTEMPTING TO CAPITALIZE ON HIS JOB TITLE TO TAKE CONTROL OF MR. KRIMAN'S 360 LOGISTICS PROJECT.**

**MR. KRIMAN SPOKE ABOUT IT WITH SVP MILLER AND ASKED HIM TO FIND OTHER THINGS FOR MR. PATTEN, BECAUSE MR. PATTEN'S LACK OF EXPERTISE IN THE ANALYTICS ARENA WERE DETRIMENTAL TO 360 LOGISTICS' SUCCESS AND PROGRESS (MR. KRIMAN's PROJECT).**

**DAYS LATER, SVP MILLER CAME TO MR. KRIMAN'S OFFICE AND TEXTUALLY SAID TO MR. KRIMAN…"I TALKED TO RYAN, HE WILL NOT BOTHER YOU ANYMORE".**

**IF SVP MILLER IS A TRUTHFUL PERSON, HE COULD CONFIRM THAT THIS IS TRUE**



SVP MILLER

**From:** Alexandro Kriman <Alexandro.Kriman@veyerlogistics.com>
**Sent:** Wednesday, August 16, 2023 1:11 PM
**To:** Lillian Tamer <Lillian.Tamer@theodpcorp.com>
**Subject:** Re: Concerns

Hello Lillian,

Please see my answers below:

**You alleged that Richard "makes a lot of mistakes (including unethical ones)". Please provide specific examples of when and what the mistakes are that you claim are unethical.**

Richard does make mistakes, when he took direction from me and even nowadays, but he likes to ignore his mistakes and if possible, place the blame on others.

A good example is the recent change in the data refreshing infrastructure without discussing it with me in advance, so I can understand the plan. However, it was so badly handled because richard is not an orchestrator, a big picture guy. Richard took control over almost all the dashboards, but now, he is trying to place the blame on me, although it is the change that he implemented that was horribly executed. This is exactly what happens when superiors get dazzled by embellished dashboards and use that as a criterion to place a violin player that has no previous business intelligence analytics experience on charge of running analytics.

However, when it comes to me, everything becomes a serious matter that needs to be pointed out and documented. I said unethical, because he has been denying that from day one that he has been trying to manage me out, despite the evidence. Denying that I recruited him to assist me with my project, denying that he took direction from me, denying that I recommended him twice to SVP Miller so he wasn't terminated when he took direction from me, denying that he ever said to me when I recruited him..."thank you Sir for giving me this opportunity". Also, failing to accurately acknowledge my true contributions to the organization and downplaying them, which is also consistent with my previous communications indicating the political and "face-saving" implications of accurately and honestly acknowledging that an entry-level employee (Alex Kriman) was the one that e.g. (unveiled the many problems with the former analytics, proposed and planned the new vision and guidelines for new analytics and aimed at establishing a new culture for analytics, developed the plan to create 360 Logistics (relabeled as veyer infrastructure and coincidently after Richard took over), that I was on charge of veyer analytics for 2 years and communicated with VPs, Directors, managers across the US organization & Canada, that I created a new plan to create a new analytics department within Veyer and how to structure it with new people, that I used my own personal credit card to prove my proposal to transform analytics, implemented the new dashboards and the data refresh infrastructure, identified peripheral new projects that brought great benefits to veyer, discovered gigantic overcharges from the IT dept. against veyer, and even developed new databases and brought onboard new 3rd party databases to improve analytics).

Even more, when I was on charge of Analytics, Ryan Patten (Sr. Director at the time) was astute in recognizing the importance of the vision and work I created, so he tried to (butt-in as they say) by leveraging his job title to manage my project and take charge, although due to his lack of expertise with analytics and insights and unsuitable approach to managing the project, he was being detrimental to the project. So, I talked about it with SVP Miller (my boss at the time) and based on my request, SVP Miller asked Ryan to stop getting involved with my project. Afterwards, SVP Miller came to my office to tell me textually "I talked to Ryan, he will not bother you anymore" (yes, this is 100% true, but again, they will not admit that this ever happened).

In true objectivity, the work I did was at the executive level, so it is unethical not to mention these things and to downplay or even deny my many contributions and the responsibilities I had. However, imagine the tremendous political and "face saving" implications if the people above me were honest enough to come forward and openly acknowledge that these things are true, that they actually happened. Acknowledging my claims of discrimination about age and being hispanic with an accent, retaliation, harassment, and that they denied/downplayed my contributions and responsibilities, would be a mayor political & "face saving" scandal within ODP. Imagine the impact of unveiling that an entry-level with a PhD identified the problems with analytics and envisioned and implemented all this transformation, so I am not sure that ODP and the people above me are ready to acknowledge their wrongdoings.

As you can see, I had certain level of clout when I was for 2 years responsible for leading analytics. However, after talking to SVP Miller about looking for better opportunities elsewhere around the company and when considering that my project was already solidified as the new analytics for veyer, I suddenly found myself reporting to richard, being micromanaged, pushed to a corner, and oppressed with all sorts of tactics to produce a paper trail of negativity against me to manage me out. So yes, failing to acknowledge the above or diminishing my contributions and previous responsibilities is wrong and unethical.

# SECTION B

THIS SECTION IS AIMED AT PROVING OTHER SPECIFIC ACTIONS THAT ODP TOOK AGAINST MR.KRIMAN

BY UNDERSTANDING ODP's ACTIONS YOU WILL CONCLUDE THAT THERE IS A GRADUAL & SYSTEMATIC PROCESS AND TACTICS AIMED AT OPPRESING MR. KRIMAN TO FORCE HIM TO RESIGN.

THE EVIDENCE POINTS AT ISSUES RELATED TO E.G. (CONSTRUCTIVE TERMINATION, RETALIATION, DISCRIMINATION, OPPRESSION, HARASSMENT, BELITTLEMENT, ISOLATION, FMLA, ACCOMMODATION).

ULTIMATELY, THE VIEWER WILL EASILY REALIZE THAT MR. KRIMAN WAS EXPLOITED DUE TO DISCRIMINATION, TO EVENTUALLY GET RID OF HIM.

OUT OF 9 PEOPLE THAT REPORTED TO SVP MILLER, MR. KRIMAN WAS THE ONLY ONE TO BE REASSIGNED, DUE TO SO-CALLED "UNFORTUNATE ORGANIZATIONAL CHANGES" AS SVP MILLER TOLD MR. KRIMAN

# MR. KRIMAN WAS THE ONLY ONE AFFECTED BY THE SO-CALLED UNFORTUNATE ORGANIZATIONAL  CHANGES

## THE ONLY ONE (OUT OF 9 PEOPLE THAT REPORTED TO SVP MILLER) TO BE REASSIGNED TO REPORT TO BOUZEK



FROM 2020 UNTIL MID 2022 BOUZEK TOOK DIRECTION FROM MR. KRIMAN, AS PER VERBAL INSTRUCTIONS FROM SVP MILLER

FOR 2 YEARS MR. KRIMAN REPORTED TO SVP MILLER WITHOUT ANY VERBAL OR IN-WRITING COMPLAINTS.

HOWEVER, AFTER MR. KRIMAN EXPRESSED HIS DESIRE TO GET BETTER OPPORTUNITIES AND TOLD SVP MILLER THAT HE APPLIED TO OTHER INTERNAL ROLES...THEN SVP MILLER NOTIFIES MR. KRIMAN THAT HE WILL START TO REPORT TO BOUZEK, SOMEONE THAT WAS TAKING DIRECTION FROM MR. KRIMAM AND IS LESS QUALIFIED THAN MR. KRIMAN.

ALSO, LETS EMPHASIZE THAT MR. KRIMAN ASKED SVP MILLER IF HE HAS DONE SOMETHING WRONG, OR IF HE WAS UNHAPPY WITH HIS WORK, BUT SVP MILLER SAID "NO" IT HAS NOTHING TO DO WITH IT, IT IS DUE TO ORGANIZATIONAL CHANGES. SVP MILLER ALSO SAID THAT NOTHING SHOULD CHANGE, BESIDES REPORTING TO BOUZEK, ALTHOUGH LATER BOUZEK DID EXACTLY THE OPPOSITE.

# BOUZEK MANAGED MR. KRIMAN WITH UNSEEN BEFORE

# EXCESSIVE DAILY MICROMANAGEMENT

# BOUZEK – UNSEEN BEFORE EXCESSIVE **DAILY** MICROMANAGEMENT

MR. KRIMAN INFORMED HR SEVERAL TIMES THAT BOUZEK IS UNUSUALLY MICROMANAGING HIM WITH **DAILY MEETINGS** THAT LAST BETWEEN 1-1.5 HOURS, TOGETHER WITH BEING INSTRUCTED TO SEND **DAILY EMAILS** TO BOUZEK TO REPORT WHAT HE HAS DONE DURING THE DAY.

SO, THE SENIOR VICE PRESIDENT (SVP) MILLER RARELY MET WITH MR. KRIMAN TO RECEIVED UPDATES, BECAUSE HE TRUSTED MR. KRIMAN.

HOWEVER, MANAGER BOUZEK (WHO PREVIOUSLY REPORTED TO MR. KRIMAN) BELIEVES THAT MR. KRIMAN NEEDS **DAILY 1-1.5 HOURS MEETINGS**, TOGETHER WITH **DAILY EMAILS** TO REPORT WHAT HE HAS DONE DURING THE DAY ???

**DAILY 1-1.5 HOURS MEETINGS**

**AND**

**SEND DAILY EMAILS TO BOUZEK ???**

TO FURTHER OPPRESS MR. KRIMAN, BOUZEK GIVES MR. KRIMAN 209 ONLINE COURSES TO COMPLETE

209 ONLINE COURSES

# BOUZEK GIVES MR. KRIMAN 209 ONLINE COURSES TO COMPLETE

WITHIN THE SPAN OF 6 MONTHS MANAGING MR. KRIMAN, BOUZEK GIVES MR. KRIMAN AN ASTONISHING 209 ONLINE COURSES TO COMPLETE

IF YOU HAVE ANY MANAGERIAL EXPERIENCE, YOU WOULD AGREE THAT THIS IS BEYOND ABNORMAL ?

BOUZEK GAVE 180 COURSES AFTER REQUESTING FMLA AND ACCOMMODATION, THEN ADDED 15 MORE, AND THEN 14 MORE COURSES = 209

From: Alexandro Kriman <Alexandro.Kriman@veyerlogistics.com>
Sent: Monday, August 28, 2023 8:50 AM
To: Lillian Tamer <Lillian.Tamer@theodpcorp.com>
Subject: Re: Concerns

Hello Lillian,

On 8/16/23 I notified you that Richard has given me 180 microsoft courses and asked me to complete 5 courses each week (this is still ongoing). Then after the 6/28/23 PIP, on 7/11 he added 15 Aspire courses covering about 19 hours of training to be finished by 8/3/23. Now, on 8/14/23 he further added another 14 Aspire courses totaling about 15+ hours of training, where 4 courses have to be finished by 8/20/23 and 10 courses to be finished by 8/27/23. This means that in the last 6 months or so, I have been officially given 180+15+14=**209** training courses to complete.

For 2 years while reporting to SVP Miller, there were 0 (cero) complaints from SVP Miller about me, or my work, or my skills, in fact it was quite the opposite. However, once I started to report to richard bouzek (who used to take direction from me), he started to immediately micromanage me and suddenly everything with my persona and my work becomes a problem. However, any reasonable person that would analyze the evidence would without a doubt agree that there is overwhelming evidence of discrimination, retaliation, abuse, and harassment against me.

We all know that the underlying intention with these tactics is to attack the employee (me) by creating discomfort/stress, induce lack of confidence, build a case and create a paper trail, together with asserting control to boost richard's ego. Yet, the ODP organization continues to allow richard bouzek to abuse the job title that ODP has given him to discriminate against me, retaliate, abuse, and harass me in order to manage me out. The reality is that there is nothing wrong with me or with my work, in fact I am still the same person that SVP Miller hired on 8/2020 and praised for my vision and work. Therefore, this experience is nothing more than a reflection of having a terrible boss called richard bouzek.

As an example, I can display the below forced assignment, asking to create a Power Bi dashboard, although I have been for over 3 years creating dashboards for ODP, not to mention that the training platform provides awful instructions to understand what steps need to be followed to get through the test. I just wonder how you or Zoe Maloney would feel if after many years of successfully working for ODP and being praised for your good work, you are suddenly asked to report to someone else and your new manager starts to quickly micromanage you and question everything about you and your work, for example questioning your communication skills, your project management skills, your ability to produce informative documents or powerpoints even though you have been successfully doing those things for many years.

Furthermore, on Friday 8/25 I had a 1:30 PM meeting that was supposed to last 30 minutes, our richard extended the meeting until 2:47 PM, although it was a meeting that doesn't take responsibility for his poor work. Nevertheless, when it comes to criticizing Alex Kriman, he has no problem spending hours belittling me and my work. The reality is that as richards' previous unofficial boss, I gave him a formal letter for underperforming, and now that he is in charge, he has not only continued to underperform, but has additionally shown with his actions a behavior that is incongruent with the professional behavior that is expected from someone that has been given the privilege to manage people.

Regards,

---

AK    Alexandro
      Kriman

      To:    Lillian Tamer



Tue 7/11/2023 10:43 AM

Hello Lillian,

This 7/11/23 morning, I was given a deadline of August 3 to complete approximately 19 hours of additional training, which is in addition to the original request to take various online courses that typically last 0.5 hours each. In addition to this, yesterday 7/10 I was also required to daily fill out a SharePoint work status log, which is in addition to the daily emails I had been already required to send with an Excel attachment that provides details of my daily work. All of this is in addition to the 1-1.5 hours of daily meetings with Richard, which are not only to talk about my work but also to deliver even more work on a daily basis. As you know, I start my work at 6 AM, so after my complaint to HR these meetings were rescheduled from the typical 10 AM to 1 PM. In this manner, instead of being able to finish my 8 hours shift, these rescheduling forces me to work overtime for the meeting and to finish that same day the given work or some of it.

I cannot imagine how all this evidence will not make any reasonable person realize that this is a calculated strategy to continue to escalate things, to oppress and overwhelm. The timing of these escalations coinciding with my complaint to HR raises solid valid suspicions of retaliatory and discriminative behavior from my supervisor. It is disheartening to find myself subjected to such this treatment after raising legitimate concerns within the organization, meanwhile Richard is allowed to continue with his calculated escalation of measures to drive me out of the company.

Regards,

# 209 ONLINE COURSES – PROOF

## THIS LIST HAS 180 COURSES





## THIS LIST HAS 15 COURSES





## THIS LIST HAS 14 COURSES





PCD AND PIP OVERLAP

BOUZEK SEEMS TO BE IN A HURRY TO GET RID OF MR. KRIMAN AND PORTRAY HIM AS AN AWFUL EMPLOYEE, BUT THEN HE DOESN'T FIRE MR. KRIMAN ???

# PCD & PIP OVERLAP SAYING THAT MR. KRIMAN IS A BAD EMPLOYEE, BUT HE IS NOT FIRED AFTER THE 60 DAYS

**PCD**

**Office Depot OfficeMax**

### Performance Correction Document

*Manager Instructions: This form is to be used by Managers to document misconduct, attendance issues and/or performance deficiencies. This document should be reviewed and signed by the Associate, and then placed in the Associate's personnel file.*

*A signed copy of completed document should be scanned and emailed to HR-Employee.Services@officedepot.com. If available, please fax to HRES at (567) 438-8746.*

**General Information**

| | | | |
|---|---|---|---|
| Associate Name: Alexandro Kriman | | EMPL ID#: 980350 | |
| Date of Occurrence: 04/07/2023 | | Location #: 1079 | |
| Manager Name: Richard Bouzek | | Manager EMPL ID#: 947178 | |

Description of Occurrence:   ☐ Performance/Conduct   ☐ Attendance

Unsatisfactory Job Performance.

Alexandro, you are receiving this PCD because your performance is below an acceptable standard. To assist you to bring your performance to an acceptable level, we've had several conversations to discuss the issues that have been identified. Since that time there haven't been any notable improvements. You consistently fail to meet deadlines related to completion of projects. You also fail to communicate and provide me with necessary and timely updates as requested on more than one occasion. I am constantly following up with you for updates. When tasks and projects are assigned to you, I trust that you will complete them in a timely basis or ask the necessary questions to be able to move forward with the project/task.

You failed to complete an action plan that was requested on 03/10/2023 and Alexandro committed to having to completed by 03/17/2023. Alexandro is aware of this request as it was discussed on several occasions to include extending the deadline to 03/29/2023. The first draft was turned in on 3/30/2023 but did not include the tasks completed or due. The next update was submitted on 4/7/2023.

You were also asked on 03/09/2023 to finalize the On Time Delivery dashboard with the facilities to ensure the data is available to shut down a report that is emailed out routinely. There were no updates on 03/16, 03/22, and 03/29 as requested.

We have also discussed opportunities and the need for you to develop your skills in Microsoft Power Platform and have discussed training options, that you have not taken advantage of.

**Performance Expectations and Suggested Actions for Consideration**

Alexandro, you are responsible for achieving and sustaining productivity, ongoing communication, and accuracy standards to create extraordinary value for our customer.

You are also expected to complete tasks in a timely manner, keep an open line of communication with me and other team members and be proactive with your skill building in Microsoft Power Platform.

Failure to demonstrate immediate and sustained improvement in the areas of accountability and completing assigned audits and observations will result in further corrective action up to and including termination.

**Coaching History (i.e., verbal discussions, coaching and feedback)**

Verbal discussions were had on the following dates:

2/23, 3/2, 3/8, 3/9, 3/10, 3/16, 3/22, 3/29, 3/31, 4/3, and 4/7

**Discipline History**

Rev. 9/17/15                                                                                              Page 1 of 1

**Office Depot OfficeMax**

Check level of current discipline and insert date of previous discipline issued within the last 12 months (the Company may skip any step depending on the nature and severity of the issue)

| Current Discipline | | | Previous Discipline Dated |
|---|---|---|---|
| X  Warning | | | _____ |
| ☐  Final Warning | | | |
| ☐  Administrative Leave | _____ to _____ | (subject to change) | |
| ☐  Termination of Employment | | | |

**Associate Comments**

**Acknowledgements**

I have discussed this Performance Correction Document with and provided a copy to the Associate.

Manager Signature   *Richard Bouzek*                Date 05/02/2023

I acknowledge that I have discussed these concerns with my Manager and received a copy of this document. I understand the level of current discipline as noted above (Warning, Final Warning, Administrative Leave or Termination). In the event that I am being warned (Non-Termination; Warning, Final Warning or Administrative Leave) regarding the above issue(s), I understand that additional deficiencies may lead to further corrective action, up to and including termination of employment.

Associate Signature   *Kriman*  *this signature is only to acknowledge the receipt of this document*   Date 5/3/2023

---

**ANY MANAGER WILL TELL YOU THAT IT IS STRANGE THAT A PCD IS GIVEN FOR SOMETHING THAT HAPPENED ALMOST 1 MONTH AGO**

**THE DOCUMENT INDICATES THAT THERE WERE NO PREVIOUS WARNINGS TO MR. KRIMAN, YET THE DESCRIPTION SAYS THAT THERE WERE WARNINGS ???**

**MR. KRIMAN WAS TOLD BY BOUZEK THAT HE HAD 60 DAYS TO IMPROVE OR HE MAY FACE TERMINATION OF EMPLOYMENT**

---

**ALTHOUGH THE PCD WAS 60 DAYS AND BOUZEK COULD HAVE FIRED MR. KRIMAN AFTER THE PCD, BOUZEK IMMEDIATELY PROCEEDED WITH A PIP AFTER ONLY 57 DAYS....**

**BUT AFTER THE 60 DAYS PIP, BOUZEK STILL DOESN'T FIRE MR. KRIMAN WHO WAS BEING PORTRAYED AS AN AWFUL EMPLOYEE ???**



---

**PIP**

**Office Depot OfficeMax**

### PERFORMANCE IMPROVEMENT PROCESS MEMORANDUM

This Performance Improvement Process (PIP) Memorandum is typically a 60-day improvement plan that outlines performance issues. Generally, before using this document, performance issues should be addressed through setting performance expectations and providing coaching and feedback. If these methods have not been successful, the PIP is typically used to address multi-faceted performance or competency issues. This Memorandum outlines performance and behavioral competency issues which must be improved. Once this Memorandum is presented to the Associate, the Associate must complete the Action Plan on the reverse side of this form to Management's expectations by the date indicated below. If the Action Plan is not timely completed, the Action Plan steps are not timely implemented, other issues arise during the PIP period, or performance is not improved to Company standards by the end of the process, termination of employment may result. If performance declines during the PIP period or is not sustained after successful completion of the PIP period, termination of employment may result.

| | | |
|---|---|---|
| Associate: Alexandro Kriman | EMPL ID#: 980350 | Hire Date: 12/19/21 |
| Position: Analyst, Sr. Financial | Location: 1079 | Today's Date: 6/28/2023 |
| Manager: Richard Bouzek | Manager ID#: 947178 | |

Summary of performance or behavioral competency issue: Continued failure to meet standard... ...ations required of a Sr. Financial Analyst. Alexandro we have discussed the following opportunities with your ...ance:

On Time Delivery Dashboard
○ Manual reports have not been decommissioned as instructed
○ PBI file turned in 6/7 as completed – multiple r...   ...ved to be addressed - all discussed during prior meetings
  ▪ Measures calculating incorrect...   ...relationships not being defined
  ▪ Dynamic Date filter not fun...   ...calculations was setup for the wrong filtering direction
  ▪ Fields calcula... ...thods vs using measures (data is not accurate because relationship was not used)
  ▪ Measur... ...a SAMEPERIODLASTYEAR function which provides inaccurate results when end-user is viewing
    ...rs at a quarterly/period/weekly view
  ...rvals left off of Carrier and Market view (Pareto and Percent Change)
...x Demurrage Refresh
○ You are responsible for ensuring the daily refresh occurs for this report and resolve any opportunities that may occur. Communicated the importance of this refresh as it sends out email notifications, and if unable to resolve by 10 am you were instructed to reach out to me for assistance. 5/8 received refreshes and they have not been successful in 5 days
Detention & Demurrage Report
○ 6/8 reviewed request changes from audience
○ 6/12 went over change requests again and suggested scope of work.
○ You estimated to be completed on 6/16. After following up, you changed completion estimate date to EOB 6/19.
○ 6/20 review D&D changes
  ▪ Not following guidelines
    • Calculations needed to be completed within Power Query, you were still trying to create measures. When asked why, you said because you were trying to get the results first. I explained how you were doing a lot of unnecessary work and not making progress and redirected you to utilize Power Query to perform the calculations.
○ As of 6/27/23 D&D has not been completed
PNL plan for 2019, 2020
○ Requested 6/12 and I outlined and reviewed expectations to extract the plan from an excel file. You once again did not follow the guidelines and you provided a file with both the plan and actuals that was not in tabular format. Reviewed the process again and provided you with screen shots of expected results. You have not provided estimated completion time as requested. Reviewed 6/27 and you estimated 4 weeks to complete. We walked thru the process and timed the steps and estimated 3.9 hours to complete
Quality Error Tracking
○ Alexandro estimated completion by 5/9
○ 5/18 Reviewed 80% complete - minor changes
  ▪ Formatting field names - Matrix Visual and field names in KPIs
  ▪ Title centered vs default color
  ▪ Parrado not started
  ▪ Avg errors by employee not calculating correct
○ 6/12 discussed opportunities with dashboard
○ Has not started the employee automated report

---

**BOUZEK SEEMS TO BE IN A HURRY GIVING THE PCD AND PIP AND PORTRAYED MR. KRIMAN AS AN AWFUL EMPLOYEE....YET, HE DID NOT FIRE MR. KRIMAN AFTER THE PCD OR PIP'S 60 DAYS ??? ... HE WANTED A RESIGNATION**

TO FURTHER OPPRESS MR. KRIMAN, BOUZEK **ISOLATED** MR. KRIMAN FROM THE REST OF THE ANALYTICS TEAM

NO CONTACT WITH THE REST OF THE TEAM

# BOUZEK – ISOLATES MR. KRIMAN FROM THE REST OF THE TEAM

Alexandro Kriman
To:Zoe Maloney
Cc:Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton   Thu
7/6/2023 9:40 PM
To whom it may concern:

This is a formal complaint for retaliation, harassment, and discrimination based on being over 40, Hispanic, and having an accent.   I request that you investigate this matter and take appropriate action against Richard Bouzek.

The following are the events that I believe constitute retaliation, harassment, and discrimination:

I was hired as a Sr. Financial Analyst on August 2020; my job was to prepare reports for SPV Miller. Yet, due to my management consultant experience, SVP Miller   approved my vision and plan to transform analytics for the company, so I was verbally put in charge of the project I created. After two years of developing 360 Logistics   (nowadays called Veyer intelligence) and other projects, collaborating with executives and managers across the organization, and receiving a successful review from SVP   Miller, I approached him in May 2022 to discuss my career goals. I spoke to him about my interest in moving to other company areas for higher-level roles that better align   with my qualifications. SVP Miller indicated that I had his full support and mentioned that my capabilities and contributions to the company's transforming analytics were   already at the executive level.

After that conversation, several months passed, and I started reporting to Richard Bouzek. However, SVP Miller said it was because of his new responsibilities involving   the company's transformation but emphasized that it had nothing to do with my performance. He also indicated that little should change and that my work should continue   as usual with the difference that I report to Richard.

By the end of July 2022, once Richard Bouzek became my manager, I had an initial conversation with him. I asked for his help to attain another role anywhere across   ODP Corp that could allow me to step away from the umbrella under SVP Miller. Richard indicated that I had his support and that, as SVP Miller suggested, things should   not change regarding my work. Furthermore, remember that I disclosed my desire for other job opportunities to Zoe Malone and other HR executives.

However, despite my application to many internal roles, I have yet to be able to interview for any of the many positions I applied for or even be called by   someone to develop a plan to transfer me to a new role. So, opportunities have not been presented despite my consistent good performance and contributions to the   company as indicated in SVP Miller's review, my tenure with ODP, having a doctorate in business, a masters in engineering, and outstanding work experience. I was   passed over for promotions, although plenty of Office Depot employees are younger and with less academic and work experience qualifications who are promoted to managerial and executive roles.

The above facts indicate that I am not wanted as an Office Depot employee and show clear discrimination against me because of my age, being Hispanic, and having an   accent.

Furthermore, because of the above, I have been discriminated against and harassed, and retaliated against by Richard Bouzek. While I was leading business intelligence   analytics under SVP Miller, on February 2022, I gave a formal written warning to Richard for underperforming in his work.

The above-written warning explains Richard's additional retaliation as well. Let's remember that my 1st performance review from SVP Miller (a seasoned high-level   executive) involved 2020 & 2021 for a total of 21 months being evaluated when he provided my review, which indicated that I had done a "great job, innovating,   collaborating, and driving the business."

In contradiction, Richard's 2022 review delivered on April 2023 evaluated only eight months (since Richard became my supervisor) and described me as an   underperforming employee. However, he is a much less experienced company employee without previous work experience in business intelligence analytics (only   systems administration and warehouse management experience). Still, regardless, it was a review that destroyed my reputation with the company.

Then, a month after delivering the 2022 yearly review, on 5/2/23, Richard proceeded with a PCD to further complain about my work. Then, less than two months later, on   6/28/23, Richard continued with another PIP to complain further about my work and verbally threatened to terminate my employment within the indicated 60 days or less if   he didn't see improvement.

Moreover, Richard crafted for me an isolation culture. On December 2022, he hired another analyst for the team (Sudheer). However, Richard never introduced us; I have   not spoken to Sudheer since he was hired, even though we are on the same team. Richard doesn't inform me about what is happening with veyer's intelligence, meets   separately with Sudheer, and only Richard knows what each person is doing or the direction path where veyer intelligence is going. In essence, Richard implemented   a top-secret management style, he keeps everything to himself.

In addition to the above, since I started to report to Richard, he also changed my job responsibilities and started to aggressively micromanage me daily 1-1.5 hours   meetings and demanding daily email status reports. First, by removing me from leadership responsibilities while I reported to SVP Miller and then started to push my   work much more on the back-end databases direction because he knows that it is not my strong area. Aren't competent managers supposed to empower employees (like   SVP Miller did), capitalize on their strengths, and support them to help them thrive instead of oppressing them?

Lastly, on 6/28, I reminded Richard that I am on average working 12 hours/day and sometimes even 16 hours. Yet, Richard's response was not with empathy   or to acknowledge any responsibility due to his flaws. Instead, he textually said that as a salaried employee, it is expected that the norm is to work 10 hours/day and do   whatever is needed to finish the work. I wonder if Richard's mentality is also shared by the ODP organization?

You, as a reader, should see a pattern of retaliation, harassment, and discrimination based on (age, being Hispanic, having an accent, also no opportunities to attain   another role across the company, as well as, a bad and contradictory yearly reviews followed by a quick PCD and then a PIP, the isolation culture and secrecy, changing   duties, micromanaging, and expecting to work overtime each day) and all this despite of having qualifications that place me on the top 1-3% of the ODP workforce, and   despite of my tangible contributions to the ODP organization with 360 Logistics (veyer intelligence) and other projects.

Regarding all the above, I also filed with the EEOC, so you should expect to hear from them in about 10 days.

Kindly,
Dr. Alexandro Kriman (Doctorate PhD in Business, Masters in Engineering, Certificate in Industrial Management)

---

MR. KRIMAN INFORMED HR SEVERAL TIMES THAT BOUZEK CRAFTED FOR MR. KRIMAN AN ISOLATION CULTURE. ON DECEMBER 2022, HE HIRED ANOTHER ANALYST FOR THE TEAM, BUT MR. KRIMAN NEVER SPOKE TO THIS OTHER ANALYST, EVEN THOUGH THEY ARE ON THE SAME TEAM.

SO, BOUZEK STARTS TO MANAGE MR. KRIMAN AND THEN HIRES ANOTHER ANALYST, BUT MR. KRIMAN NEVER, EVER TALKS TO THE NEW ANALYST ???

AND TO MAKE MATTERS WORSE, BOUZEK MEETS SEPARATELY WITH EACH OF THEM TO AVOID COMMUNICATION BETWEEN THEM ???

IN ADDITION TO ALL THE ABOVE, BOUZEK WOULD NOT DISCUSS WITH MR. KRIMAN ANYTHING ABOUT UPCOMING OR FUTURE PLANS RELATED TO ANALYTICS.

BASICALLY, BOUZEK TURNED MR. KRIMAN INTO A SIMPLE ORDER TAKER, BY SAYING (I NEED SO AND SO BY SUCH DATE), WHICH IS NOT THE WAY TEAMS OPERATE



BOUZEK DEMANDS FROM MR. KRIMAN TO **WORK AT LEAST 10 HOURS** PER DAY

# BOUZEK DEMANDS A MINIMUM OF <span style="color:red">10 HOURS PER DAY</span> AND WEEKENDS IF NECESSARY

AK  Alexandro
    Kriman

To:     Lillian Tamer

Cc:     Zoe Maloney; Nora Diaz; Jennifer Harrold; Diane Taylor; Juan Cedres; Marguerite Hamilton

Fri 7/7/2023 4:33 PM

Thank you Lillian for reaching out.

Certainly, feel free to call me from 8 AM onwards during the morning.

Today 7/7, I had another daily meeting with Richard.

He made me feel threatened, he literally told me that I am running out of time, that I might not even have 60 days.

And despite of already working on average 12 hours/day and sometimes even 16 hours, he emphasized that the "expectation" is that I work a minimum of 10 hours/day and that he suggested to put the needed extra hours and even work during the weekends to get the work done. Then he proceeded to say that he actually expects the P&L project to be finished by Monday 7/10, so he said that he expected that I work over the entire weekend 7/8-7/9 to get the work done.

Furthermore, he complained about the PIP action plan I developed and delivered as he requested on 7/5.

I was made uncomfortable because he reiterated several times that he wanted me to remove some small sentences that made him feel that I was pointing fingers at him e.g. (instead of using those discussions to produce material for PCDs and PIPs, instead of not saying anything and then suddenly surprising me with a PCD or PIP). He also made a big fuss about the action plan not being what he expected, and after a lengthy verbosity I had to listen to, it was revealed that the only thing that was actually missing was 1 item in reference to technical training, as well as asked me to change some items labeled as "3 months" to "immediately".

I don't know what to tell you, I have dealt in the past with many top executives, CEOs, wealthy owners of large businesses, and even with important foreign government officials, but never saw or heard of anything like this.

Kindly.





SO, SENIOR VICE PRESIDENT (SVP) MILLER NEVER HAD A PROBLEM WITH MR. KRIMAN'S WORK ETHIC AND NEVER ASKED MR. KRIMAN TO WORK A MINIMUM OF 10 HOURS/DAY.

HOWEVER, MANAGER BOUZEK DEMANDS 10 HOURS/DAY FROM MR. KRIMAN ???

BOUZEK RESTRICTS ACCESS TO MR. KRIMAN, LIMITING MR. KRIMAN's EFFICIENCY

MR. KRIMAN IS LITERALLY FORCED TO COPY/PASTE DATA DUE TO BOUZEK's ACCESS RESTRICTIONS
IT IS LIKE SAYING TO AN ACCOUNTANT NOT TO USE EXCEL AND INSTEAD USE MICROSOFT WORD AND A CALCULATOR TO DO THE JOB.

AK    Alexandro Kriman

To:

    Lillian Tamer

Tue 9/19/2023 1:26 PM

Hello Lillian,

Today 9/19 I was given by richard a task to see how to improve a P&L dashboard.

Regarding the P&L task, even though I am part of the analytics team and always had full access to critical company data, I am now forbidden from accessing the P&L dashboard and certain other dashboards, I can only view them online as any other user does, but I can't download the dashboards into my PC or edit them.

Additionally, regarding the mentioned unusual filter he asked to implement, I asked him if he knew how to solve that issue, but he refused to explain how. Aren't supervisors supposed to explain things to other employees ?. This would be equivalent to your manager asking you to unusually create a Powerpoint with 3D letters as headers, and if you asked how to accomplish that, your manager tells you to go and figure that out on your own. On the opposite side, when richard took direction from me, I always showed everything to him and always explained things, so he could understand why I wanted things done in certain way.

Furthermore, regardless of richard knowing that I am overseas due to bereavement, he keeps going at me with more demands and deadlines, as if nothing has happened, which is consistent with my previous complaints about richard not having any consideration and empathy for other people.

How much more abuse is HR going to keep tolerating simply to show support to the person with the highest job title, even though richard's behavior and actions are unacceptable ?

The pattern speaks for itself :

1-I am first hired to lead analytics according to the vision I presented to SVP Miller
2-richard becomes my supervisor, although he took direction from me
3-richard takes over all my projects and ideas and I am ordered to do as told...or else
4-I am also segregated from the new hired analyst sudheer
5-I am now forbidden from getting full access to certain dashboards

The situation has reached a critical point, and it's evident that these actions constitute a clear pattern of systematic oppression, discrimination, retaliation, and harassment. To illustrate the gravity of the situation, imagine being tasked with improving an HR PowerPoint presentation, but you're not allowed access to the actual PPT file. Instead, you are expected to work solely with screenshots taken from an online version. Such a scenario is not only unreasonable, but also erodes productivity and goes against the company's philosophy of respect and inclusion.

What is even more astonishing is the continued authority granted to Richard to manage anybody, despite the mounting evidence of discrimination, retaliation, and harassment. It raises questions about the questionable support Richard is receiving from higher-ups in the organization, as it is unlikely that he could implement all these actions against me without support from above. No professional organization should tolerate such behavior from a manager. It is essential that we ensure a fair and inclusive work environment for all employees, the credibility and integrity of our organization are at stake, so it's crucial that swift measures are taken to rectify richard bouzek's behavior and the given power he has wrongly received to have authority over other employees.

With that said, it seems too much coincidence that every time I complain about richard's behavior to HR, richard somehow figures out new actions against me. Instead, I hope that this time actions are taken by HR to stop richard bouzek.

BOUZEK DEMANDS FROM MR. KRIMAN TO START WORKING FROM THE OFFICE AT LEAST 3 TIMES PER WEEK

TO PLACE PRESSURE ON MR.KRIMAN TO FORCE HIM TO RESIGN

# BOUZEK DEMANDS FROM MR. KRIMAN TO START WORKING FROM THE OFFICE AT LEAST 3 TIMES PER WEEK

To: Aneisha Rogers-Scott
Cc: Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton;Zoe Maloney
Tue 5/16/2023 6:13 PM
More than 75% of recipients have opened this mail.

Hello,

I am writing to follow up on my letter dated 5/7/23 regarding my concerns regarding the misconduct, discrimination, and retaliatory practices of Richard Bouzek against me.

Between the beginning of 2022 and 3rd quarter of 2002, I talked to SVP Miller to convey my concerns regarding the poor performance and behavior of Richard Bouzek, because at the time, I reported to SVP Miller and Richard was recruited by me to assist me with my project and unofficially took direction from me.

Also, around mid 2022, I spoke with SVP Miller regarding my desire to grow my career by applying to other available roles across the ODP organization. My enthusiasm was very well received and supported by SVP Miller, who acknowledged that my performance and qualifications were at the executive level. Therefore, I was excited to apply to many roles where I felt that my qualifications, skills and experience could make again a positive impact in the organization, together with being optimistic that I would have an exciting and tenured career with ODP for many years to come.

However, by the end of 2022, Richard became my superior and although SVP Miller never mentioned any performance issues about me and stated that nothing should change besides reporting to Richard, Richard immediately started to oppress me. Furthermore, due to a negative 2022 review from him (although during most 2022 I reported to SVP Miller), my option to be even considered for another role across the ODP organization, was completely eliminated by Richard. This could have given me the opportunity to shine again and get away from Richard's harassment.

So far, since I notified SVP Miller of my desire to apply to other ODP roles, I have applied for 8 internal roles across the ODP organization, but I have been interviewed for only 1 role by a recruiter, who told me that my information had been forwarded to the hiring manager, however there was no further dialogue. For the other roles to which I have applied, I haven't even been prescreened for consideration, despite of my notorious contributions to ODP, having a Doctorate in business, MSc engineering, excellent cross-functional experience, and a multicultural/multilingual background, which are all qualifications that have nothing to envy to many ODP sr. managers and executives when you compare with their qualifications. Therefore, it is obvious that somebody must have given the order to not entertain my job applications.

These are a few examples of the disparate treatment I had to immediately endure, since I started working for Richard:

• I was right away pushed away from leading every single project and/or idea I created
• I was handcuffed with systematic and incremental daily micromanagement
• Suddenly my work is constantly criticized and is never good enough
• I am being bombarded with requests, changes, and tasks
• He is constantly telling me to redo things even after he gave me the green light
• Richard sees himself as someone glorious in need to constantly enlighten me
• I am kept away from everything because now everything is kept top secret by Richard
• I was asked to only work on certain specific things as instructed and nothing else
• Richard built a wall between me and the other team member, there is zero communication
• My project 360 Logistics was soon after relabeled as Veyer Intelligence
• Access to Power BI in the cloud was restricted by Richard although I created the cloud
• Micromanagement meetings unnecessarily last 1-1.5 hours
• I have to send daily emails disclosing what I done during the day
• I was asked to work from the office 3 times per week to place more pressure on me
• My innovations, ideas, or discoveries no longer matter, only Richard's work can shine
• Belittling me saying that I lack in many areas, that I shouldn't apply to other ODP roles
• He redefined my role as data engineer, which is what I previously recommended to SVP Miller to rebuild Richard's work.

As of this writing I have not received any response to my outstanding questions from my initial letter addressed to HR dated 5/7/23 or follow up about our phone conversation on 5/10/2023. I remain hopeful, although I am concerned that my questions and concerns have not been taken seriously.

**SO, MR. KRIMAN WORKED FOR SVP MILLER FOR 2 YEARS AND SVP MILLER GAVE HIM LIBERTY TO WORK FROM HOME OR FROM THE OFFICE, AND NEVER SAID ANYTHING ABOUT MR. KRIMAN HAVING TO WORK A MINIMUM OF 10 HOURS/DAY.**

**THEN BOUZEK COMES AND DEMANDS MR. KRIMAN WORKING 3 TIMES PER WEEK FROM THE OFFICE AND ASKED HIM TO WORK A MINIMUM OF 10 HOURS PER DAY**

**BOUZEK KNEW THAT MR. KRIMAN HAD TO DRIVE 50-60 MINUTES TO GET TO WORK.**



ODP CLAIMS NO DISCRIMINATION, NO RETALIATION...

AND NOT TO KNOW THAT MR. KRIMAN FILED WITH THE EEOC

THESE ARE SOME OF THE EMAILS MR. KRIMAN SENT TO HR AND PROOF THAT **HE NOTIFIED HR ABOUT THE EEOC**

Alexandro Kriman
To:Zoe Maloney
Cc:Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton
5/7/2023 6:18 PM

To Office Depot HR.docx
23 KB

**FIVE (5) HR PEOPLE WERE NOTIFIED VIA EMAIL, INCLUDING THE HEAD OF HR**

To whom it may concern:

I want to take this opportunity to express my concerns about Richard Bouzek.

I arrived to ODP with the desire to develop a long-term carrier, feeling excited, optimistic, and full of passion, but now I feel low-spirited, taken advantage of, and betrayed by some of my coworkers. I joined ODP in August 2020 with over a decade of experience leading, orchestrating the transformation of BI analytics, developing strategic vision and projects to increase revenue/efficiency, as well as with an atypical combination of technical & business experience, which includes a Doctorate PhD in business, Masters in engineering, and a Certificate in industrial management, executive experience, management consultant experience, vast cross-functional experience (e.g. marketing, sales/business development, inventory, financials, operations), foreign languages, and vast US and international experience (living in France, Finland, Chile) as well as working with the (US, LATAM, and EU markets).

The above allowed me from the get go to take the initiative to identify the inefficiencies of the former back & frontend BI analytics/reporting infrastructure, reason why I introduced SVP Miller to Power Bi and single-handed developed a proposal to SVP Miller to implement in phases a new vision for BI analytics, to change the perspective on how we manage BI analytics, and develop pioneer BI analytics by transforming things from top to bottom with the 360 Logistics (nowadays relabeled Veyer Intelligence) together with other important peripheral projects. Because of this, SVP Miller approved my proposal and had me for 2 years on charge of everything related to BI analytics, reason why I recruited Richard Bouzek to specifically assist me with the backend, and I was given the authority to unofficially manage the team. Furthermore, after 360 Logistics gain some momentum, SVP introduced the work to many other individuals across the organization, so we can certainly say that Veyer Intelligence wouldn't exist nowadays if it wasn't for my visionary work, and that my analytics work also had an impact across the ODP organization. Unfortunately, not many people know about this because both of my performance reviews surprisingly failed to be detailed enough to mention that even though I have an entry-level job title, I was in reality conducting duties that are at the executive level (setting up the BI analytics vision, guidelines, communicating with executives and managers across the company, developing strategic projects, hired and provided direction to Richard despite of his Sr. Mgr. job title, in addition to developing Power BI), which is anyways what I do best, "gather information, identify problems, develop solutions, and orchestrate the implementation of transformational change".

Therefore, my first performance review conducted by SVP Miller, which combined years 2020 & 2021, was an excellent review and SVP Miller praised me for my work, vision, and ability to implement. However, later on during mid-2022, because of the lack of opportunities under SVP Miller, I informed him of my desire to attain a Director or Senior Manager role elsewhere within the organization, due to my accomplishments with the ODP organization, my overall qualifications as regards to education and work experience, and desire to capitalize on the spectrum of things I bring to the table. During this conversation, SVP Miller complimented me by saying that my qualifications are at the executive level and that without my vision, leadership, and project management experience we wouldn't have been able to materialize 360 Logistics and everything that it entails. He even articulated that my leadership skills as regards to setting vision, and skills to spot problems and put things together to implement, were textually "far superior, when compared to the skills of other people and again offered me his help and full support to apply to other roles across the ODP organization.

However, during my tenure as the leader of Veyer BI Analytics, I observed that Richard was not online with the vision I created for Veyer BI Analytics (and supported by SVP Miller), he seemed to have his own private agenda, he was problematic taking direction, and his work was derailing 360 Logistics and not in accordance with the goal to transform the way we handled BI Analytics. Indeed, Richard's attitude was very disappointing when considering how grateful he initially was with the opportunity I offered him, I introduced him to Power Bi, I made big efforts to involve him with the projects and gave him as much credit I could for his work, as well as even recommended him to SVP Miller because Richard was scared of losing his job after his warehouse facility was decommissioned. Therefore, I believe that Mr. Bouzek has no shame about stepping on any of his coworkers to cash-in on their projects and ideas for personal gains, to push forward his own personal agenda and career. Therefore, I discussed frankly with SVP Miller the idea to hire an external expert in database modeling, so we could redesign Richard's backend work and reassign Richard. I believe that this needs to be done, not only to improve BI Analytics performance, but most importantly to protect the ODP organization from having to rely on anybody's knowledge/expertise as regards to e.g. understanding how dashboards where build, how to fix where, the data was coming from, or how the different tables/views relate to each other. In simple terms, my vision was advocating long-term vision and full simplicity so anybody could easily understand things, and Richard's work is a self-convenient spider web of complexity.

Moving forward in time, at the end of 2022, SVP Miller called me to his office to notify me that I was no longer reporting to him and that from that point forward I was reporting to Richard Bouzek. During that meeting, SVP Miller explained that he made those changes because of his new responsibilities regarding the new organization (Veyer) and also indicated that nothing should change as regards to my work, even though I had to report to Richard. Better said, SVP Miller never mentioned anything related to my performance. However, regardless of what SVP Miller said, as soon as I started to report to Richard Bouzek, I observed a systematic & incremental approach to micromanage me, to harass me, to belittle me, and demoralize me to force me to resign or find a way to build a case against me with a convenient negative narrative to get me fired, which are all things that fall into many EEOC categories such as e.g. (harassment, discrimination, retaliation, bullying, hostile work environment, intimidation, and misconduct).

For example, I was right away pushed away from leading every single project I created, I was handcuffed with micromanagement, suddenly my work is constantly criticized and is never good enough, I am being bombarded with requests and changes, he is constantly telling me to redo things even after he gave me the green light, Richard sees himself as someone glorious in need to constantly enlighten me, I am kept away from everything because now everything is kept top secret by Richard, I was stopped from developing new ideas and asked to only work on certain specific things as instructed, my project 360 Logistics was relabeled as Veyer Intelligence, my access to Power Bi in the cloud was restricted by Richard even though I was the one that did all the setup of the cloud infrastructure, I am micromanaged on a daily basis with meetings that last between 1-1.5 hours, I have to send daily emails disclosing what I done during the day, and most recently I was asked to work from the ODP office at least 3 times per week even though there is no reason for me to do so and many coworkers work 100% of their time from home. And, if I happen to innovate or discover a problem there is complete silence from his part, but if he does something good, then it must be noted. Furthermore, Richard has told me that I lack in many areas, that I wouldn't apply to ODP roles as Director or Senior Manager because I need years of ODP experience to prove myself, as if my 15-year career and education meant nothing. Richard is also making changes to my role by making learning demands to turn me more into a backend techy person (so-called data engineer), although I was hired as a FTP employee because of my vision and PM skills to transform analytics, because Richard knows that by demanding more backend work from me, he can push me into a situation that makes me look incompetent, which is an old trick when a subordinate is sent an employee into a death sentence. Also, when I told Richard that my workload doesn't allow me to take these video-learning courses, he asked me to use my free time or weekends for that purpose.

Because of Richard's poor performance review my 2022 yearly bonus was 44% less than in 2021 due to Richard's systematic plan to destroy me. To make matters worse, although Richard knew that I was looking for other ODP roles and that SVP Miller offered his full support, because of Richard's poor performance review, I can't no longer be considered for other ODP jobs across the organization, even if I applied to a janitor role. For example, I was rejected for a simple Sr. Manager of Customer Insights role, despite of having a Doctorate PhD, my overall qualifications, having respectable experience, and my accomplishments with the ODP organization. Hence, I questioned Richard about this, and he strangely said that he was not aware that his negative performance review could block all my chances of finding another role within the ODP organization. In simple terms, Richard has not only taken over my projects and ideas, but he has also destroyed any chance of me finding a role elsewhere within the ODP organization, so I can once again shine in a new role and get away from him. When considering all the issues with Richard, I believe that it was a poor decision to empower an individual like him to supervise others when having poor managerial skills and lack empathy and good ethics as regards to honesty. Richard is good at coding, so metaphorically speaking, he is a good violin player, but he is detrimental to the ODP organization when playing the role of an orchestra director.

But, even though I know that Richard is doing all these things to get rid of me, it feels like torture, and with me having to become a "yes Richard" type of employee to keep my job, I have kept quiet about all this abuse because if I complain, people will very likely point fingers to whoever has the lowest job title and then abuse their job titles to terminate my employment. The reality is that it is very easy to construct a negative narrative to get rid of a subordinate, for example an EVP could easily make a SVP life miserable if they wanted, or a VP could easily do the same with a Director. However, once Richard sent me the PCD, I realized that my days with ODP are likely counted, so I decided that I have nothing to lose by contacting the Human Resources department.

Doesn't all this seem suspicious, going from being a highly valuable employee that revolutionized BI analytics and was praised by SVP Miller to swiftly being labelled as nothing more than an incompetent, useless employee? Maybe is because of my accent? Well, that said, one of the things I learned when managing people is that the job of a superior (and of the organization itself) is to capitalize on the strengths of your employees to produce maximum benefit to the organization, not to oppress and belittle employees. This is the message that CEO Smith and CHRO Maloney have been strongly advocating as regards to identifying top talent, retention, and inclusion, but Richard doesn't seem to have heard their message.

This behavior has made it difficult for me to perform and has caused me a great deal of stress and anxiety. I have tried to address these issues with Richard, but he has disregarded my concerns and has not taken any steps to improve the situation, instead things have worsened. I received a disciplinary action on 5/2/23 related to my performance, which I do not agree with.

I believe that this behavior violates the company's policies on workplace harassment and creates a hostile work environment that is harmful to my mental and emotional well-being. I am requesting that the company investigate these concerns and take appropriate action to address the situation. With that said, it is undeniably fulfilling to help others and contribute with your ideas and innovations to the team and the organization, but not when you are unjustly kept on the shadows as regards to your contributions and deprived of opportunities, while at the same time the company and many of my coworkers benefit from my work and ideas. I see employment as a two-way street relationship that should be equally beneficial to both parties, but despite of giving so much to the organization, so far I haven't been able to find that equally beneficial relationship at ODP.

Dr. Alexandro Kriman (Doctorate PhD in Business, Masters in Engineering, Certificate in industrial management)

---

THIS LETTER TALKS ABOUT THINGS LIKE:

- LACK OF OPPORTUNITIES
- TRANSFER REQUEST
- HARASSMENT
- ABUSE
- DISCRIMINATION
- CLAIMING UNDESERVED CREDIT
- BELITTLEMENT
- MICROMANGEMENT
- RETALIATION
- OPPRESSION
- DEGRADATION
- STREESS, ANXIETY
- ISOLATION
- RESTRICTION

# 2nd EMAIL MR. KRIMAN SENT TO TOP HR OFFICIALS TO COMPLAIN ABOUT BOUZEK, BUT THERE WAS NO ACTION

To: Aneisha Rogers-Scott
Cc: Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton;Zoe Maloney
Tue 5/16/2023 6:13 PM
More than 75% of recipients have opened this mail.

Hello,

I am writing to follow up on my letter dated 5/7/23 regarding my concerns regarding the misconduct, discrimination, and retaliatory practices of Richard Bouzek against me.

Between the beginning of 2022 and 3rd quarter of 2002, I talked to SVP Miller to convey my concerns regarding the poor performance and behavior of Richard Bouzek, because at the time, I reported to SVP Miller and Richard was recruited by me to assist me with my project and unofficially took direction from me.

Also, around mid 2022, I spoke with SVP Miller regarding my desire to grow my career by applying to other available roles across the ODP organization. My enthusiasm was very well received and supported by SVP Miller, who acknowledged that my performance and qualifications were at the executive level. Therefore, I was excited to apply to many roles where I felt that my qualifications, skills and experience could make again a positive impact in the organization, together with being optimistic that I would have an exciting and tenured career with ODP for many years to come.

However, by the end of 2022, Richard became my superior and although SVP Miller never mentioned any performance issues about me and stated that nothing should change besides reporting to Richard, Richard immediately started to oppress me. Furthermore, due to a negative 2022 review from him (although during most 2022 I reported to SVP Miller), my option to be even considered for another role across the ODP organization, was completely eliminated by Richard. This could have given me the opportunity to shine again and get away from Richard's harassment.

So far, since I notified SVP Miller of my desire to apply to other ODP roles, I have applied for 8 internal roles across the ODP organization, but I have been interviewed for on only 1 role by a recruiter, who told me that my information had been forwarded to the hiring manager, however there was no further dialogue. For the other roles to which I have applied, I haven't even been prescreened for consideration, despite of my notorious contributions to ODP, having a Doctorate in business, MSc engineering, excellent cross-functional experience, and a multicultural/multilingual background, which are all qualifications that have nothing to envy to many ODP sr. managers and executives when you compare with their qualifications. Therefore, it is obvious that somebody must have given the order to not entertain my job applications.

These are a few examples of the disparate treatment I had to immediately endure, since I started working for Richard:

•I was right away pushed away from leading every single project and/or idea I created
•I was handcuffed with systematic and incremental daily micromanagement
•Suddenly my work is constantly criticized and is never good enough
•I am being bombarded with requests, changes, and tasks
•He is constantly telling me to redo things even after he gave me the green light
•Richard sees himself as someone glorious in need to constantly enlighten me
•I am kept away from everything because now everything is kept top secret by Richard
•I was asked to only work on certain specific things as instructed and nothing else
•Richard built a wall between me and the other team member, there is zero communication
•My project 360 Logistics was soon after relabeled as Vever Intelligence
•Access to Power BI in the cloud was restricted by Richard although I created the cloud
•Micromanagement meetings unnecessarily last 1-1.5 hours
•I have to send daily emails disclosing what I done during the day
•I was asked to work from the office 3 times per week to place more pressure on me
•My innovations, ideas, or discoveries no longer matter, only Richard's work can shine
•Belittling me saying that I lack in many areas, that I shouldn't apply to other ODP roles
•He redefined my role as data engineer, which is what I previously recommended to SVP Miller to rebuild Richard's work.

As of this writing I have not received any response to my outstanding questions from my initial letter addressed to HR dated 5/7/23 or follow up about our phone conversation on 5/10/2023. I remain hopeful, although I am concerned that my questions and concerns have not been taken seriously.

As you are aware I was recently placed on a PCD (PIP) dated 5/3/23, but oddly related to a 4/7/23 occurrence. I have invested almost 3 years of my life with ODP, so I would like to reiterate that I am wholly committed to growing my career with Office Depot, and I remain excited to the opportunity to continue to contribute to the ODP organization with my skills and experience.

While I remain on this PCD (PIP), I understand that I am ineligible to be considered for other opportunities, not to mention Richard's 2022 review. This has a particularly disparate impact on me, as I am a minority, have an accent, being over the age of 40, and with a documented health condition due to Richard's harassment.

This oppressive experience has obviously been crafted on purpose. However, I simply wish to move past this experience in an effort to continue my contributions within the organization by way of merit and qualifications.

So I am respectfully requesting that the PCD (PIP) be rescinded, as I believe to be unjustified and a form of retaliation for previously complaining against Richard's work and behavior, for seeking in-writing acknowledgement as the visionary that pioneered the creation of 360 Logistics/Vever intelligence and other valuable projects, for seeking in-writing acknowledgement that I unofficially managed Richard Bouzek during my 2 years tenure as the leader of Vever Analytics, and for exercising my rights to move to other roles across the ODP organization. It is also highly possible that beyond retaliation, this is also about allowing silence and the passing of time to create the unmerited perception that all these pioneer developments, vision, projects, and ideas came from the wisdom and expertise of other highly experienced people, but not from me (someone with an entry-level analyst title).

At this time, due to the above-mentioned, I remain under a provider's care for stress and anxiety. The symptoms have been exacerbated over the last 8 months I have been under Richard's supervision and are consistent with Richard's systematic and incremental micromanagement and harassment. Symptoms of my health condition include:

1. Difficulty sleeping
2. Feeling weak, trembling
3. Anxiety episodes
4. Heart palpitations, nervousness, sweating, high blood pressure
5. Nausea, gas, heartburn
6. Digestive and urination complications with often desire to release

Due to the above, please accept the following as a request for reasonable accommodation. Specifically, I am requesting the following accommodations:

•A fully remote work from home schedule

•Daily teams meetings with Richard to be reduced to 30 minutes, as they typically and unnecessarily last 1-1.5 hours and sometimes more, as well as be reduced to only 1 weekly meeting to allow a more focused and less stressful work environment. Most work/tasks can be easily provided via email or via a shared excel template that itemizes the work that needs to be done. And, if something is not clear, things can always be clarified via a quick call or email.

Lastly, may I please be provided with the guided process and any documents that are required, so I can complete a request for FMLA. I would also sincerely appreciate if you could kindly provide me with an update on the status of my letter and the actions being taken by the company to address my concerns and requests.

Thank you very much for considering this request.

Sincerely,
Dr. Alexandro Kriman (Doctorate PhD in Business, Masters in engineering, Certificate in industrial management)

**SOME OF THE MANY THINGS MR. KRIMAN COMPLAINED ABOUT BOUZEK**

## FIVE (5) HR PEOPLE WERE NOTIFIED VIA EMAIL, INCLUDING THE HEAD OF HR

Alexandro Kriman
To:Zoe Maloney
Cc:Jennifer Harrold;Diane Taylor;Juan Cedres;Marguerite Hamilton   Thu 7/6/2023 9:40 PM
To whom it may concern:

This is a formal complaint for retaliation, harassment, and discrimination based on being over 40, Hispanic, and having an accent.  I request that you investigate this matter and take appropriate action against Richard Bouzek.

The following are the events that I believe constitute retaliation, harassment, and discrimination:

I was hired as a Sr. Financial Analyst on August 2020; my job was to prepare reports for SPV Miller. Yet, due to my management consultant experience, SVP Miller approved my vision and plan to transform analytics for the company, so I was verbally put in charge of the  project I created. After two years of developing 360 Logistics (nowadays called Veyer intelligence) and other projects, collaborating with executives and managers across the organization, and receiving a successful review from SVP Miller, I approached him in May 2022 to discuss my career goals. I spoke to him about my interest in moving to other company areas for higher-level roles that better align with my qualifications. SVP Miller indicated that I had his full support and mentioned that my capabilities and contributions to the company's transforming analytics were already at the executive level.

After that conversation, several months passed, and I started reporting to Richard Bouzek. However, SVP Miller said it was because of his new responsibilities involving the company's transformation but emphasized that it had nothing to do with my performance. He also  indicated that little should change and that my work should continue as usual with the difference that I report to Richard.

By the end of July 2022, once Richard Bouzek became my manager, I had an informal conversation with him. I asked for his help to attain role anywhere across ODP Corp that could allow me to step away from the umbrella under SVP Miller. Richard indicated that I  had his support and that, as SVP Miller suggested, things should not change regarding my work. Furthermore, remember that I disclosed my desire for other job opportunities to Zoe Malone and other HR executives.

However, despite my application to many internal roles, I applied to the many positions I applied for or been called by someone to develop a plan to transfer to a new role. So, opportunities have not been presented despite my consistent  good performance and contributions to the company as indicated in SVP Miller's review, my tenure with ODP, having a doctorate in business, a masters in engineering, and being passed over for promotions, although plenty of Office Depot  employees are younger and with less academic and work experience qualifications who are promoted to managerial and executive roles.

The above facts indicate that I am not wanted as an Office Depot employee and show clear discrimination against me because of my age, being Hispanic, and having an accent.

Furthermore, because of the above, I have been discriminated against and harassed, and retaliated against by Richard Bouzek. While I was leading business intelligence analytics under SVP Miller, on February 2022, I gave a formal written warning to Richard for underperforming in his work.

The above-written warning explains Richard's additional retaliation as well. Let's remember that my 1st performance review from SVP Miller (a seasoned high-level executive) involved 2020 & 2021 for a total of 21 months being evaluated when he provided my review, which  indicated that I had done a "great job, innovating, collaborating, and driving the business."

In contradiction, Richard's 2022 review delivered on April 2023 evaluated only eight months (since Richard became my supervisor) and described me as an underperforming employee. However, he is a much less experienced corporate employee without previous work  experience in business intelligence analytics (only systems administration and warehouse management experience). Still, regardless, it was a review that destroyed my reputation with the company.

Then, a month after delivering the 2022 yearly review, on 5/2/23, Richard proceeded with a PCD to further complain about my work. Then, less than two months later, on 6/28/23, Richard continued with another PIP to complain further about my work and verbally  threatened to terminate my employment within the indicated 60 days or else if he didn't see improvement.

Moreover, Richard crafted for me an isolation culture. On December 2022, he hired another analyst for the team (Sudheer). However, Richard never introduced us; I have not spoken to Sudheer since he was hired, even though we are on the same team. Richard doesn't  inform me about what is happening with veyer's intelligence, meets separately with Sudheer, and only Richard knows what each person is doing or the direction with veyer intelligence is going. In essence, Richard implemented a top-secret management style, he  keeps everything to himself.

In addition to the above, since I started to report to Richard, he also changed my job responsibilities and started to aggressively micromanage me with daily 1-1.5 hours meetings and demanding daily email status reports. First, by removing me from my leadership  responsibilities while I reported to SVP Miller and then started to push my work much more on the back-end databases direction because he knows that it is not my strong area. Aren't competent managers supposed to empower employees (like SVP Miller did), capitalize on  their strengths, and support them to help them thrive instead of oppressing them?

Lastly, on 6/28, I reminded Richard that I am on average working 12 hours/day and sometimes even 16 hours. Yet, Richard's response was not with empathy or to acknowledge any responsibility due to his flaws. Instead, he textually said that as a salaried employee, it is  expected that the norm is to work 10 hours/day and to whatever is needed to finish the work. I wonder if Richard's mentality is on behalf of the ODP organization.

You, as a reader, should see a pattern of abuse, harassment, and discrimination based on (age, being Hispanic, having an accent, also no opportunities to attain another role across the company, as well as, a bad and contradictory yearly reviews followed by a quick  PCD and then a PIP, the isolation culture and toxic, changing duties, micromanaging, and expecting to work overtime each day) and all this despite of having qualifications that place me on the top 1-3% of the ODP workforce, and despite of my tangible contributions to the ODP organization with 360 Logistics (veyer intelligence) and other projects.

Regarding all the above, I also filed with the EEOC, so you should expect to hear from them in about 10 days.

Kindly,

Dr. Alexandro Kriman (Doctorate PhD in Business, Masters in Engineering, Certificate in Industrial Management)

---

THIS LETTER TALKS ABOUT THINGS LIKE:

- LACK OF OPPORTUNITIES
- TRANSFER REQUEST
- HARASSMENT
- DISCRIMINATION
- ABUSE
- CLAIMING UNDESERVED CREDIT
- BELITTLEMENT
- MICROMANAGEMENT
- RETALIATION
- OPPRESSION
- DEGRADATION
- STRESS, ANXIETY
- ISOLATION
- RESTRICTION

# 4TH LETTER TO HR - MR. KRIMAN'S FURTHER COMPLAINTS ABOUT BOUZEK

To:
Alexandro Kriman
•Lillian Tamer
Tue 7/25/2023 12:23 PM
Hello Lillian,

THIS EMAIL ITEMIZES MORE ISSUES WITH BOUZEK AND FMLA VIOLATIONS

I wish that I didn't need to write you this email.
Yesterday 7/24 at around 8 AM, I requested FMLA time for 7/24/23 from 1:30 PM to 2:30 PM.
During the same 7/24 at 10:30 AM, I surprisingly received an email from Richard once again changing the schedule for the daily meeting from 1-2 PM to 1:30 – 2 PM, in conflict with my FMLA time.  Why after clearly requesting FMLA time from 1:30 PM onwards, the daily meeting gets rescheduled also at 1:30 PM, as well as all future meetings also get rescheduled from 1-2 PM to 1:30 to 2 PM.  Also, this is the 2nd time where requesting FMLA time, the daily meeting gets pushed further and further to the end of my workday.

These incidents are clearly just another example that fit into a much larger pattern of discrimination, retaliation, and harassment, and are a clear indicator that ODP shouldn't allow Richard Bouzek to have the privilege of managing any ODP employee.
A bad supervisor will deprive you from opportunities, will undermine your work, your work ethic, and your performance, including unscrupulously managing an employee out with all sorts of tactics. This behavior likely comes from various factors, including jealousy, feeling threatened by the employee's work,  innovation, vision, ideas, and high qualifications. Ultimately, these actions are a reflection of the supervisor's own failures, insecurities, and lack of ability to be a good manager.

Lots of proof has been presented to unveil plenty of red flags, related to discrimination, retaliation, and harassment:

1- Initially being hired to report to Sr. Director John Chavarria, but quickly being reassigned to report to SVP Miller. Then after 2 successful years reporting to SVP Miller, Mr. Kriman is assigned to report to Sr. Manager Richard, after talking to SVP miller about seeking better opportunities across the company.
2- Why a praised, successful employee that reinvented analytics for the company and implemented many other critical projects gets in a sudden and precalculated manner demoted to report to a much less qualified Sr. Manager that took direction from Mr. Kriman, although there is a high risk that this move will not only likely jeopardize Mr. Kriman's opportunities across the company, but also likely to create a work environment where Richard could potentially try to push Mr. Kriman out of the company.
3- Why Mr. Kriman's superiors denied Mr. Kriman's actual role and contributions to the company as regards to being the "orchestrator, the mastermind" that developed the vision, guidelines, and implemented the new analytics infrastructure, together with also envisioning the creation of a Veyer analytics department, despite having evidence that Mr. Kriman's actual role was much more than being just a simple analyst following instructions and taking direction from the wisdom and experience of SVP Miller.
4- Why Richard denied ever being recruited by Mr. Kriman and even taking direction from Mr. Kriman, despite the evidence that Mr. Kriman created the project to reinvent analytics and was leading analytics.
5- Why there is an obvious contradiction when comparing the performance reviews from SVP Miller Vs Richard, and even more so when considering that SVP Miller's review encompassed a much larger time frame
6- Why Richard retaliated to micromanage Mr. Kriman from the get-go, even though Mr. Kriman has done a fantastic job that is not only envisioning the reinvention of analytics but also leading its implementation.
7- Why Richard proceeded with this retaliation and harassment after Mr. Kriman had talked with SVP Miller and Richard about his desire to move from SVP Miller's umbrella in search of better opportunities where he can once again shine. Yet, Richard ruined any chances of Mr. Kriman being considered even for a janitor role across the company.
8- From the get-go, why Richard removed Mr. Kriman from all his previous responsibilities, which were actually work, projects, and ideas that were created by Mr. Kriman. Instead Mr. Kriman was literally told not to think about anything else, to only do as instructed and do nothing more. Also access rights to areas developed by Mr. Kriman himself, where rapidly removed by Richard.
9- Why Richard has never introduced Mr. Kriman to the other analyst (Sudheer) and never tried to create a team environment as it is done across the ODP company. Not to mention that Richard has turned Mr. Kriman into an order taker, keeping him isolated from the team and from all the information that relates to analytics. In essence, everything has become top secret.
10- Why after only less than 2 months after delivering the performance review for Mr. Kriman, Richard sent a PCD to Mr. Kriman unusually complaining about something that happened a month ago
11- Why not even after 2 months after providing the PCD, Richard sent a PIP to Mr. Kriman, which interestingly was also sent after Mr. Kriman talked to HR and was given approval for FMLA.
12- On 7/18 Mr. Kriman requested FMLA time for 7/19 to start taking it at 2 PM. Then, Richard sent the daily meeting to 2-3 PM in conflict with the FMLA time request.
13- On 7/24 Mr. Kriman requested FMLA time from 1:30-2:30 PM and once again Richard moved the daily meeting from 1-2 to 1:30-2 PM, again in conflict with the requested FMLA.
14- After complaining to HR, Richard retaliated by also rescheduling the daily meeting to 10 AM, although it has always been Richard's desire to continue to work beyond 8 hours/day.  Rescheduling the meeting also to 10 AM is also part of a number of tactics to keep putting more and more pressure on Mr. Kriman and force him to continue to work beyond 8 hours/day.
15- Despite of already working on average 12 hours/day and sometimes even 16 hours, Richard emphasized that the "expectation" is to work a minimum of 10 hours/day and that he suggested to put the needed extra hours and even work during the weekends to get the work done. Richard also ordered Mr. Kriman to work during the 7/8-7/9 weekend.
16- On 7/11/23, I was given a deadline of August 3 to complete approximately 19 hours of additional training, which is in addition to the original request to take various online courses that typically last 0.5 hours each and 5 of those courses need to be completed on a weekly basis.  This also proves the incremental oppression on Mr. Kriman.

In light of the substantial evidence presented, it becomes clearly evident that there is a premeditated pattern of oppression being inflicted on me, in blatant violation of company policies and laws that protect workers. The numerous instances of discriminatory actions, retaliation, and persistent harassment  create a distressing picture of an environment where my well-being and professional success have been deliberately jeopardized. This persistent mistreatment not only undermines morale but also jeopardizes my career prospects within the company, a company I have devoted my talents and protected.  It is imperative to rectify these injustices and provide the protection and support that I rightfully deserve. Failure to address this not only perpetuates an unjust work culture but also reflects poorly on the company's commitment to safeguarding its employees from such abuse. It is time for the company to  stand up for what is right and ensure a workplace that fosters honesty, fairness, respect, and equal opportunities for all its employees, including me (Mr. Kriman).

With that said, ODP shouldn't allow Richard Bouzek to continue to manage any ODP employee. He is a person that has demonstrated via all these actions to be unfit to manage and lead anything. He is also untrustworthy and deceiving, together with discriminating, retaliating, harassing, and applying all  sort of tactics to manage me out. It all reveals a manager who is more interested in fulfilling his private agenda and abusing his job title to exert power over others.
Regards,
Regards.

Alexandro Kriman

To:    Lillian Tamer

AK



Thu 8/10/2023 11:59 AM

Hello Lillian,

I first contacted HR on 5/7/23 regarding the discrimination, retaliation, harassment I have been encountering.
Since then, I have provided enough information that supports my concerns about being managed out.

Today 8/10/23, I realized that our entire analytics data refreshing infrastructure was now changed to a different data refreshing infrastructure. As part of a tiny analytics team, why I was not informed about this tremendously critical change ?. This behavior of isolation and marginalization is consistent with the information I have been providing to HR about Richard keeping everything top-secret. The truth is that Richard makes a lot of mistakes (including unethical ones), which also have an impact on my work, but with the difference that there is nobody there that has a private agenda against him, so he is not being micromanaged to create a paper trail of evidence to manage him out.

On that note, although it is a taboo topic that nobody dares to acknowledge or talk about, we all know that any manager could easily abuse their job title by implementing some known tactics that can lead to portray an employee on a negative way. Some tactics examples:

**Selective negative reporting**: Where incidents or aspects of my performance are being disproportionately highlighted and manipulated to create a paper trail. How can so swiftly an employee go from being praised by SVP Miller to being not good enough for anything when working under Richard.

**Disregard for good work and contributions**: Contributions and good work are not acknowledged and given due recognition. Richard seems to be constantly constipated as regards to being incapable of saying anything positive, negativity and belittling is his "modus operandi".

**Micromanagement:** It is no secret that from day 1, Richard went on micromagement mode

**Isolation:** It is no secret that from day 1, Richard has isolated Alex Kriman from the rest of the team

**Marginalizing:** It is no secret that from day 1, Richard keeps everything top-secret, only minimum and selected information is provided, together with removing Alex Kriman's access to areas that were in fact created by Alex Kriman.

**New expectations:** I have been set to ensure I fall short; new back-end demands are imposed on Alex Kriman.

**Job blocking:** Obstructing or impeding Alex Kriman's career advancement or opportunities at other business units or teams across the ODP companies.

**Retaliation:** There is obvious retaliation in response to my FMLA request, accommodation request, and for contacting the EEOC. Furthermore, retaliation regarding the formal performance complaint letter I wrote to Richard when Richard took direction from me.

**Creating False documentation and/or statements:** During the HR investigation, it was said that Alex Kriman never created the vision for analytics, guidelines, and implemented the new infrastructure, and that Alex Kriman never recruited Richard Bouzek and that he never took direction from Alex Kriman. Instead, Alex Kriman was portrait as a simple entry-level employee that was just there taking direction from others. Yet, there is evidence that proves that those are false statements. This should be enough evidence to make any organization raise some red flags as regards to why the involved parties made inaccurate misleading statements about Mr. Kriman's contributions and responsibilities to purposely undermine my credibility within the organization.

As you can see, there are enough documented instances and patterns showing evidence about me being managed out, which raises serious concerns about my supervisor's conduct. The consistent application of selective negative reporting, micromanagement, isolation, etc, etc, creates a troubling image of an individual abusing his position and erodes the trust that the company placed on him.

Regards,

THIS EMAIL ITEMIZES THE TACTICS USED BY BOUZEK TO FORCE MR. KRIMAN TO RESIGN

# SOME MORE OF THE MANY EMAILS MR. KRIMAN SENT TO HR

**ALL THESE EMAILS WERE TO COMPLAIN ABOUT BOUZEK AND HIS TREATMENT AGAINST MR. KRIMAN.
ALSO, TO REQUEST TO BE TRANSFERRED, TO RECEIVE AND OPPORTUNITY TO MOVE AWAY FROM BOUZEK.**

**HOWEVER, THERE WAS NEVER MUCH RESPONSE FROM HR, BESIDES SAYING THAT THEY ARE INVESTIGATING AND THEN (OF COURSE) VERBALLY TELLING MR. KRIMAN THAT HR HAS FOUND THAT THERE IS NO WRONG DOING**



BEFORE & AFTER REPORTING TO BOUZEK, MR. KRIMAN APPLIES TO **ALMOST A DOZEN** OF INTERNAL POSITIONS, BUT WAS ALWAYS REJECTED WITHOUT EVEN AN INTERVIEW

WITH MR. KRIMAN's TRACK RECORD TRANSFORMING ANALYTICS FOR THE COMPANY, THE SUPPORT THAT SVP MILLER VOICED TO GIVE TO MR. KRIMAN, AND WHEN CONSIDERING THAT MR. KRIMAN WAS ONE OF THE FEW EMPLOYEES WITH A DOCTORATE DEGREE, REGARDLESS HE WAS STILL NOT GOOD ENOUGH TO EVEN GET AN INTERVIEW ?

# SOME ODP JOBS MR. KRIMAN APPLIED TO, BUT NO INTERVIEWS

**MR. KRIMAN EVEN EMAILED HR TO NOTIFIY THEM OF HIS MOST RECENT JOB APPLICATION – 14 DAYS LATER, HE GETS FIRED**

**THIS IS A COPY OF A SR. MANAGER MARKETING RESEARCH ROLE MR. KRIMAN APPLIED, BUT NO INTERVIEW, DESPITE HIS ACCOMPLISHMENTS, EXPERIENCE, AND HAVING A DOCTORATE PhD.**

**AND THE ROLE DOESN'T EVEN REQUIRE ENGLISH SKILLS**

VEYER, VARIS ARE COMPANIES THAT BELONG TO OFFICE DEPOT (ODP).

ON PAPER THEY ARE DIFFERENT ENTITIES, BUT IN PRACTICALLITY THEY WORK TOGETHER AS ONE.

**10 JOB APPLICATIONS BUT NOT EVEN INTERVIEWS ???**



9 Director of Channel Alliances (Varis)
10 Business Analyst, Senior - Data Analytics (Varis)

# SOME ODP EMPLOYEES AS EXAMPLES, TYPICALLY PROMOTED BETWEEN 12-18 MONTHS, BUT NOT MR. KRIMAN, ALTHOUGH HE SERVED ODP FOR 38 MONTHS

| Employee | Comments |
|---|---|
| Wesley Brinkhurst (from associate to director)<br>https://www.linkedin.com/in/wesleybrinkhurst | Bs+MBA, from associate to Director in 11 months |
| Leonardo Reyes maybe<br>https://www.linkedin.com/in/leonardo-reyes-3b927025/ | BA+BS, from Associate to manager in 1.1 year |
| Yogesh Pandey<br>https://www.linkedin.com/in/ypandey/ | BS+MBA, from analyst to manager in 2.4 years |
| Brad Seigfreid<br>https://www.linkedin.com/in/bradseigfreid/details/experience/ | 2 bachelors, from specialist to manager in 1.9 years |
| Michael Tuller<br>https://www.linkedin.com/in/michaelatuller/ | BS+MBA, from analytist to Sr. analyst in 1.3 yr. From Sr analyst to manager in 1 yr. |
| Trupti Dave<br>https://www.linkedin.com/in/truptidave/ | BS+MBA hired as Sr. Manager |
| Rick Winn<br>https://www.linkedin.com/in/rick-winn-5924b010/ | BS hired as manager without previous experience |
| Michael Arias<br>https://www.linkedin.com/in/michael-arias-6a8416/ | BS. From analyst to manager in 1.5 yr |
| Tiffany Schlotter (excellent example)<br>https://www.linkedin.com/in/tiffany-schlotter/ | BS. 7 years analyst experience and then hired as Director |
| Lindsey Rothrock<br>https://www.linkedin.com/in/lrothrock/ | BS. From consultant to Senior Manager in 9 months |
| Paul Schepflin<br>https://www.linkedin.com/in/paul-schepflin-48a67a3/ | BS. From analytist to manager in 2.3 years |
| Zhanna Vlasova (PhD like me)<br>https://www.linkedin.com/in/zhanna-vlasova/ | PhD Econ. 12 years experience and Hired as Director |
| David Henson<br>https://www.linkedin.com/in/david-henson-41738175/ | BS. 13 years experience in sales, hired as Sr. Manager |
| Ed Walters<br>https://www.linkedin.com/in/ed-walters-16288211b/ | Bs. From analyst to Sr. Manager in 1.3 yr. |
| Danny Jovic<br>https://www.linkedin.com/in/danny-jovic-88005311/ | Bs+BS. 13 years experience mostly as manager, then hired as Director |
| Mario Cordon<br>https://www.linkedin.com/in/mario-cordon-13658b1/ | Bs+MBA. Few years experience as manager and hired as Director |
| Andrew Wiley<br>https://www.linkedin.com/in/andrewwiley/ | Bs+MBA. From supervisor to manager in 1 year and 7 months |
| Kelly Storey<br>https://www.linkedin.com/in/kellymstorey/ | Bs. 7 years experience as an associate and hired as manager. Then after 1.5 years promoted to Sr. Manager |
| Ryan Patten<br>https://www.linkedin.com/in/ryan-patten-aa688a7/ | BSc criminal justice, MBA. Promoted after 2 years, then after 1 year, then again after 2 years. |
| Kendra Bocinsky<br>https://www.linkedin.com/in/kendra-bocinsky-48a33687/ | No degrees, from analyst to manager in 3.5 years to manager, then again after 20 months |

DESPITE MR. KRIMAN HAVING MADE A HUGE IMPACT IN ODP ANALYTICS AND OTHER AREAS, HE NEVER RECEIVED A CHANCE.

MOST OF THESE EMPLOYEES ARE YOUNGER THAN MR. KRIMAN AND LESS QUALIFIED THAN MR. KRIMAN, YET THEY WERE SWIFTLY PROMOTED

WE ALSO SEE A PATTERN WHERE MANY OLDER INDIVIDUALS ARE HIRED BY ODP AS "CONSULTANT WORKERS" AND THEY ARE STUCK AS "CONSULTANT WORKERS", MEANWHILE LESS QUALIFIED YOUNGER INDIVIDUALS ARE GIVEN OPPORTUNITIES TO MOVE UP AS MANAGERS, ETC.

# HR TRIES TO CHANGE MR. KRIMAN's JOB TITLE TO CONTINUE TO PUT PRESSURE ON HIM

# ODP TRIED TO CHANGE MR KRIMAN's JOB TITLE

**UPON REQUESTING FMLA & ACCOMODATION,** HR SUBMITTED THIS JOB TITLE AND DESCRIPTION TO BE PROVIDED TO MR. KRIMAN's DOCTOR.

WE CAN ONLY SPECULATE REGARDING WHY ODP WANTED TO PORTRAY MR. KRIMAN AS SOMEONE THAT NEEDED TO BE AT THE OFFICE, INSTEAD OF BEING ALLOWED TO WORK REMOTELY. ALSO, THE SR. FINANCIAL SYSTEMS JOB TITLE, COULD HAVE FORCED MR. KRIMAN TO DO BACKEND DEVELOPMENT (CODING WORK) WITH THE DATABASES, WHICH IS NOT HIS EXPERTISE.

MR. KRIMAN COMPLAINED ABOUT THIS TO HR UNTIL THEY SUBMITTED DOCUMENTATION WITH MR. KRIMAN's CORRECT JOB TITLE.



ACTIVE JOB APPLICATIONS

200200 - Analyst, Sr. Financial - USSSD

Status: Under Consideration ▾

Dallas, TX, United States

Candidate Experience site · 32893 · Applied on 12/08/2020

## CORRECT JOB TITLE

### Office DEPOT

**Global Job Description Template**

| Job Title: | Sr. Financial Systems | Human Resources Use Only | |
|---|---|---|---|
| New or Existing Job: | ☒ New   ☐ Existing | Evaluated by: | |
| Division: | Corporate | Grade: | |
| Function: | Finance | Job Code: | |
| Functional Supervisor Title: | | ☐ Exempt   ☐ Non-Exempt | |
| Organizational Supervisor Title: | | Date Job Evaluated: | |

## WRONG JOB TITLE AND DESCRIPTION

**General Summary**
A brief statement (3-5 sentences) describing the main purpose of the job and an overall summary or purpose of what it does. The intent of this statement is to describe why the job exists and what the incumbent is expected to accomplish.

The incumbent in this position will be responsible for coordinating and gathering business related requests affecting the Chart of Accounts (COA), system configurations, and related processes. The COA effort is comprised of values, hierarchies, Cross Validation Rules, combinations, mapping, violation reports, and related setup across multiple applications including Oracle, Hyperion, Integral, PeopleSoft Finance, PeopleSoft HR and other legacy applications. The incumbent will be responsible for performing detail impact analysis, gathering business requirements, developing appropriate implementation strategies, and manage retention of all related documentation.

BOUZEK RESCHEDULES DAILY MEETING IN CONFLICT WITH FMLA REQUEST

YES, FMLA IS NOT HANDLED BY THE EEOC, BUT THE EEOC IS INTERESTED IN IDENTIFYING TACTICS USED BY ODP TO HARASS AND OPPRESS MR. KRIMAN

# BOUZEK PURPOSELY RESCHEDULED MEETING IN CONFLICT WITH FMLA REQUEST



MR. KRIMAN REQUESTED FMLA TIME ON 7/18/23 FOR 2-3 PM TO ATTEND THE PRE-SCHEDULED MEETING FOR 1-2 PM. BE AWARE THAT MR. KRIMAN STARTS HIS WORK DAY AT 6 AM AND WORKS 8 STRAIGHT HOURS FROM 6-2 PM.

REGARDLESS, ON 7/19/23 BOUZEK RESCHEDULED THE MEETING TO 2-3 PM IN CONFLICT WITH THE PREVIOUS FMLA REQUEST.

MR. KRIMAN EMAILED HR TO COMPLAIN ABOUT BOUZEK RESCHEDULING MEETINGS IN CONFLICT WITH FMLA, AS WELL AS TO FORCE MR. KRIMAN TO WORK OVERTIME DUE TO HIS WORK SCHEDULE (6 AM – 2 PM), WHICH SVP MILLER NEVER HAD A PROBLEM WITH, MILLER JUST SAID TO WORK 8 HOURS.

Alexandro Kriman
To:  Lillian Tamer

Hello Lillian

I hope this email finds you well.

As you already know, there have been recent changes in our daily meeting schedule orchestrated by Richard. Previously, we held our 10-11 AM meetings, which usually lasted for about 1-1.5 hours. However, Richard has now shifted these meetings to 1-2 PM. While this might seem like a simple adjustment, the implications for me have been quite concerning.

You see, I typically start my workday at 6 AM, and with these meetings now scheduled at the end of my workday, it has put me in a challenging position. Meetings are scheduled at the end of my daily 8 hours in addition to assigning me additional tasks on the same day as these late meetings, putting significant pressure on me to work overtime. This deliberate combination of a late meeting and additional workload shows that he is intentionally attempting to continue to oppress me and force me into overtime, creating an atmosphere of unnecessary stress and an imbalance in my work Vs personal life.

To add more to this unjust treatment, I requested FMLA time on 7/18 for today 7/19, starting at 2 PM. However, despite of this previous request, Richard unilaterally changed today 7/19 today's meeting from 1-2 PM to 2-3 PM. This decision is clearly a calculated move to disrupt my planned FMLA time, further aggravating the situation. It's disheartening to see such actions, as it undermines the respect for my FMLA time and contributes to an increasingly toxic work environment.

These incidents are not isolated; they fit into a larger pattern of discrimination and retaliation that I have already explained. The change in today's schedule is just another example of premeditated actions taken against me to continue to oppress me, rather than being a mere coincidence or an innocent mistake and are a clear indicator that ODP shouldn't allow Richard Bouzek to have the privilege of managing anybody.

Regards,

# ONCE AGAIN BOUZEK PURPOSELY RESCHEDULED MEETING IN CONFLICT WITH FMLA REQUEST



# BOUZEK THREATENS MR. KRIMAN

# BOUZEK KEEPS THREATENING MR. KRIMAN

**From:** Alexandro Kriman <Alexandro.Kriman@veyerlogistics.com>
**Sent:** Thursday, August 17, 2023 2:43 PM
**To:** Lillian Tamer <Lillian.Tamer@theodpcorp.com>
**Subject:** Re: Concerns

Hello Lillian,

On 8/16, I was receiving feedback from Richard regarding a dashboard I created.

Our meeting started at 1:30 PM and even though it was supposed to end at 2 PM, Richard used every little detail that he found to go on and on until 2:25 PM criticizing me and my work.

He was repeatedly, again and again, asking me with a belittling tone e.g. "is this your best work", "is this the best you can do", "Alex, I need an answer to my specific question, can you do any better than this", "you are not responding my specific question, so I assume that you can't do any better". I really felt like being on a trial at a courthouse, being interrogated by a lawyer, just waiting for me to say something wrong, so he could jump on me. The fact that richard is on a mission to manage me out, couldn't be more evident.

Keep in mind, that we are talking here about someone with a Sr. Manager title behaving in this deplorable manner, how on earth can an international company like Office Depot hire someone with such poor managerial and people skills and without any previous experience in business intelligence analytics to manage analytics for the company?

To make matters worse, I was working with a back-end data table that was created by Richard. Interestingly, he was scolding me for utilizing the wrong data variable, which he had previously mentioned as the correct variable. However, when I asked him which was the correct variable to use, then he started to go all over the data without knowing with certainty which variable was the correct one to use (even though he created the data table). Later on, Richard pointed out to another data variable that was supposed to be the correct one, although it was labelled with a misleading name (as if I am supposed to be a mind reader to know that), but still he wasn't 100% sure. Then, he proceeded to argue on and on about me joining data tables incorrectly instead of simply telling me that the correct variables to be joined are labelled as A, B. Imagine if you used the wrong font size in a report and your supervisor would go on and on lecturing you for using the wrong font size, instead of simply telling you in 3-5 seconds to change the font size. So, I can only conclude that Richard enjoys capitalizing on finding an error or anything that he might not like, so he can give lengthy lectures that make him feel superior.

Point being, why the need to speak to people in a condescending manner, why the need to belittle people, why lecturing people, why using every possible detail or excuse to put people down, why that constant need to prove that he is the boss and superior to boost his own self-esteem. On that note, I am truly surprised that Richard used to be a warehouse GM, with his constantly constipated attitude and less than desirable people skills, I am not sure how people were able to tolerate working for someone like him.

Instead, richard could have easily said to me e.g. great work on this project, things are looking good and online with what we need, but we need a few tweaks here and there to better enhance some metrics. This kind of approach fosters collaboration instead of being negative, demoralizing, dismissive, denigrating, and potentially damaging the employee's morale, self-esteem, and health. Richard consistently behaves in this negative manner, which is a clear indicator of a person that enjoys being authoritarian rather than collaborative, insensitive, disrespectful, unprofessional, and obviously lacks leadership skills. Richard's consistent dismissal of his own mistakes while placing blame on others, coupled with his demotivating attitude, should raise serious doubts about deserving the authority to manage anybody. In essence he is a toxic supervisor, whose actions and behaviors contribute to a toxic and unproductive work environment.

# DOUBLE STANDARDS TO OPPRESS MR. KRIMAN

# DOUBLE STANDARDS BETWEEN BOUZEK's PTO AND MR. KRIMAN's PTO

## BASICALLY, THERE WAS NO INTEREST IN BOUZEK's OBVIOUS MISTAKES, BUT WHEN IT CAME TO MR. KRIMAN, ANYTHING WAS FAIR GAME TO TRY TO MAKE HIM LOOK BAD.



Alexandro Kriman

AK    To:    Lillian Tamer

Fri 9/1/2023 6:34 PM

Hello Lillian,

I'm writing to address a concerning issue regarding disparity in expectations. As a subordinate, I am constantly being reminded of expectations, however it appears that there is a marked contrast in expectations between team members and those in managerial positions.

In my previous emails, I commented about Richard pursuing every possible tactic to complain about anything that could help him to create a paper trail against me to manage me out. With that said, I have consistently received criticism since Richard became my supervisor, and it's disheartening to witness a noticeable double standard.

One of those complaints relates to my communication skills. On that note, today 9/1/23 I accidentally saw in Richard's MS Teams profile that he took PTO without letting me know, although we had a scheduled meeting, where I needed to discuss with him some things related to a project I am working on.

On multiple occasions, Richard has taken unannounced PTOs, without sending an email, or a Teams' note, or simply saying "I am taking PTO on this date". In contrast, when it comes to me as a subordinate, Richard expects to receive an email, or a Teams note, or something that can inform him about my FMLA time PTO.

I value the importance of work-life balance for everyone, but I believe equal expectations is a crucial matter. I believe in a workplace where fairness and equal standards are upheld regardless of one's position. On that regard, Richard's actions not only erode morale, but also create an atmosphere of privilege for some and compliance for others.

Regards

COMPARING MR. KRIMAN's WORK WITH BOUZEK's WORK – BOUZEK's BIAS

BOUZEK's BIAS

# REALITY CHECK – BOUZEK'S BIAS STATEMENTS ABOUT MR. KRIMAN's WORK

**From:** Alexandro Kriman <Alexandro.Kriman@veyerlogistics.com>
**Sent:** Tuesday, September 19, 2023 12:19 AM
**To:** Lillian Tamer <Lillian.Tamer@theodpcorp.com>
**Subject:** Re: Concerns

Hello Lillian,

On 9/15/23 I had a meeting with richard and once again he was criticizing my work, but in a very hypocritical way, he likes to criticize others, but lacks self-awareness to acknowledge or see his own flaws.

As you can see, my dashboard below looks very technically advanced and visually appealing, but regardless, richard never stops criticizing my work. In simple words, he likes to "hammer" me every time he gets the chance. Even tough, technical solutions and visual concepts we see in our current dashboards were actually introduced by me. In fact, on 9/15 after the dashboard was already in place and functional, he asked me to figure out how to use 1 filter with the KPIs that can filter current and previous year values as you use the filter, although this has not been done in other published dashboards. Point being, richard is always trying to push me against the wall to see if I will fail, so he can build a paper trail against me to manage me out.

For that purpose, I collected records of dashboards developed and published by richard, where any reasonable person will see that criticizing my work makes no sense. In fact, many of my dashboards look better than richard's dashboards.

Many problems and delays we have with the dashboards, relate to backend databases developed by richard, which are used by the dashboards to create the visuals. As you could understand, if you develop backend databases that are not clear or have validation issues, those will impact the easy frontend development when building the dashboard, which is a problem that I was trying to fix when I was leading analytics. It is a simple concept, develop a good foundation with the backend databases and then everything else becomes easier.

The reality is that my project 360 Logistics (relabeled as Veyer Intelligence) has been detrimentally impacted since richard took over my responsibilities leading analytics, the project is nowadays a complete mess.

Comparing the below dashboard samples, proves the discrimination, retaliation, and harassment I have been discussing with the HR department.

## MR. KRIMAN'S WORK





**MR. KRIMAN INTRODUCED BOUZEK TO POWER BI WHEN MR. KRIMAN RECRUITED BOUZEK.**

REGARDLESS, BOUZEK WAS VERY CRITICAL OF MR. KRIMAN's WORK, ALTHOUGH AS YOU CAN SEE, MR. KRIMAN's DASHBOARDS ARE AS GOOD OR EVEN NICER THAN BOUZEK's DASHBOARDS.



ALSO REMEMBER THAT MR. KRIMAN HAD TO RELY ON THE BACKEND DATABASES THAT BOUZEK CREATED WITH HIS OWN HANDS TO BE ABLE TO CREATE THE DASHBOARDS. SO, IF ANYTHING WAS WRONG OR UNCLEAR WITH A DATABASE, MR. KRIMAN's WORK WAS AFFECTED, WHICH WAS OFTEN THE CASE, BUT BOUZEK WOULDN'T RECOGNIZE HIS MISTAKES.

THIS WAS THE REASON MR. KRIMAN FORMALLY REPRIMANDED BOUZEK AND WANTED TO REPLACE HIM, WHEN HE TOOK DIRECTION FROM MR. KRIMAN.

## BOUZEK's WORK







**ALEX KRIMAN**
To: You

Reply    Reply all    Forward

Mon 10/9/2023 8:09 PM

To: Lillian Tamer

Mon 10/9/2023 10:49 AM

Hello,

On 10/6/23 I had a meeting with Richard.
Despite my positive attitude to show him my findings and to find solutions for some projects I am working on, Richard never has anything positive to say and in fact, has never uttered anything positive since he became my supervisor, it is more of a peon / task coordinator type of work relationship (as I mentioned before, he is a ruthless watchdog micromanager). Furthermore, although Richard was placed on-charge of analytics, he has not contributed anything new to analytics since he became my supervisor, all the vision, ideas, and work he is currently working on were actually envisioned and developed by me when I was on charge of analytics. With that said, Richard Bouzek might have been given a Sr. Manager title and the authority to tell me what to do, but he is definitely not a Sr. manager, or a manager, or a supervisor, or even a project manager. Richard's work and behavior is more appropriate to a "task coordinator", which is something congruent with what SVP Miller mentioned before.

When I reported to SVP Miller I collaborated with many executives across the company, and they showed me respect and made me feel valued/appreciated for helping them with the new analytics I envisioned and created for the company.
Moreover, even though nowadays I have limited interactions with various executives, those limited but friendly interactions make me feel respected and valued in comparison to interacting with Richard's constantly constipated and oppressive attitude.

The reality is that when it comes to developing things, the problems we encounter and the constant back and forth between projects are Richard's fault, because he is more concerned about presenting dashboards to SVP Miller to try to stay on the good side with him, instead of him developing proper databases in the backend foundation. For example, he recently created a database to understand lines of LOTC, LEOTC, LEOTC+1, and Failures, where simple common sense will tell you that if you want to understand those 4 metrics, then you need a database that has columns with those 4 metrics plus a column that has a count of total lines. Yet, Richard delivered this database that according to his own words he didn't clearly understand and had questions about, a database that doesn't even have a column for LOTC, nor for the other metrics. Therefore, everything had to be figured out by me via calculations and assumptions. SVP Miller doesn't have expertise in Analytics, but he clearly understands when a database is very well developed, so he can swiftly drag data fields into a visual to get the numbers he wants, versus a database where he can't drag data fields into a visual, because the database wasn't properly developed.

Richard also asked me to deliver a dashboard to understand equipment usage and failures inside the warehouses and although I developed the dashboard, I informed him that I had concluded together with the top person in the maintenance department that the dashboard's data was more less useless until we solved a huge problem with the equipment's ID numbers. Yet, Richard keeps pushing forward with delivering the dashboard to be seen in a positive note by SVP Miller, instead of solving the problem from the foundation ground up. Ultimately, Richard blames me for all these problems and delays while I try to remain quiet when talking to him not to put more fuel into the fire, although he takes notes to present to SVP Miller and to HR, where he abuses his job title to place the blame on me while trying to falsely portrait himself as a highly competent manager.

Furthermore, Richard is a Master at complicating things, at developing complex solutions, and transferring problems that should have been taking care of in the backend (the foundation) to the frontend dashboards as well.
In this manner, he can accomplish 2 things, which is to proliferate complexity throughout the analytics infrastructure to protect his job, together with giving me a hard time as a way to gather documentation to manage me.
To make matters worse, he also enjoys asking me to develop dashboards with unnecessary complexity, with the excuse that this complexity is highly needed by the end-users to better analyze things. Meanwhile the reality is that 99.9% of end-users have a hard time to understand how to navigate the dashboards and even understand the numbers in the dashboards that Richard makes available to them, which is a problem I tried to formally address with Richard when he took direction from me, but Richard is a person that has a hard time understanding the real world.

Beyond all the above said, it is also interesting how the company gave Richard the authority to manage analytics, without taken the time to evaluate his resume to realize that he has no previous qualifications in that area.
However, every time that a job becomes available at Office Depot, candidates are required to have previous qualifications in that specific area. Richard comes from a systems administration background (taking care of computers, networks, servers), which has nothing to do with business intelligence analytics.

Regards,

OFFICE DEPOT INTENSIFIES QUESTIONING WHEN MR. KRIMAN PRESENTED 2ND ACCOMMODATION REQUEST

AND, CHANGED THE ACCOMMODATION REQUEST FORM FROM A STANDARD FORM TO A CUSTOMIZED ONE

# DISCREPANCIES WHEN MR. KRIMAN PRESENTED 2ND FMLA/ACCOMMODATION REQUEST

INTERESTINGLY, THE LINE OF QUESTIONING CHANGED WHEN MR. KRIMAN REQUESTED HIS 2ND ACCOMMODATION REQUEST.

QUESTIONS SEEM TO BE SPECIFICALLY DESIGNED FOR MR. KRIMAN

**1ST ACCOMMODATION REQUEST QUESTIONS:**

1-DOES MR. KRIMAN HAVE A MEDICAL CONDITION THAT REQUIRE AN ACCOMMODATION ?

2-IS MR. KRIMAN ABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF THEIR POSITION WITHOUT A SIGNIFICANT RISK TO HIS HEALTH AND SAFETY ?

3-IF NOT, WHAT FUNCTIONS CAN HE NOT PERFORM AND WHY CAN HE NOT PERFORM THOSE FUNCTIONS ?

4-IF MR KRIMAN IS UNABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF THE POSITION, PLEASE PROVIDE A DESCRIPTION OF ANY ACCOMMODATION WHICH WOULD ALLOW HIM TO PERFORM THOSE FUNCTIONS ?

5-IS THIS ACCOMMODATIONS TEMPORARY OR PERMANENT , IF TEMPORARY WHAT IS THE LENGTH OF TIME NEEDED ?



WHY CHANGING THE QUESTIONS IN THE

ACCOMMODATION REQUEST FORM WHEN MR. KRIMAN REQUESTED HIS 2ND ACCOMMODATION FOR THE SAME REASONS AS BEFORE AND HAD A DOCTOR's NOTE ???

SHOULDN'T THE ACCOMMODATION FORM BE A STANDARD FORM FOR ALL EMPLOYEES, SO EVERYBODY IS CONSISTENTLY AND EQUALLY TREATED ???

**2ND ACCOMMODATION REQUEST QUESTIONS:**

THEY ARE ASKING FOR MORE MEDICAL INFO, ALTHOUGH THERE IS DOCTOR-PATIENT CONFIDENTIALITY

1-IN THE EMPLOYER NOTIFICATION FROM THE JUNE 7, 2023, APPOINTMENT; IT WAS RECOMMENDED THAT MR. KRIMAN WORK FROM HOME FOR 3-6 MONTHS. IS THIS ACCOMMODATION TEMPORARY OR PERMANENT, IF TEMPORARY PLEASE PROVIDE THE EXPECTED DURATION?

2-THE ASSOCIATE IS ON A HYBRID SCHEDULE, WHERE HE IS SCHEDULE TO WORK FROM HOME 2 DAYS A WEEK, WITH EXPECTED ATTENDANCE IN OFFICE FOR 3 DAYS A WEEK.

2A- ARE THERE ANY ACCOMMODATIONS OR MEASURES THAT CAN MITIGATE THE RECOMMENDATION TO WORK FROM HOME?

2B- CAN MR. KRIMAN WORK IN THE OFFICE ONE DAY A WEEK AND GRADUALLY PROGRESS TO WORKING 3-DAYS A WEEK IN OFFICE. IF SO, WHAT ACCOMMODATIONS CAN BE MADE IN THE WORKPLACE TO ALLOW HIM TO RETURN?

3-PLEASE PROVIDE ANY OTHER ADDITIONAL RELEVANT INFORMATION REGARDING MR. KRIMAN'S MEDICAL CONDITION AND/OR WORK RESTRICTIONS THAT MAY ASSIST US WITH DETERMINING APPROPRIATE REASONABLE ACCOMMODATIONS FOR HIM.

IT IS A VIOLATION OF "ADA" POLICY TO FAIL TO PROVIDE REASONABLE ACCOMMODATION TO AN EMPLOYEE WHEN PRESENTING A DOCTOR'S NOTE –  2ND ACCOMMODATION WAS BEING PROCESSED WHEN FIRED

BLANK PAGE

# MR. KRIMAN WAS TERMINATED ALMOST 2 MONTHS (59 DAYS) AFTER THE 2ND PIP

ALSO, TERMINATED WHILE PROCESSING 2ND FMLA/ACCOMMODATION REQUEST AND 2 WEEKS AFTER APPLYING TO ANOTHER INTERNAL JOB

# TERMINATED ALMOST 2 MONTHS AFTER ENDING OF THE 2ND PIP

## 1ST PCD



## PIP AFTER THE PCD



BOUZEK PORTRAYS MR.KRIMAN AS AN AWFUL UNDERPERFORMING EMPLOYEE.

IF THAT IS THE CASE, BOUZEK COULD HAVE FIRED MR. KRIMAN AFTER THE 60-DAY PCD AND ALSO FIRED HIM RIGHT AFTER THE 60-DAY PIP, BUT HE DID NOT.

THEREFORE WE CAN CONCLUDE THAT BOUZEK WAS SATISFIED WITH MR. KRIMAN's PERFORMANCE.

**YET, ALMOST 2 MONTHS AFTER THE END OF THE PIP (59 DAYS), BOUZEK TERMINATES MR. KRIMAN ???**

THIS IS CLEARLY A RED FLAG, AN INDICATOR THAT THE SO-CALLED PERFORMANCE ISSUES WERE PART OF THE "CONSTRUCTIVE TERMINATION" EFFORTS TO FORCE MR. KRIMAN TO RESIGN.

FROM 6/28/23 60-DAYS IS 8/26/23.

AND MR. KRIMAN WAS TERMINATED ON 10/23/23, WHICH IS 59 DAYS AFTER THE PIP HAD ENDED

# MR. KRIMAN REQUESTED IN-WRITING THE RESULTS OF THE HR INVESTIGATION, BUT HR REFUSED

**From:** Alexandro Kriman <Alexandro.Kriman@veyerlogistics.com>
**Sent:** Wednesday, September 27, 2023 10:23 AM
**To:** Lillian Tamer <Lillian.Tamer@theodpcorp.com>
**Subject:** Re: Re:

Hello Lillian,

Regarding your Monday 9/25/23 phone call from number 424-391-6262 at 10:31 AM about the investigation's results finding no discrimination and retaliation.
For my records, could you please provide in writing the results of the investigation, as well as your comment about ODP welcoming my application to other roles across the organization.

Also, during the call, you mentioned that the 209 training courses that have been assigned to me were actually requested by me.
With that said, I would appreciate if you could explain how you came up with that conclusion, although I have been very clear in my emails that all the 209 courses were richard's idea and have been assigned by richard.
Besides, any supervisor assigning more than 10 courses in the last 6 months or so to another employee, should already be a red flag indicator for HR regarding discrimination and retaliation.

In fact, my 8/28/23 email textually said:
On 8/16/23 I notified you that Richard has given me 180 microsoft courses and asked me to complete 5 courses each week (this is still ongoing). Then after the 6/28/23 PIP, on 7/11 he added 15 Aspire courses covering about 19 hours of training to be finished by 8/3/23. Now, on 8/14/23 he further added another 14 Aspire courses totaling about 15+ hours of training, where 4 courses have to be finished by 8/20/23 and 10 courses to be finished by 8/27/23. This means that in the last 6 months or so, I have been officially given 180+15+14=**209** training courses to complete.

Furthermore, for the record, on 9/26/23 I had a meeting with richard, and although I had just returned from the other side of the world due to bereavement, not to mention that I am also sick (as you heard in my voice during your 9/25/23 call) he goes right into business to find out what I got for him, asking do you have this and that ready. The lack of positive supervisory characteristics in richard are eminent e.g. (being compassionate, supportive, a role model/teacher, fairness, respect, ethical behavior). Instead, a fair description of richard is being a "ruthless watchdog micromanager", which is not the kind of supervisor that a leading organization like ODP should be supporting, if the organization is looking to have long-term success.

Regards.

> MR. KRIMAN REQUESTED SEVERAL TIMES A WRITTEN STATEMENT FROM HR MENTIONING WHAT WAS SAID OVER THE PHONE TO MR. KRIMAN REGARDING THE HR INVESTIGATIONS' RESULTS.
>
> HOWEVER, HR REFUSED TO PROVIDE THINGS IN WRITING BY INDICATING THAT IT WAS ALL CONFIDENTIAL INFORMATION.
>
> ISN'T IT INTERESTING, THEY CAN TELL MR. KRIMAN THINGS OVER THE PHONE, BUT THEY CAN'T PROVIDE THE SAME INFORMATION IN WRITING ???

AS YOU CAN SEE IN THE EMAIL, HR EVEN ATTEMPTED TO SAY THAT MR. KRIMAN ASSIGNED TO HIMSELF 209 ONLINE COURSES. HOWEVER, AFTER MR. KRIMAN INDICATED THAT HE HAS REPEADTEDLY SAID THAT BOUZEK ASSIGNED THOSE TO HIM AND MADE REFERENCE TO THE 8/28/23 EMAIL, THEN HR REMAINED SILENT ABOUT THAT SPECIFIC ISSUE.

LESS THAN 1 MONTH AFTER TERMINATING MR. KRIMAN, OFFICE DEPOT POSTED A ROLE TO REPLACE MR. KRIMAN

AND YOU WOULDN'T BELIEVE WHAT WE FOUND

# 1 MONTH AFTER TERMINATION MR. KRIMAN, ODP STARTS TO LOOK FOR A MANAGER TO REPLACE HIM

## THE ROLE REQUIRES ENGLISH SKILLS AND IT WAS OFFERING A "MANAGER" JOB TITLE

On 11/21/23 after terminating Mr. Kriman on 10/23 (not even a month after Mr. Kriman's termination), OD posted an "Analytics **Manager**" role (req ID 79180) to replace Mr. Kriman.

As of 11/22/23 out of a total of 140 OD job listings across the USA involving a MANAGER job title, there are only 5 "business development manager roles, ID 77326" (basically cold calling jobs) asking for English skills plus the role to replace Mr. Kriman also asking for English skills, which is very suspicious.

In fact, we have documented a recently listed role (WMS Implementer and Trainer (supply chain -ID 74591) listed at the same Grand prairie location that requires software system development but interestingly doesn't mention English skills.

This is because the Analytics Manager role to replace Mr. Kriman is there to fulfill the needs of the SVP and it is expected to interact with SVP Miller, who didn't like Mr. Kriman's accent.

This new job posting means that OD had the money and the job title to provide growth opportunities, but not for Mr. Kriman. Indeed, this is also a huge red flag that can't be denied.

https://careers.theodpcorp.com/jobs/13632345-analytics-manager-supply-chain-hybrid

**WMS Implementer and Trainer (Supply Chain) HYBRID**
Location: 2220 N Highway 360, Grand Prairie, TX, United States
Date Posted:
Aug 18, 2023

Requisition Number: 74591

INTERESTINGLY, MOST ODP ROLES DO NOT SPECIFY English (Reading, Writing, and Verbal)....SUCH AS THE ABOVE WMS IMPLEMENTER AND TRAINING.



**THE ROLE TO REPLACE MR. KRIMAN UNUSUALLY SPECIFIED** English (Reading, Writing, and Verbal)

SO, MR. KRIMAN WORKED FOR ODP FOR OVER 3 YEARS AND TALKED WITH HIS SUPERIORS ABOUT BETTER OPPORTUNITIES WITHIN THE ORGANIZATION AND EVEN TO BE TRANSFERRED TO STAY AWAY FROM BOUZEK.

INSTEAD, THEY FIRED HIM AND LESS THAN 30 DAYS LATER THEY POSTED A ROLE TO REPLACE HIM, BUT WITH A MANAGER JOB TITLE THAT DEMANDED ENGLISH SKILLS.
ISN'T THIS INTERESTING ???



# MALICIOUS INTENTIONAL DEFAMATION-LIBEL

AFTER TERMINATION, OFFICE DEPOT HAS BEEN REPORTING THAT I WORKED FOR THEM FROM 7/2020 UNTIL 12/2021. HENCE WHO KNOWS HOW MANY JOB OPPORTUNITIES I HAVE LOST BECAUSE OF THIS - MY DATES OF EMPLOYMENT WERE 7/2020 UNTIL 10/2023 (ALMOST 3.5 YEARS, NOT 17 MONTHS).

SEE BELOW SCREENSHOT PROVIDED BY A POTENTIAL EMPLOYER THAT SHARED THE BELOW INFORMATION WITH ME:



**Verified Information**

Office Depot

The Work Number For Everyone

On-Line Verification

800-367-5690

6600 N.Military Trail

Boca Raton

Florida

Analyst, Sr. Financial

07/2020

12/2021

Information Current As Of: 12/2021 Total Time With Employer: 1 Years, 0 Months
Status: No Longer Employed
Name: Alexandro Kriman

This is recorded as proof in 9/8/2024 email, although we notified Odepot on email of 12/3/2023 about my employment dates. Basically, they continued to provide wrong employment information.

**THERE IS A TRAIL OF RETALIATION COMING FROM OFFICE DEPOT, IT IS HARD TO BELIEVE THAT THIS WAS ANOTHER UNINTENTIONAL MISTAKE ???**



# CONCLUSION - RECAP COMPARISON

## MR. KRIMAN UNDER SVP MILLER

- MR. KRIMAN WAS THE MASTERMING, ORCHESTRATOR, CREATOR THAT TRANSFORMED ANALYTICS AND SVP MILLER SUPPORTED HIM

- MANAGED ANALYTICS, AND RECRUITED AND MANAGED BOUZEK AS PER SVP MILLER INSTRUCTIONS

- WAS THE CONTACT PERSON FOR ANALYTICS AND WAS CONSIDERED PART OF SVP MILLER's LEADERSHIP TEAM

- MR. KRIMAN's TYPICAL ACTIVITIES WERE WORKING ON DASHBOARDS, COMMUNICATING WITH EXECUTIVES IN THE USA & CANADA, INSTRUCTING BOUZEK, TROUBLESHOOTING, STRATEGIZING ON THE ANALYTICS DIRECTION, ENVISIONING NEW PROJECTS, DEALING WITH BUDGET ISSUES AND CONTRACTORS, DEVELOPING POLICY AND GUIDELINES

- HAD COMPLETE ACCESS TO ANYTHING HE NEEDED WITH SVP MILLER's SUPPORT

- SVP MILLER TRUSTED MR. KRIMAN TO DEVELOP ANY PROJECT HE NEEDED RELATED TO ANALYTICS

- SVP TRUSTED MR. KRIMAN, SO THEY WOULD SPARSELY MEET WITH SVP MILLER TO REPORT ON THE STATUS QUO

- MR. KRIMAN RECEIVED FROM SVP MILLER CHRISTMAS GIFTS AND IS INVITED TO TEAM ACTIVITIES WITH OTHER EXECUTIVES

- MR. KRIMAN IS TOLD THAT HE CAN WORK AS HE PLEASES FROM EITHER HOME OR FROM THE OFFICE

AS YOU CAN SEE, ALTHOUGH MR. KRIMAN HAD AN ANALYST JOB TITLE, HE WAS IN REALITY CONDUCTING EXECUTIVE-LEVEL RESPONSIBILITIES

## MR. KRIMAN UNDER BOUZEK

- IMMEDIATELY, BOUZEK INSTRUCTED MR. KRIMAN TO DROP EVERYTHING HE WAS WORKING ON, INCLUDING IDEAS OR PERIFERIAL PROJECTS

- BOUZEK INSTRUCTED MR. KRIMAN TO "ONLY DO AS TOLD" AND NOTHING MORE

- IMMEDIATELY BOUZEK RESTRICTED MR. KRIMAN ACCESS TO DATABASES AND POWER BI, ALTHOUGH IT WAS MR. KRIMAN THAT DEVELOPED THE OVERALL POWER BI INFRASTRUCTURE WITH HIS OWN HANDS

- BOUZEK ISOLATED MR. KRIMAN FROM THE REST OF THE TEAM, THERE WAS ZERO COMMUNICATION BETWEEN THE REST OF THE TEAM AND MR. KRIMAN

- BOUZEK DID NOT COMMUNICATE TO MR. KRIMAN THE NEW PLANS FOR ANALYTICS, ALTHOUGH HE IS PART OF THE TEAM. HE SIMPLY TREATED MR. KRIMAN AS AN ORDER TAKER, ASKING HIM TO WORK ON VERY SPECIFIC THINGS

- MR. KRIMAN NO LONGER COMMUNICATED WITH EXECUTIVES OR OTHER EMPLOYEES, UNLESS IT WAS SPECIFICALLY ASKED BY BOUZEK

- SVP MILLER STOPPED ALL COMMUNICATION WITH MR. KRIMAN, BECAUSE OF BOUZEK

- MR. KRIMAN NO LONGER RECEIVED FROM SVP MILLER CHRISTMAS GIFS, OR HAPPY BIRTHDAY EMAILS, AND WAS NO LONGER INVITED TO TEAM ACTIVITIES BY SVP MILLER

- MR. KRIMAN IS REQUIRED TO WORK A MINIMUM OF 10 HOURS PER DAY AND WEEKENDS IF NEEDED

- MR. KRIMAN IS REQUIRED TO WORK AT LEAST 3 TIMES PER WEEK FROM THE OFFICE

- MR. KRIMAN IS REQUIRED TO HAVE "DAILY" 1-1.5 HOURS MEETINGS WITH BOUZEK TOGETHER WITH SENDING "DAILY" EMAILS TO BOUZEK TO REPORT DAILY ACTIVITY

- MR.KRIMAN WAS GIVEN 209 ONLINE LEARNING COURSES BY BOUZEK

AS YOU CAN SEE, MR. KRIMAN WAS NOT ONLY REMOVED FROM ALL HIS PREVIOUS RESPONSIBILITIES, BUT WAS ALSO ISOLATED, AND HAND-CUFFED WITH DEMANDS



SO, MR. KRIMAN GOES FROM REPORTING TO A SVP AND HAVING EXECUTIVE-LEVEL RESPONSIBILITIES.....TO REPORTING TO A MANAGER THAT BASICALLY HAND-CUFFED HIM AND ISOLATED HIM.

YET, ODP TRIES TO TURN THIS AROUND TO BLAME MR. KRIMAN

# CONCLUSION - MR. KRIMAN WAS THE ONLY ONE AFFECTED BY THE SO-CALLED UNFORTUNATE ORGANIZATIONAL CHANGES

IT IS A NO-BRAINER, SVP MILLER SHOULD HAVE EASILY REALIZED/KNOWN THE NEGATIVE IMPLICATIONS OF HIS DECISION ON MR. KRIMAN:

1. **SVP MILLER WAS AWARE ABOUT MR. KRIMAN'S PROBLEMS WITH BOUZEK:** SVP MILLER KNEW THAT MR. KRIMAN HAD FORMALLY (IN-WRITING) AND VERBALLY REPRIMANDED BOUZEK DUE TO PERFORMANCE AND OTHER ISSUES, WHICH COULD CERTAINLY PLACE MR. KRIMAN INTO A HIGH-RISK "RETALIATION" SITUATION.

2. **REPUTATION AND CAREER PROGRESSION DAMAGES:** GOING FROM REPORTING TO A SVP TO A MANAGER THAT MR. KRIMAN USED TO SUPERVISE, CAN HARM THE EMPLOYEE'S REPUTATION WITHIN THE COMPANY AND HINDER CAREER DEVELOPMENT ACROSS THE COMPANY.

3. **EMOTIONAL TOLL:** THIS TYPE OF DEMOTION CAN BE EMOTIONALLY STRESSFUL FOR AN EMPLOYEE



**SO WHY SVP MILLER DID THIS TO MR. KRIMAN ?**

THE REASON IS CALLED "CONSTRUCTIVE TERMINATION", MR. KRIMAN HAD AN EXCELLENT TRACK RECORD, SO THEY NEEDED TO FIND WAYS TO FORCE HIM TO RESIGN TO AVOID QUESTIONS AND GOSSIP.

SVP MILLER WANTED TO SQUEEZE AS MUCH KNOW-HOW AND IDEAS AS POSSIBLE FROM MR. KRIMAN AND THEN FORCE HIM TO RESIGN.

**FORCE MR. KRIMAN TO RESIGN, WHY ?**

1- IT WILL LOOK BAD IF THEY FIRED AN OVERPERFORMING EMPLOYEE, GOSSIP & QUESTIONS COULD HAVE BEEN A PROBLEM.

2- MOST IMPORTANTLY, MR. KRIMAN IS IN HIS LATE 50s SO HE IS CONSIDERED BY SVP MILLER (AND BY THE COMPANY) UNUSABLE TO BE PROMOTED FOR THE LONG TERM (NOT TO MENTION HIS ACCENT)

3- SVP MILLER WANTED TO CONCEAL MR. KRIMAN'S CONTRIBUTIONS. MR. KRIMAN SINGLE-HANDED UNVEILED AND SOLVED MANY PROBLEMS (AND WITHOUT MUCH EXPERIENCE IN SUPPLY CHAIN) AND ONLY HAD AN "ANALYST" JOB TITLE. IF THIS BECAME WIDELY KNOWN, SVP MILLER'S REPUTATION COULD HAVE BEEN DAMAGED...PEOPLE WERE ALREADY NOTICING THAT ALL THESE CHANGES HAPPENED AFTER MR. KRIMAN ARRIVAL TO ODP.

4- THIS WAS ALSO A GREAT OPPORTUNITY FOR BOUZEK TO RETALIATE AGAINST MR. KRIMAN AND TO TAKE OVER MR. KRIMAN'S WORK AND IDEAS, SO AS TIME PASSES BY, PEOPLE WILL FORGET ABOUT MR. KRIMAN AND BOUZEK CAN TAKE CREDIT FOR MR. KRIMAN'S WORK.

IT MAKES PERFECT SENSE, SVP MILLER HAD A PRIVATE AGENDA TO EXPLOIT MR. KRIMAN AND THEN GET RID OF HIM, AND BOUZEK BECAME SVP MILLER'S **"AGENT"** WHO WAS DELIGHTFUL FOR THE OPPORTUNITY TO DO SO, SO HE CAN ALSO FULFILL HIS OWN PRIVATE AGENDA TO TAKE CREDIT FOR MR. KRIMAN's WORK AND RETALIATE AGAINST HIM.

INDEED, THIS MAKES SENSE, BECAUSE AFTER BOUZEK MANAGED MR. KRIMAN, SVP MILLER NEVER EVEN TRY TO CONTACT MR. KRIMAN AND ASK...HOW ARE THINGS GOING ALEX, IS BOUZEK TREATING YOU WELL ???.

# FAMILY FUNERAL-BEREAVEMENT, NO REDUCTION IN WORKLOAD AND MEETINGS

To:
Richard Bouzek
Wed 9/6/2023 10:03 AM
Hello Richard,

Thank you for your kind words.

My father-in-law passed away, so I will need to take bereavement leave to deal with traveling arrangements and cope with these family matters.

With that said, I will need to utilize the bereavement days on 9/7 and 9/8, as well as 9/21 and 9/22.

Also, because of traveling, I need to take PTO today 9/6/23 from 11 AM until 2 PM (you will receive an email from Kronos)

With that said, could you please email me what you need for me to work on, so I can start working on things before our 9/11 @ 1:30 meeting.

Changing the topic, I have been trying to manually refresh D&D and Fill Rate 1.2 because they indicate next refresh on 9/6, although it should say 9/7.

Let me know.

Thanks.



# IF THERE IS ANY ITEM IN THIS PRESENTATION THAT IS DIFFICULT TO READ OR UNDERSTAND, DO NOT HESITATE TO CONTACT MR. KRIMAN TO PROVIDE AN EASIER TO READ ITEM.